UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CRIMINAL NO. 14CR10363 |
| ) | |
| Plaintiff, ) | |
| ) | ORAL ARGUMENT REQUESTED |
| v. ) | |
| ) | |
| (1) BARRY J. CADDEN, ) | |
| (2) GLENN A. CHIN, ) | |
| (3) GENE SVIRSKIY, ) | |
| (4) CHRISTOPHER M. LEARY, ) | |
| (5) JOSEPH M. EVANOSKY, ) | |
| (6) SCOTT M. CONNOLLY, ) | |
| (7) SHARON P. CARTER, ) | |
| (8) ALLA V. STEPANETS, ) | |
| (9) GREGORY A. CONIGLIARO, ) | |
| (10) ROBERT A. RONZIO, ) | |
| (11) KATHY S. CHIN, ) | |
| (12) MICHELLE L. THOMAS, ) | |
| (13) CARLA R. CONIGLIARO, ) | |
| (14) DOUGLAS A. CONIGLIARO ) | |
| ) | |
| Defendants ) | |
| ) | |

## DEFENDANTS' CONSOLIDATED MOTION FOR BILL OF PARTICULARS

Defendants Barry Cadden, Glenn Chin, Gene Svirskiy, Christopher Leary, Joseph Evanosky, Scott Connolly, Sharon Carter, Alla Stepanets, and Robert Ronzio (the "Defendants") respectfully request, pursuant to Federal Rule of Criminal Procedure 7(f) and the Fifth and Sixth Amendments to the United States Constitution, that this Court order the government to provide a bill of particulars.

## INTRODUCTION

Counts 1 through 3 of the Indictment are not sufficiently particular to allow Defendants to prepare their defense and avoid surprise at trial.  In broad terms, these counts accuse Defendants of committing and conspiring to commit racketeering (Counts 1 and 2) and conspiring to defraud the United States (Count 3), in carrying out their everyday job duties over many years.  *See* Indictment at Count 1 ¶¶ 36(a)–(g), 37(a)–(f), 38; Count 2 ¶¶ 73–75; Count 3 ¶¶ 77–87. Although the Indictment provides some details concerning the enumerated charged racketeering and overt acts in Counts 1 and 3, it provides little to no detail about the dates, locations, or the nature and extent of the evidence pertaining to the general allegations in those counts.  These general allegations, titled the "manner and means" of the "enterprise" (Count 1) and "conspiracy" (Count 3), essentially allege that Defendants violated laws through criminally substandard performance of their otherwise legitimate job duties – and in the case of Defendants Cadden and Chin committed twenty-five predicate racketeering acts of second degree murder by doing so.  But as the Indictment currently stands, Defendants could have committed such violations *any* or *every* day they were at work during a roughly one- to fourteen-year period—the Indictment gives them no idea when or how.  The Indictment also leaves Defendants guessing as to which specific individuals, besides Defendants, supposedly were involved in the allegedly criminal activity and which specific persons or entities purportedly were victimized.  In lieu of particularized allegations sufficient to place Defendants on notice concerning these issues, the Indictment is riddled instead with generic references to unspecified "NECC staff," members of the "MSM sales force," "customers," and "others."  *See, e.g.*, Indictment ¶¶ 35, 36(f), 74, 80, 84.

After carefully analyzing the Indictment and the structure of the government's productions to no avail, Defendants each requested a bill of particulars.  In the form letter it used

to deny each Defendant's request in its entirety, the government summarily claimed that the Indictment was "sufficiently particular" and touted its "five discovery productions totaling more than 8.8 million pages," which allegedly "enable [the Defendants] to prepare [their] defense, and avoid any unfair surprise at trial." The government also generally pointed each Defendant to its production folder labeled "Indictment Counts," which it claims "contains documents most relevant to the charges [each Defendant] faces."

But the government's rote response completely ignores the serious problems Defendants face in attempting to discern the "manner and means" conduct relevant to them as individuals. The "Indictment Counts" folder appears to contain principally NECC standard-form order records (e.g., order forms, formula worksheets, invoices, verification sheets, shipping records) and, in certain instances, patient medical records that pertain specifically to the enumerated racketeering and overt acts, not to the Indictment's sweeping, generalized "manner and means" allegations. And, the government's unwillingness to provide any additional details leaves Defendants in the dark, unable to sufficiently prepare individual defenses for trial and at risk of severe prejudice. For these reasons, this Court should order the government to provide Defendants with individualized bills of particulars.[1]

## **BACKGROUND**

Defendants have all been charged in various portions of a sprawling 131-count Indictment relating to their employment at the New England Compounding Center ("NECC"). The government obtained the Indictment "in connection with" the 2012 nationwide fungal meningitis outbreak that it contends was caused by contaminated vials of preservative-free

---

[1] On August 28, 2015, this Court granted Defendants' Joint Motion for an Extension of Time to File a Consolidated Motion for Bill of Particulars until fourteen days after the government's last response to Defendants' written requests for bills of particular. Dkt #324. The government sent its last response to Defendants' requests on September 1, 2015, and this motion followed within fourteen days.

methylprednisolone acetate (MPA), an injectable steroid compounded by NECC.  Even though twelve of the fourteen defendants are not alleged to have had anything whatsoever to do with the production of MPA, the government carefully crafted the Indictment to ensure that those defendants are still hopelessly mired in the case.

This request for a bill of particulars is addressed primarily to the "manner and means" allegations of Counts 1 through 3.[2]  Count 1 alleges racketeering in violation of 18 U.S.C. § 1962(c) and is composed of seventy-eight separate racketeering acts; Count 2 (which occupies one and a half pages in the seventy-three page indictment) incorporates only the "enterprise" and "manner and means" allegations from Count 1 and alleges conspiracy to commit racketeering in violation of 18 U.S.C. § 1962(d); and Count 3 alleges a conspiracy to defraud the United States in violation of 18 U.S.C. § 371.  Counts 1 and 3 are structured similarly; Count 1 contains general allegations of Defendants' racketeering activity and separately alleges specific racketeering acts, and Count 3 contains general allegations of Defendants' fraudulent activity and separately alleges specific overt acts of fraud. Count 2 simply incorporates by reference the "enterprise" and "manner and means" allegations of Count 1 but does not incorporate any of the Count 1 racketeering acts.

With respect to the Defendants who have joined in this motion, Defendant Cadden is charged in Counts 1 through 3; Defendants Chin, Svirskiy, Leary, Evanosky and Connolly are charged in Counts 1 and 2; Defendants Carter and Stepanets are charged in Counts 2 and 3; and Defendant Ronzio is charged in Count 3.  Each of these individuals was either a pharmacist

---

[2] Defendants Cadden and Chin have also made requests relating to the second degree murder racketeering predicate acts in which they alone are named in Count 1.  Specifically, as part of the RICO count, the Indictment alleges these two Defendants committed twenty-five acts of second degree murder under the laws of seven different states. Indictment, ¶¶ 56-62.  Other than rote recitation of the second degree murder standards in the seven states, the Indictment provides no further information regarding how any of the acts described in Count 1 caused the alleged contamination of the MPA at issue or the deaths of the individuals identified in racketeering acts 28-52.  Particularly in the face of such serious charges, the Defendants are entitled to detailed information regarding these allegations.

(Cadden, Chin, Svirskiy, Leary, Evanosky and Stepanets) or a pharmacy technician (Carter and Connolly), except for Defendant Ronzio, who was the NECC sales director.

Count 1 of the Indictment alleges, among other things, that Defendants Cadden, Chin, Svirskiy, Leary, Evanosky, and Connolly committed substantive racketeering violations by failing to comply with the "production" and "cleaning and disinfecting" standards published in the United States Pharmacopeia (the "USP").  Although Count 1 enumerates seventy-eight specific racketeering acts, it also charges these Defendants with racketeering for failing to meet certain unspecified USP standards on: 1) expired ingredients; 2) sterilization; 3) mixing stock solutions and labeling; 4) testing; 5) licensing; and 6) cleaning and disinfecting.  Indictment Count 1 ¶¶ 36(a)–(g), 37(a)–(f).  Some of these Defendants may have engaged in "production" and "cleaning and disinfecting practices" throughout their employment, and may have undertaken actions like "cleaning," and "mixing" regularly, sometimes daily, for the multi-year period alleged in the Indictment.

As to the USP, the Indictment fails to detail the specific provisions of the USP at issue. This lack of detail is significant in the context of a privately published, copyrighted text containing over 5,000 pages.  *See* Thirty-Fifth Revision and the National Formulary, Thirtieth Edition (2012) ("USP 35").   The USP includes monographs describing the recipe for hundreds of drugs and numerous general chapters describing frequently cited procedures, some of which are mandatory and others merely interpretive.  *Id.*, Mission and Preface, p. v; General Notices & Requirements, p. 3.  The Indictment cites USP Chapter 797, for example, but Chapter 797 contains over thirty-five pages of highly technical, complicated, and at times conflicting information.  USP 35, p. 350-386.  Furthermore, in the face of a publication produced annually

and supplemented biannually, the Indictment does not specify which version of the USP is at issue in the six-year time frame of alleged USP violations.   USP 35, Mission and Preface, p. v.

Count 2 alleges that all of the Defendants, except Ronzio, engaged in a racketeering conspiracy through their "sterilization" and "shipment authorization" activities at NECC.  Such "sterilization" and "shipment authorization" activities, as defined and described in the Indictment, occurred thousands or (quite possibly) tens of thousands of times during the years alleged in the Indictment.  The breadth and ambiguity of Count 2 is exacerbated by the fact that the government has declined to indicate whether the enumerated racketeering acts in Count 1 are alleged to be part of Count 2.  Further, Count 2 is shrouded in almost complete mystery for Defendants Carter and Stepanets, as neither is named *anywhere* in the Count 1 racketeering charge, which establishes the "enterprise" and "manner and means" upon which the Count 2 racketeering conspiracy charge seemingly rests.

Finally, Count 3 alleges that Defendants Cadden, Ronzio, Carter, and Stepanets, and one other, engaged in a conspiracy to defraud the United States by obstructing and making false statements to the FDA.  Although Count 3 alleges several specific overt acts of fraud, it also charges Cadden, Carter, Stepanets, and Ronzio with various general improprieties relating to "patient names."  As part of their regular work within NECC's shipping arm, they may have seen tens of thousands of client orders with an even greater number of individual patient names.

Despite the Indictment's expansive accusations—and in marked contrast to some of the detail provided for the specific charged racketeering and overt acts—it does not provide *any* detail about the dates, locations, or the nature and extent of the evidence pertaining to the general allegations in Counts 1 through 3. *See* Indictment at Count 1 ¶¶ 36(a)–(g), 37(a)–(f), 38; Count 2 ¶¶ 73–75; Count 3 ¶¶ 77–87.  Indeed, these allegations appear to be the narrative form of the

enumerated specific racketeering and overt acts, although the Government does not so state. This is particularly problematic where the Indictment does not provide Defendants with information to identify with any specificity the allegedly illegal conduct against which they must defend.

## **ARGUMENT**

A criminal defendant may request a bill of particulars under Fed. R. Crim. P. 7(f) to learn "detail of the charges against him where necessary to enable him to prepare his defense, to avoid surprise at trial, and to protect against double jeopardy." *United States v. Paiva*, 892 F.2d 148, 154 (1st Cir. 1989); *see also, e.g., United States v. Vaughn*, 722 F.3d 918, 926 (7th Cir. 2013) (noting that a request for a bill of particulars is appropriate "if a defendant has serious apprehension about his ability to prepare a defense in light of the charges against him."). When an indictment lacks specificity, a bill of particulars helps promote "the underlying concerns of proper pleading—notice of the charge to be met and protection against double jeopardy"—in advance of trial. *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992); *see also United States v. Fletcher*, 74 F.3d 49, 53 (4th Cir. 1996) (noting that a bill of particulars "amplifies the indictment by providing missing or additional information so that the defendant can effectively prepare for trial."). Rule 7(f) "specifically empowers the trial court to direct the filing of a bill of particulars" and gives the trial court "very broad discretion in ruling upon requests for such bills." *Will v. United States*, 389 U.S. 90, 98-99 (1967) (internal quotation marks omitted).

A bill of particulars can be especially crucial where, as here, the government charges criminal offenses under statutes as broad as RICO:

> With the wide latitude accorded the prosecution to frame a charge that a defendant has "conspired" to promote the affairs of an "enterprise" through "a pattern of racketeering activity" comes an obligation to particularize the nature of

the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope."

*United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). In *Davidoff*, the indictment charged a seven-year-long RICO conspiracy "carried out through various extortion offenses." *Id*. The indictment put the defendant on notice that he would be "obliged to defend against extortionate schemes directed at one company," but at trial, he was "confronted with evidence of extortions aimed at entirely different companies." *Id*. The defendant was convicted and the Court of Appeals reversed, holding that the trial judge should have granted a bill of particulars. *Id*. While noting that it did not "mean to imply that even in a RICO case the prosecution must always disclose every act it will prove that may violate some criminal statute," the court found it "simply unrealistic" to think that a defendant "had a fair opportunity to defend against . . . allegations not made prior to trial." *Id*.

In two relatively recent District of Massachusetts RICO cases, the court has made it clear that broad allegations require supplementation through a bill of particulars. In *United States v. Perry*, the court partially granted a bill of particulars because the 33-count, four-defendant RICO indictment was so general that it was "impossible for the defendants to identify specific interactions which form the basis of the charges against them."  No. CRIM 12-10293-DJC, 2013 WL 3158078, at *5 (D. Mass. June 19, 2013). The indictment accused the defendants of being part of a group that exerted control over a moving and trade show union for its own purposes, and alleged that the group furthered its objectives by "multiple acts of extortion . . . [on its own members and] on various business entities throughout Boston" over a multi-year span. *Id*. at *1. However, it did not specify which of the business services the group provided was the result of extortion, and which communications the defendants had "with any representatives of these companies were in furtherance of an unlawful scheme," leaving the defendants unable to

"distinguish between legitimate and allegedly illegitimate communications and employment." *Id.*
at *5. Similarly, the court granted a bill of particulars in *United States v. Asselin*, a thirteen-
defendant RICO case with a 122-count indictment, because it was "necessary to prevent surprise
and to save Defendant from undue labor in the preparation of his case." No. CRIM 04-30033-
MAP, 2005 WL 2365326 (D. Mass. Sept. 9, 2005), at *2. The court granted the request for the
bill of particulars because the particulars the defendant sought regarding the alleged bribes and
kickbacks— "i.e., identification of contracts he had or benefits he received"—were "integral to
the case against him." *Id.* at *2.

The indictment infirmities in *Perry* and *Asselin* are the same infirmities at issue here.
Here, the Indictment alleges that the Defendants violated various unspecific sections of the USP
and federal criminal law by acting in ways that would otherwise characterize their lawful, day-
to-day professional responsibilities.  Failing to cite the specific language of the USP at issue is
akin to indicting Defendants for violating 18 U.S.C. without specifying which sections were
violated.  Thus, regarding the general allegations in Counts 1 through 3, the Defendants cannot
"distinguish between legitimate and allegedly illegitimate" actions, s*ee Perry*, 2013 WL 3158078
at *5, and cannot be certain of the facts "integral to the case against [them], *see Asselin*, 2005
WL 2365326 at *2.  Further, in *Asselin*, when the government asserted that all contracts on
which Defendant bid or in which he participated (he owned and operated a contracting business)
were tainted in one way or another," the court rejected that description as "much too general in
the context of the case." *Id.*  That is precisely what the Indictment does here; it alleges that all
activities involving these Defendants' day-to-day activities are (or at least could be) racketeering
violations or acts evidencing a conspiracy to defraud the United States.

Further, the need for a bill of particulars is particularly acute where, as here, the Defendants face sweepingly broad racketeering charges. The government has described this case as the largest criminal case of its kind ever brought in the United States.[3] The Indictment includes 131 counts and fourteen defendants with varying degrees of supposed involvement in the racketeering conduct alleged—conduct the Indictment often describes in general terms, applied to groups of defendants and spanning years at a time. As currently framed, much of the conduct alleged (aside from the enumerated specific racketeering and overt acts) could have occurred *any time* the Defendants were at work during a multi-year period. Without a bill of particulars, there is no way for them to discern the conduct that will be at issue at trial, which could in turn jeopardize the fairness of the trial itself.

In its general allegations in Counts 1 through 3, the Indictment simply provides the approximate time frame (invariably phrased as "beginning in at least [year] and continuing until in or around [month, year]") and a generalized description of the Defendants' behavior. Aside from the enumerated racketeering acts in Count 1 and overt acts in Count 3, the Indictment offers no clue about the acts underlying the general allegations.  Indeed, the Government has declined even to indicate whether the enumerated specific racketeering acts in Count 1 are alleged to be part of Count 2. This is particularly troubling for Defendants Carter and Stepanets, given that they are not identified in *any* of the enumerated racketeering acts in Count 1, yet are charged in Count 2.

Contrary to the Government's rote justification for declining Defendants' requests for a bill of particulars, the Government's voluminous discovery productions in this matter are "no substitute for adequate specification."  *United States v. Trie*, 21 F. Supp. 2d 7, 21 n.12 (D.D.C.

---

[3] *See, e.g.,* Denise Lavoie, *14 charged in deadly 2012 meningitis outbreak*, Associated Press (Dec. 18, 2014) ("U.S. Attorney Carmen Ortiz called [this case] the biggest criminal case ever brought in the U.S. over contaminated medicine.").

1998) (granting request for bill of particulars despite government's production of 1.9 million pages of documents); *see also Davidoff*, 845 F.2d at 1155 (holding that government could not rely on production of 6,000 pages of materials to avoid providing bill of particulars); *United States v. Savin*, No. 00-cr-00045-RWS, 2001 WL 243533, at *3 (S.D.N.Y. Mar. 7, 2001) (granting request for bill of particulars despite government's production of a "veritable mountain of documents").

The government cannot predicate sweeping criminal charges on generalized allegations that encompass Defendants' day-to-day (lawful) job functions, and then claim that such charges are "sufficiently particular" because the details underlying the allegations exist somewhere in several million pages of documents produced in discovery.  To the contrary, the voluminous automatic discovery and subsequent document productions the government has provided in this case—totaling over 8.8 million pages of documents—actually *underscore* the need for specificity regarding the general "allegations" in Counts 1 through 3.  *See United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987); *see also, e.g.*, *United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010) (noting that the "district court made clear that it ordered a bill of particulars because so much discovery was produced to the defendants, not too little"); *United States v. Aispuro*, No. CR 08-2936 JB, 2010 WL 1404196, at *7 (D.N.M. Mar. 16, 2010) ("The Court also finds persuasive the Defendants' argument that, in a complex case with voluminous unorganized discovery, a bill of particulars is particularly necessary to avoid surprise at trial."); *United States v. Mahaffy*, 446 F. Supp. 2d 115, 120  (E.D.N.Y. 2006) ("[A] large volume of discovery warrants a bill of particulars if it obfuscates the allegedly unlawful conduct and unfairly inhibits the defendant's preparation for trial."); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 234

(S.D.N.Y. 2000) ("[S]ometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars.").

The decision in *United States v. Bortnovsky* is instructive here. There, the Second Circuit reversed a guilty verdict in a fraud and racketeering trial due to the trial court's failure to grant a bill of particulars identifying the documents the government intended to prove fraudulent. 820 F.2d at 574. Although the government provided "mountains of documents to defense counsel," defense attorneys "were left unguided as to" the specifics of the alleged fraud, leaving "[t]he relevance of key events . . . shrouded in mystery at the commencement and throughout the trial." *Id*. at 574–75. This left defendants unable to prepare adequately for trial and impermissibly shifted the burden of proof by forcing defendants to "explain . . . events . . .  and confront numerous documents unrelated to the charges pending." *Id*. at 575. There, as here, a bill of particulars was "vital to [defendants'] understanding of the charges pending and to the preparation of a defense." *Id*. at 575.[4]

## **REQUESTS**

The Defendants' request is straightforward and consistent with the requests and relief provided in *Perry* and *Asselin*: for the general allegations in Counts 1, 2, and 3,  Defendants ask this Court to order the government to identify the date(s), location(s), nature and evidence pertaining to each act underlying the allegation as it pertains to each Defendant.  If, however, the allegations in the Indictment are confined to the enumerated acts identified in Count 1 and Count

---

[4]The government's rejoinder, which points Defendants to a production folder labeled "Indictment Counts," which the government characterizes as containing documents "most relevant to the charges [each Defendant] faces," is unavailing.  The "Indictment Counts" folder largely contains order records and patient records pertaining to the Indictment's enumerated racketeering and overt acts.  The folder provides no guidance or clarity concerning the Indictment's generalized "manner and means" allegations, including the meager 1 ½ pages that comprise Count 2's RICO conspiracy charge.

The government also has indicated that it plans to take issue with this motion not having been filed within fourteen days of the Indictment.  However, Defendants should not be faulted for believing, as the government continues to claim, that the discovery might answer their questions and therefore seeking answers in the discovery before asking for the Court's assistance.

3, the Government should state that as well.  The Government should also state whether the enumerated acts in Count 1 carry over to Count 2.

More specifically, Defendants ask this Court to order the government to provide a bill of particulars that furnishes the following information for each of the below paragraphs in the Indictment (and for each Defendant named therein):

### Count One, Paragraphs 35 Through 37

*MSM's Representations to Customers*

1. ¶ 35: Cadden: The date(s), location(s), nature and evidence of each time that the government alleges that Mr. Cadden "instructed the MSM sales force to falsely represent to customers that NECC was providing the highest quality compounded medications;" that MSM's sales force and marketing materials falsely claimed that NECC was USP-797 compliant; and that NECC had a "strictly enforced environmental monitoring program and a comprehensive end-product testing program for its drugs."

*Expired Ingredients*

2. ¶ 36 (a): Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "used, caused others to use, and approved the use of expired and expiring ingredients in the compounding of purportedly sterile drugs in violation of USP-797," and/or "completed, caused others to complete, and approved the completion of written documentation with fictitious expirations dates."

3. ¶ 36 (b): Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "used, caused others to use, and approved the use of expired and expiring stock solutions in the compounding of purportedly sterile drugs and to fill customer orders in violation of USP-797," and/or "labeled, caused others to label, and approved the labeling of the final drugs with a new NECC lot number and BUD."

*Sterility*

4. ¶ 36(c): Cadden, Chin, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "failed and caused others to fail to properly sterilize drugs in violation of USP-797," in particular by autoclaving drugs "for less than the 20-minute duration identified in NECC's formulation worksheets for specific drugs and USP-797," and/or that the named Defendant "never verified and caused others to verify the effectiveness of the sterilization process through the use of a biological indicator as required by USP-797."

### *Mixing Stock Solutions and Drug Labeling*

5.        ¶ 36(d): Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "mixed, caused others to mix, and approved the mixing of stock solutions of different drug lots to fill customer orders in violation of USP-797," and "falsely labeled, caused others to falsely label, and approved the false labeling of drugs sent to customers with either the newer lot number in the case of an expiring older lot, or the older lot in the case of an untested newer lot"; and for custom drug products, that the named Defendant "labeled, caused other to label, and approved the labeling of drugs sent to customers with a new, third NECC lot number of the specific customer order."

### *Sampling*

6.        ¶ 36(e): Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant: 1) "failed and caused others to fail to properly test drugs for sterility in violation of USP-797," in particular by taking "only two samples of each batch…for testing regardless of the size of the batch" and sending "only one of the two samples… for sterility testing;" and 2) "sampled, caused others to sample, and approved the sampling from batches of stock solutions, and not the filled vials of drugs that NECC shipped to customers for patient use."

7.        ¶ 36(f): Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "caused shipments to NECC customers of purportedly sterile drugs that were never tested and for which test results had not yet been received."  In particular, identify the date(s), location(s), nature and evidence of any such acts by each named Defendant *other than* as alleged in the related enumerated Racketeering Acts 53-63.

### *Licensing*

8.        ¶ 36(g): Cadden, Chin, Svirskiy and Connolly.  The date(s), location(s), nature and evidence of each time the government alleges that the Defendant Connolly: 1) "worked as a pharmacy technician in Clean Room 2 filling cardioplegia drugs for hospital customers;" 2) "supervised the other pharmacy technicians in Clean Room 3" and "conceal[ed] his presence from regulators … [by] operat[ing] the equipment in Clean Room 2 using Defendant Cadden's name and password;" 3) "was not administered a media-fill test to verify his aseptic technique."  Defendant Svirskiy requests the date(s), location(s), nature and evidence of each time the Government alleges that he knew about Defendant Connolly's unlicensed status, and that Mr. Svirskiy supervised Scott Connolly.

### *Cleaning and Disinfecting*

9.        ¶ 37(a):  Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "failed and

caused others to fail to properly clean and disinfect Clean Rooms 1 and 2 as required by USP-797."

10.     ¶ 37 (b):  Chin.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "instructed pharmacy technicians working in Clean Room 1 to prioritize production over cleaning and disinfecting."

11.     ¶ 37 (c):  Chin.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendant "instructed pharmacists and pharmacy technicians working in Clean Room 1 under his supervision to fraudulently complete cleaning logs at the end of the month purporting to show that NECC Clean Room 1 was properly cleaned and disinfected."

12.     ¶ 37 (e):  Cadden, Chin, Svirskiy, Leary and Evanosky.  The date(s), location(s), nature and evidence of each time the government alleges that the named Defendants "were notified of action-level sampling hits from the Clean Room 1 rooms."

### *The Racketeering Violation*

13.     ¶ 38:  Cadden, Svirskiy, Leary, Evanosky, and Connolly.  The date(s), location(s), nature and evidence of any involvement or participation, whether direct or indirect, that each named Defendant is alleged to have had in Racketeering Acts 1-52.

### *The Methylprednisolone Acetate*

14.     ¶¶ 43-54: Cadden.  The date(s), location(s), nature and evidence of each time the government alleges that Defendant Chin committed the actions detailed in ¶¶ 43-54, and that Defendant Cadden knew of and/or directed those actions, including:

    (a)     Defendant Chin "with the knowledge of [D]efendant (1) Cadden, attempted to sterilize the 05212012@68 lot in the autoclave for 15 minutes and 4 seconds, rather than the 20 minutes as stated in the written formula instructions and USP-797," and/or "did not verify the sterilization process used for the 05212012@68 lot through the use of a biological indicator as required by USP-797," as alleged in ¶ 43 of the Indictment;

    (b)     Defendant Chin "filled two 5 milliliter vials from the batch of the 05212012@68 lot to be sent to an independent laboratory for sterility testing . . . and based on a single 5 milliliter vial, the independent laboratory issued a report indicating that the 05212012@68 lot was sterile," and/or Defendant Chin "with the knowledge of [D]efendant (1) Cadden, did not conduct any sterility testing of the filled vials of the 05212012@68 lot, which NECC shipped to customers for patient use," as alleged in ¶ 44 of the Indictment;

    (c)     Defendant Chin "with the knowledge of [D]efendant (1) Cadden, directed pharmacy technicians and other NECC personnel to label the vials filled with the 05212012@68 lot as injectable," as alleged in ¶ 45 of the Indictment;

(d)    Defendant Chin "with the knowledge of Defendant (1) Cadden, directed that filled vials of the 051212012@68 lot be sent out of Clean Room 1 for shipment," as alleged in ¶ 46 of the Indictment;

(e)    Defendant Chin "with the knowledge of [D]efendant (1) Cadden, attempted to sterilize the 06292012@26 lot in the autoclave for 15 minutes and 4 seconds, rather than 20 minutes as stated in the written formula instructions and USP-797," and/or "did not verify the sterilization process used for the 06292012@26 lot through the use of a biological indicator as required by USP-797," as alleged in ¶ 47 of the Indictment;

(f)    Defendant Chin "filled two 5 milliliter vials from the batch of the 06292012@26 lot to be sent to an independent laboratory for sterility testing . . . and based on a single 5 milliliter vial, the independent laboratory issued a report indicating that the 05212012@68 lot was sterile," and/or "with the knowledge of [D]efendant (1) Cadden, did not conduct sterility testing of the filled vials of the 06292012@26 lot, which NECC shipped to customers for patient use," as alleged in ¶ 48 of the Indictment;

(g)    Defendant Chin "with the knowledge of [D]efendant (1) Cadden, directed pharmacy technicians and other NECC personnel to label the vials filled with the 06292012@26 lot as injectable," as alleged in ¶ 49;

(h)    during the time that the 05212012@68 and 06292012@26 lots were compounded and filled "NECC recorded action-level environmental sampling results every week in the Clean Room 1 rooms but did not take any action to remediate the issues as required by USP-797," as alleged in ¶¶ 45 and 49;

(i)    Defendant Chin "with the knowledge of Defendant (1) Cadden, directed that filled vials of the 06292012@26 lot be sent out of Clean Room 1 for shipment," as alleged in ¶ 50 of the Indictment;

(j)    Defendant Chin "with the knowledge of [D]efendant (1) Cadden, attempted to sterilize the 08102012@51 lot in the autoclave for 15 minutes and 4 seconds, rather than 20 minutes as stated in the written formula instructions and USP-797," and/or "did not verify the sterilization process used for the 08102012@51 lot through the use of a biological indicator as required by USP-797," as alleged in ¶ 51 of the Indictment;

(k)    Defendant Chin "filled two 5 milliliter vials from the stock of the 08102010@51 lot to be sent to an independent laboratory for sterility testing" and "based on a single 5 milliliter vial, the independent laboratory issued a report indicating the 08102012@51 was sterile," and/or Defendant Chin "with the knowledge of [D]efendant (1) Cadden, did not conduct sterility testing of the filled vials of the 08102012@51 lot, which NECC shipped to customers for patient use," as alleged in ¶ 52 of the Indictment;

(l)      Defendant Chin "with the knowledge of [D]efendant (1) Cadden, directed pharmacy technicians and other NECC personnel to label the vials filled with the 08102012@51 lot as injectable," as alleged in ¶ 53 of the Indictment;

(m)      "during the time that the 08102012@51 lot was compounded and filled, NECC recorded action-level environmental sampling hits every week in the Clean Room 1 rooms but did not take any action to remediate the issues as required by USP-797," as alleged in ¶ 53 of the Indictment; and

(n)      Defendant Chin "with the knowledge of Defendant (1) Cadden, directed that filled vials of the 08102012@51 lot be sent out of Clean Room 1 for shipment," as alleged in ¶ 54 of the Indictment.

## *Second Degree Murder RICO Predicate Acts 28-52*

15.     ¶ 56: Cadden and Chin. The date(s), location(s), nature and evidence of each time that the government alleges that the named defendants " acting in wanton and willful disregard of the likelihood that the natural tendency of [his] actions would cause death or great bodily harm, caused the deaths of the individuals" listed in Racketeering Acts 28-35;

16.     ¶ 57: Cadden and Chin. The date(s), location(s), nature and evidence of each time the government alleges that the named defendants "knowingly, that is, acting with an awareness that [his] conduct was reasonably certain to cause death, and unlawfully killed the individuals" listed in Racketeering Acts 36-42;

17.     ¶ 58: Cadden and Chin.  The date(s), location(s), nature and evidence of each time the government alleges that the named defendants "knowingly, that is, acting with an awareness of a high probability that [his] conduct would result in death, killed the individuals" listed in Racketeering Acts 43-45;

18.     ¶ 59: Cadden and Chin. The date(s), location(s), nature and evidence of each time the government alleges the named defendants "created a very high degree of risk to the lives of the individuals listed [in Racketeering Acts 46-48], and, conscious of such risk, acted with extreme disregard of the life-endangering consequences, thereby causing the deaths of the individuals" listed in Racketeering Acts 46-48, as alleged in ¶ 59 of the Indictment;

19.     ¶ 60: Cadden and Chin. The date(s), location(s), nature and evidence of each time the government alleges the named defendants "willfully and purposefully embarked upon a course of wrongful conduct likely to cause death and great bodily harm, and unlawfully killed the individuals" listed in Racketeering Acts 49-50, as alleged in of the Indictment;

20.     ¶ 61: Cadden and Chin. The date(s), location(s), nature and evidence of each time the government alleges the named defendants "acting imminently dangerous to another and demonstrating a depraved mind without regard for human life, unlawfully killed the individual" listed in Racketeering Act 51;

21.     ¶ 62: Cadden and Chin. The date(s), location(s), nature and evidence of each time the government alleges the named defendants "acting in a manner inherently dangerous to

human life to recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief, unlawfully killed the individual" listed in Racketeering Act 52;

22.     ¶¶ 56-62: Cadden and Chin. The date(s), location(s), nature and evidence of each time the government alleges the named defendants caused the deaths of the individuals listed in Racketeering Acts 28-52;

23.     ¶¶ 56-62: Cadden and Chin. Which of NECC's alleged production practices and/or cleaning and disinfecting practices cited in ¶¶ 36-37 of the Indictment caused the deaths of the individuals identified in Racketeering Acts 28-52; and

(a)     How each alleged production practice and/or cleaning and disinfecting practice identified in in response to the question above caused the deaths of the individuals identified in Racketeering Acts 28-52.

## Count Two, Paragraphs 73 Through 75

### *Testing and Drug Shipment Authorization*

24.     ¶¶ 73-75:  Carter and Stepanets.  The date(s), location(s), nature and evidence of each act of racketeering that the Defendant is alleged to have committed or participated in, directly or indirectly, in the conduct of the affairs of the alleged enterprise, including but not limited to: 1) each specific shipment that the Defendant allegedly confirmed or authorized of "drugs that were improperly tested, drugs for which test results had not yet been received, drugs that were not tested at all, and drugs that were made with an expired ingredient;" 2) how, when and where the Defendant confirmed or authorized each such shipment; 3) which specific drugs were allegedly deficient and in what respects; and 4) as to each such act, the identity of each individual who allegedly participated with the Defendant in the commission of the act.

25.     ¶¶ 73-75:  Cadden, Chin, Svirskiy, Leary, Evanosky and Connolly.  The date(s), location(s), nature and evidence of each act of racketeering that the named Defendant is alleged to have committed or participated, directly or indirectly, in the conduct of the affairs of the alleged enterprise, and in particular whether Racketeering Acts 1-52 are alleged to be part of Count Two.

## Counts One and Two

### *The United States Pharmacopeia*

26.     The Indictment relies on alleged violations of the United States Pharmacopeia ("USP") in ¶¶ 17-32, 36(a)-(e), 37(a), 37(f), 42, 43, 45, 47, 49, 51, 53, 64, 67, 68, 74, and 111. Identify the specific language in the USP alleged to have been violated and the version of the USP at issue (by year and by supplement number if contained in a supplement).

## Count Three, Paragraphs 77 Through 102

### *Patient Names*

27.     ¶ 78: Ronzio.  Identify the legal basis for your inference that the Defendants were under a legal obligation to identify NECC as a drug manufacturer "rather than" as a licensed pharmacy.  (In your answer please identify any legal authority which prohibits NECC from being both a licensed pharmacy and a drug manufacturer and your reason for including the phrase "rather than" in paragraph 78).  Further, please explain how the lack of prescriptions, (if NECC were a manufacturer as you allege), would subject NECC to "heightened regulatory oversight by the FDA".  (In your answer, please explain what this "heightened regulatory oversight" would have entailed).

28.     ¶ 79: Cadden. The date(s), location(s), nature and evidence of each time the government alleges Defendant Cadden "falsely represented to the FDA and the MABOP that NECC, as a pharmacy, dispensed drugs only upon receipt of valid, patient-specific prescriptions as required by Massachusetts law," and/or "falsely represented that NECC was a compounding pharmacy and not a manufacturer, and therefore . . . claimed NECC was not subject to FDA oversight."

29.     ¶ 80:  Cadden, Carter, Stepanets and Ronzio.  Identify the date(s), locations(s), nature and evidence of each time you allege that named Defendant "instructed the MSM sales force to inform customers they needed to provide names of patients for orders of drugs" and, for each such time, specifically identify whom on the MSM sales force the named Defendant so instructed.

30.     ¶ 81:  Cadden, Carter, Stepanets and Ronzio.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant "instructed the MSM sales force to inform customers that NECC would not include the patients' names on the labels affixed to the drugs" and, for each such time, specifically identify whom on the MSM sales force the named Defendant so instructed.

31.     ¶ 82:  Cadden, Carter, Stepanets and Ronzio.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant "used and caused others to use the names of patients supplied by NECC's customers to create fraudulent prescriptions for drugs."

32.     ¶ 83:  Cadden, Carter, and Stepanets.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant "reused and caused others to reuse the names of patients from the same order or previous orders supplied by NECC's customers to create fraudulent prescriptions for drugs."

33.     ¶ 84:  Cadden, Carter, Stepanets and Ronzio.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant "shipped and caused others to ship drugs to NECC's customers without any patient names, and then used and caused others to use the names of patients received after the drug shipments to create fraudulent prescriptions for those or subsequent orders."

34.     ¶ 85:  Cadden, Carter, and Stepanets.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant "used and caused others to use the names of celebrities, fictional characters, doctors, and medical staff to create fraudulent prescriptions for drugs."

35.     ¶ 86:  Cadden, Carter, Stepanets and Ronzio.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant: 1) "waived the need for patient names for subsequent orders for certain . . . customers;" and 2) "used and caused others to use the name of the hospital or medical facility as the patient name to create fraudulent prescriptions."

36.     ¶ 87:  Cadden, Carter, Stepanets and Ronzio.  Identify the date(s), locations(s), nature and evidence of each time you allege that the named Defendant: 1) "used and caused others to use the name of the hospital or medical facility as the patient name to create fraudulent prescriptions;" 2) identify how, when and where the named Defendant allegedly "created ratios of fraudulent prescriptions to number of drug units sold for NECC's various drugs;" and 3) "instructed NECC staff and the MSM sales force on the ratios of how many patient names would be needed for each order size," and, for each such time, specifically identify whom on the NECC staff and on the MSM sales force the named Defendant so instructed.

37.     ¶¶ 92-101: Ronzio.  Explain how emails between certain defendants and not made to third parties or the FDA constitute "overt acts" of the conspiracy and how they were material to the alleged fraud.

38.     ¶¶ 101 and 102: Ronzio.  Identify any and all shipments related to this case which you allege were influenced by Mr. Ronzio's alleged 8/24/12 email statements.  (In your answer, please explain how an email sent after a shipment could have influenced the order resulting in the shipment).

39.     ¶ 101: Ronzio.  Explain how this email was false or misleading and how it was material to NECC's intent to avoid FDA oversight.

40.     ¶102: Ronzio.  Identify each customer placing each order and the date the order was placed and please explain how the false names were material NECC's alleged intent to avoid FDA oversight.

## **CONCLUSION**

For all the reasons discussed above and pursuant to Federal Rule of Criminal Procedure

7(f) and the Fifth and Sixth Amendments to the United States Constitution, this Court should

grant Defendants' Consolidated Motion for Bill of Particulars.

Respectfully submitted,


BARRY J. CADDEN

By his attorneys,

/s/ Bruce A. Singal
Bruce A. Singal
BBO #464420
Michelle R. Peirce
BBO #557316
Callan G. Stein
Donoghue Barrett & Singal One
Beacon Street, Suite 1320
Boston, MA 02108
(617) 720-5090
bsingal@dbslawfirm.com
mpeirce@dbslawfirm.com
cstein@dbslawfirm.com


GLENN A. CHIN

By his attorney,

/s/ Stephen J. Weymouth
Stephen J. Weymouth
BBO #523680
Weymouth Law
65a Atlantic Avenue
Boston, MA 02110
(617) 573-9598
sweymouth@sweymouthlaw.com


GENE SVIRSKIY

By his attorney,

/s/ Jeremy M. Sternberg
Jeremy M. Sternberg
BBO #556566
Christopher M. Iaquinto
BBO #685718
Holland & Knight
10 Saint James Avenue, 11th Floor
Boston, MA 02116
(617) 854-1476
jeremy.sternberg@hklaw.com
christopher.iaquinto@hklaw.com


CHRISTOPHER M. LEARY

By his attorney,

/s/ Paul V. Kelly
Paul V. Kelly
BBO #267010
Jackson Lewis PC
75 Park Plaza, 4th Floor
Boston, MA 02116
(617) 367-0025
paul.kelly@jacksonlewis.com

JOSEPH M. EVANOSKY

By his attorneys,

/s/ Mark W. Pearlstein
Mark W. Pearlstein
BBO # 542064
Dana M. McSherry
BBO # 664430
McDermott Will & Emery
28 State Street
Boston, MA 02109
(617) 535-4000
mpearlstein@mwe.com
dmcsherry@mwe.com

SHARON P. CARTER

By her attorney,

/s/ Michael J. Pineault
Michael J. Pineault
BBO #555314
Clements & Pineault LLP
24 Federal Street
Boston, MA 02110
(857) 445-0135
mpineault@clementspineault.com

ROBERT A. RONZIO

By his attorney,

/s/ Peter C. Horstmann
Peter C. Horstmann
BBO #556377
Partridge, Ankner & Horstmann, LLP
450 Lexington Street, Suite 101
Newton, MA 02466
(617) 723-1980
pete@horstmannlaw.com

SCOTT M. CONNOLLY

By his attorney,

/s/ Raymond Sayeg, Jr.
Raymond Sayeg, Jr.
BBO #555437
Krattenmaker O'Connor & Ingber
One McKinley Square
Boston, MA 02109
(617) 523-1010
rsayeg@koilaw.com

ALLA V. STEPANETS

By her attorney,

/s/ John H. Cunha, Jr.
John H. Cunha, Jr.
BBO #108580
Cunha & Holcomb, P.C.
1 State Street, Suite 500
Boston, MA 02109
(617) 523-4300
cunha@cunhaholcomb.com

Dated:  September 15, 2015

## <u>CERTIFICATE OF SERVICE PURSUANT TO L.R. 5.2(b)</u>

I, Dana M. McSherry, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 15, 2015.

/s/ *Dana McSherry*
Dana McSherry

DM_US 64111957-1.099744.0140

23