UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA,       )
                                )
            v.                  )      Criminal No.:  14-cr-10363-RGS
                                )
BARRY J. CADDEN, et al.         )      ORAL ARGUMENT REQUESTED
                                )
            Defendants.         )
_____)

## DEFENDANTS' CONSOLIDATED MOTION TO COMPEL DISCOVERY[1]

In a civil case arising out of the facts at issue in this indictment, all parties would be entitled to voluminous discovery—documents, interrogatories, depositions—to flesh out the facts of that dispute. Here, where the government has brought sweeping criminal charges against fourteen people and has even accused two of those defendants of "murder," the government's approach has been to offer the minimum discovery that it perceives is required and nothing more.

Defendants understand that this dichotomy is in part a product of the criminal justice system and rules. But that disconnect goes well beyond simply the "nature of the system" in this case. The government has made it clear that it will provide little or nothing that defendants request without Court intervention and will instead stand by its often-repeated contention that everything defendants need in discovery is located in a mountain of electronic data already provided to defendants. If there is no case citation or rule to support a request that is plainly relevant and designed to move the case toward trial efficiently, the government refuses to comply, pointing to the lack of a case or rule requiring it to do so. Indeed, the government has

---

[1] The following defendants join in this motion for every request discussed, unless otherwise noted: Glenn A. Chin, Gene Svirskiy, Christopher M. Leary, Joseph M. Evanosky, Scott M. Connolly, Sharon P. Carter, Alla V. Stepanets, Robert A. Ronzio, Kathy S. Chin, and Michelle L. Thomas.

been so committed to keeping defendants from getting anything more than bare bones information in this case that it has repeatedly intervened in the civil multi-district litigation ("MLD") relating to the outbreak in order to try and stop discovery from proceeding in that forum for fear that the defendants will get additional insight into the facts of the case. (*See* Section III below.)

This hide-the-ball approach by the government continued in its October 30, 2015, response to defendants' consolidated discovery request. Defendants made sixty-eight discovery requests for material that is plainly material to their defense. The government, while willing to discuss a handful of those requests, did not provide a single piece of information in response.

This is not how a case of this magnitude should be litigated. Defendants request that this Court exercise its inherent discretion and grant the requests below, all of which are material to defendants' case preparation or seek exculpatory information.[2]

## PERTINENT BACKGROUND

Defendants made the instant discovery requests by letter dated October 16, 2015. (A copy of the letter is attached at Tab A.) Though numerous, defendants' requests are no more broad than the government's indictment, and each request seeks information that is critical to defendants' defense of these charges. The government responded to defendants' requests by letter dated October 30, 2015, the deadline for its response.  (A copy of the government's response letter is attached at Tab B.)

---

[2] By its own admission, the government has not yet completed its discovery. Accordingly, on October 27, 2015, defendants filed a Joint Motion to Continue Discovery. Defendants reserve the right to bring additional discovery motions, if necessary, based on the government's future productions and based on defendants' continuing review of the more than 8 million documents produced in this case by the government.

In that letter, the government declined to grant a single request made by the defendants or provide a piece of information defendants sought, though it expressed a willingness to discuss the timing of expert disclosures and witness list disclosures.[3] The parties conferenced those issues and revisited several others raised in the defendants' discovery letter. The government agreed to consider further certain of defendants' requests, but committed to nothing concrete.

## ARGUMENT

### I.  THERE SHOULD BE NO FURTHER DELAY IN PROVIDING DEFENDANTS WITH THE REQUESTED RULE 16 AND RELATED INFORMATION.

In a case of this complexity—and with an impending trial date of April 4, 2016—it is critical that defendants be provided with Rule 16 material and other basic information as soon as possible. In paragraphs 1 through 8 of their October 16, 2015, letter, defendants requested this standard Rule 16 information. Those requests are each addressed separately below due to their importance to defendants' trial preparation efforts[4]:

### A.  The government's complete witness list for its case-in-chief.

The government's discovery to date shows that the government interviewed over three hundred potential witnesses during its lengthy investigation, many of them multiple times. And recently the government has suggested that it continues to interview new witnesses. (*See* June 15, 2015, Affidavit of Carmen M. Ortiz, Doc. No. 1976 in the MDL attached at Tab C.)  Given the massive list of potential witnesses, it is critically important to maintaining the April 4 trial date that the government provides defendants with its witness list.

---

[3] Given how little information was included in the government's response letter, it is hard to imagine any reason beyond mere delay for it failing to respond to defendants' written request until the day such response was due.

[4] Based on the government's response, defendants withdraw request number 6, as the government has stated that defendants have been provided with all video and audio tapes requested.

There is no reason for the government to delay providing such a witness list given that it knows who its prospective witnesses will be and is actually sharing that list, at least in part, with attorneys in the civil MDL. Specifically, a recent hearing in the NECC MDL case addressed the government's request to stay depositions of certain former NECC employees that had been noticed. At the October 14, 2015, hearing before Judge Boal, the government made clear that it is informing attorneys in that civil case whether certain individuals the civil parties wish to depose are potential government witnesses in the criminal trial. Assistant United States Attorney Strachan explained to Judge Boal:

> "[W]e already in the past---the Saint Thomas Entities have emailed me and said, Are [sic] all of these people potential witnesses of yours? I've written back and said, Yes [sic], they are, and we can address them on a piecemeal basis going forward if that's what the Court chooses to do, but so far, of the six or so former employees of MSM and NECC that they've noticed depositions of, they are all our potential witnesses, yes."[5]

(Transcript of the October 14, 2015, Hearing Before Judge Boal, at p. 9; excerpts from the transcript including all of the government's argument is attached at Tab D.)  There is simply no reason that defendants here should not be entitled to this same information that the government is apparently willing to give the attorneys for the parties in the civil case.

The government knows who its witnesses are—or, certainly the bulk of them—or the procedure above would not work. Further, as the Court wrote over one month ago in ordering the government to share its exhibit list with defendants: "It is difficult for me, as a former prosecutor, to imagine that the government is not well along in its structuring of a lengthy trial that is due to commence in some six months." (September 30, 2015, Memorandum and Order on

---

[5] In fact, the government has not opposed at least one former employee's deposition; Lisa Cadden was deposed on October 29, 2015, with no objection by the government and no motion by the government to halt that deposition. Undersigned counsel for Mr. and Mrs. Cadden are informed and believe that the procedure described above by AUSA Strachan was followed with respect to Saint Thomas's request to depose Ms. Cadden and that the government had no objection because Ms. Cadden would not be a government witness at trial.

Appeal of a Decision of the Magistrate Judge, p. 8.)[6] Defendants ask that the government provide

them with its witness list immediately.[7]

## B.   A date certain by which the government will share all Jencks material.[8]

The government is playing its cards so close to the vest in this case that it not only refuses

to disclose information, but it will not even commit to *a date by which* it will disclose

information. In response to defendants' request for a date certain by which the government will

disclose Jencks material, the government only states that it will produce this material "prior to

trial," and will determine a disclosure date by December 16, 2015. To emphasize: the

government will not *disclose* the Jencks material by December 16, but will simply reveal the

future disclosure date by then. (*See* Tab B, at p. 1) The government offers equally vague

disclosure dates in response to certain of defendants' other discovery requests. (*See, e.g.,* ab B, at

p. 2, the government will make an additional discovery production "in the near future," the

government will produce Rule 404(b) information "prior to trial in this case.")

Given that there are over 300 potential witnesses in an investigation that extended for

over two years, the volume of Jencks material will undoubtedly be staggering. The trial date is

already aggressive in a case of this complexity and scope even without the government's

reluctance to provide Jencks information a moment before it might be required to do so under the

rules. It will be impossible without Court intervention.

---

[6] In addition, given that the government is required to provide its exhibit list to defendants on November 30, 2015, it should also have a fairly comprehensive witness list at that time.

[7] The government made clear that it would not produce the witness list by November 30, 2015, as requested by defendants during the conference call on this motion. The government ended the call by saying they would "take some time to think about" the request for an earlier witness disclosure.

[8] The government should also be required to provide all exhibits referenced during each witness's grand jury testimony together with each transcript.

C.    **All interview memoranda and notes of interviews not previously provided.**[9]

In response to this request, the government stated that it "will be making an additional discovery production in the near future that contains additional interview memoranda and agent notes primarily for interviews conducted since the last production." The government's reluctance to provide deadlines for its disclosure of critical trial information puts the trial date at risk. Defendants request that the Court order the government to: (1) provide all interview memoranda[10] in its possession within one week; and, (2) provide interview memoranda to defendants on a rolling basis within a reasonable time of each interview, but in no event later than two weeks after a given interview takes place. Defendants also ask that the Court set a deadline for the government to complete its discovery.

D.    **The identities of all expert witnesses whom the government intends to call at trial and a written summary of any testimony that the government intends to use under Rules 702, 703, and/or 705 of the Federal Rules of Evidence during its case-in-chief at trial.**

The Court's Scheduling Order requires simultaneous exchanges of expert witness disclosures on March 28, 2016, one week before trial. This timing, and the simultaneous exchange approach, is unworkable in a case of this kind and complexity where there could be numerous experts that the government may seek to employ concerning compounding, clean rooms, microbiology, and product testing, to name just a few potential expert topics. Moreover, it will be time-intensive and prohibitively expensive to require defendants to retain and disclose their experts prior to obtaining the government's expert disclosures to which defendants will be responding.

---

[9] This request includes all witnesses who were questioned or interviewed by any federal or state agency in connection with the investigation of NECC and related individuals following the fungal meningitis outbreak. It includes as well a request for notes (including those of all government employees attending the interview) and draft memos not previously provided for interviews for which the government did previously provide some information.

[10] The government should also be required to provide the bates ranges, or copies, of all documents discussed or shown to the witness during the interview.

For these reasons, defendants sought the government's expert disclosures under Rule 16(a)(1)(G) which provides that: "At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial." Defendants seek phased expert disclosure, with the government providing its expert disclosures by January 15, 2016, and defendants disclosing their expert/s in response by March 15, 2016. Defendants proposed this schedule to the government in a telephone call on November 3, 2015. The government expressed some willingness to alter the schedule but—though it had invited discussion about this issue—did not have a proposal of its own and indicated it would respond to the proposal after discussing it internally.[11]

The government has been investigating this case for more than three years and no doubt retained experts early in this investigation to assist it in understanding the complex medical and scientific issues permeating this case. Those experts should be disclosed as soon as possible so that the defendants have the necessary time to locate and prepare experts in opposition. Defendants ask that the Court order the government to make its expert disclosures by January 15, 2016, and that defendants make their disclosures by March 15, 2016.

**E.      All evidence the government intends to offer under Federal Rule of Evidence 404(b).**

The government's refusal to provide Rule 404(b) disclosures sooner rather than later assures that there will be great disarray—and a massive information dump—as the case nears trial. Federal Rule of Evidence 404(b) provides that: "On request by a defendant in a criminal case, the prosecutor must: (A) provide reasonable notice of the general nature of any such

---

[11] Due to the discovery motion deadline, defendants include this issue here out of an abundance of caution even though it has not yet received the government's proposal, if any. In addition, the discussion with the government suggested that the government will not likely agree to the schedule defendants proposed and thus, the issue would likely have been before the Court regardless.

evidence that the prosecutor intends to offer at trial; and (B) do so before trial — or during trial if the court, for good cause, excuses lack of pretrial notice." The indictment is already sweeping, both legally and factually. Through this discovery request, defendants seek to ensure that they will not be defending even more allegations through Federal Rule of Evidence 404(b).

The government's response makes clear that it intends to offer evidence under Rule 404(b), but—consistent with its practice in this case—the government will say only that it will provide notice of that proposed 404(b) evidence "prior to trial in this case." (*See* Tab B, at p. 2.) Based on a recent government filing, there is not doubt that the government will try to inject countless other alleged acts of wrongdoing into this already massive case. In its opposition to Kathy Chin's recent severance motion, the government referenced "hundreds" of other shipments allegedly authorized by Kathy Chin pursuant to allegedly fake prescriptions. (Government's Opposition to Defendant Kathy Chin's Motion to Sever, Doc. No. 344, at p. 4.) In subsequent correspondence with Ms. Chin's attorney following up on this assertion, the government made clear that the evidence against Ms. Chin will not be limited to those in the indictment. These potentially hundreds of other acts for Ms. Chin will then need to be multiplied by the other eleven defendants. A dumping of this type shortly before trial will put the defendants in an untenable position. Each of these allegations takes time and effort to understand and explain in order to defend it. Defendants need this disclosure, and need it as soon as possible, to defend themselves properly.[12]

---

[12] During the conference of this motion, the only indication the government would provide as to the nature of the expected Rule 404(b) evidence was that there would be other examples of allegedly shipping without testing, use of expired drugs, and mixing lots.

## II.    DEFENDANTS ARE ENTITLED TO IMMEDIATE PRODUCTION AND IDENTIFICATION OF *BRADY* AND *GIGLIO* MATERIAL.

Government disclosure of exculpatory material and impeachment evidence is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The United States Attorney's Manual directs that "[e]xculpatory information must be disclosed reasonably promptly after it is discovered."  (*See* United States Attorney's Manual, 9-5.001(D)1.)

The government's *Brady* disclosures here have been limited to a handful of disclosures in each defendant's Rule 16 automatic discovery letters. The government has disclosed no further exculpatory information or documents, and has instead directed defendants to search the 8.8 million documents provided thus far in discovery (with more to come) to find information that may show one or more defendants' innocence. (*See* Tab B, at pp. 4-12.)

Commentators have noted the real risks in allowing the government to satisfy its *Brady* obligations by simply pointing to a massive discovery production, especially in the electronic age where those productions are staggeringly voluminous. *See, e.g., "The Brady Dump': Problems with 'Open File' Discovery*," New York Law Journal, Sept. 4, 2009. It should go without saying that, at a minimum, the government should be required to give defendants, or identify specifically, all exculpatory documents or other information of which *it is aware* in that 8.8 million documents, even if the government does not have a burden to comb through that information itself to locate exculpatory information for defendants. And the government should also share all *Brady* material it locates going forward in future discovery being provided to defendants. The defendants' October 16, 2015, letter puts the government on notice of the types of information defendants view as exculpatory.

As discussed below, the government is refusing to identify *Brady* and *Giglio* material concerning the most serious charges in the indictment, second-degree murder (*See* Section II.A. below), and likewise refuses to turn over *Brady* and *Giglio* material of which it has actual notice (*See* Section II.B. below). Further, there must be more information available from the FDA concerning the important disclosures the government has made about numerous errors and regulatory violations by FDA labs involved in this investigation. (*See* Section III.C. below.)

A.    **The government must provide Cadden and Chin with information bearing on the causation element in the murder racketeering act allegations.**

The government alleges second-degree murder racketeering acts against defendants Cadden and Chin based on three lots of methylprednisolone acetate ("MPA") injectibles. (Indictment, ¶¶56-62.) A critical element of those second-degree murder racketeering acts is that the government must prove that defendants' caused the twenty-five individuals' deaths—i.e., that they caused the twenty-five particular MPA vials to become contaminated. *See, e.g., People v. Goecke*, 457 Mich. 442, 463 (1998); *State v. Ruane*, 912 S.W.2d 766, 774 (Tenn. Crim. App. 1995).

Defendants do not believe the government can meet this heavy burden. Accordingly, defendants Chin and Cadden seek exculpatory evidence and information from the government that tends to demonstrate that the government will not be able to prove how the MPA became contaminated. Specifically, defendants requested: "All evidence that demonstrates specifically how the vials containing the MPA that were injected into individuals listed in Racketeering Acts 28-52 of Count One became contaminated with fungus." (*See* Tab A, at ¶ 10.) Likewise, defendants requested: "All information concerning any attempt to determine specifically how the

three lots of MPA referenced in Racketeering Acts 28-32[13] of Count One, or certain vials from those lots, became contaminated." (*Id.,* at ¶ 26.) The absence of evidence of how these three lots of MPA got contaminated would necessitate acquittals and, thus, is plainly exculpatory regarding the most serious charges in the indictment.

Despite the obvious significance of evidence showing that the government, to this day, may well not know how the three lots became contaminated, the government refuses to share this crucial information. First, the government requests that defendants "identify a statute, federal or local rule, or case in support of your request for this information." (*See* Tab B, at ¶ 10.) This response rings hollow. The information sought is classic *Brady* information; the government's inability to prove that Cadden or Chin participated in or caused the particular acts that contaminated the vials would require the murder racketeering acts to be dismissed. *See, e.g., Com. of Virginia v. Futrell,* 2012 WL 8261797, *4-5 (Va. Cir. Ct.).

The government further explains its refusal to provide this exculpatory information by saying: "As you are aware, the five prior discovery productions contain a substantial amount of information regarding NECC's practices inside the clean room and its production of preservative-free methylprednisolone acetate." (*See* Tab B, at ¶ 10.) The government cannot believe that it can prove second-degree murder charges against Cadden and Chin by simply pointing to alleged deviations from the U.S. Pharmacopeia by "NECC" and then asking the jury to conclude that that is sufficient to deem Cadden and Chin murderers.

The government should not have brought second-degree murder charges if it could not prove every element of those charges. If the government is aware of efforts to identify the

---

[13] This request, as defendants are sure the government understood, should have referenced Racketeering Acts 28—52.

specific source or cause of the contamination, it must provide defendants with the conclusions, or lack of conclusions, of those efforts.

**B.      Defendants seek a court order that the government comply with its constitutional obligations under *Brady* and *Giglio* to provide generally exculpatory material and particularized evidence defendants have identified <u>as material to their defenses.</u>**

Defendants' requests 16 through 25 seek general *Brady* and *Giglio* information the government is required to provide defendants in all criminal cases. Requests 26 through 66 request exculpatory information about the particular charges against the defendants. There should be no real question that the topics listed are all exculpatory and potentially material to defendants' defense. If the government has located exculpatory information responsive to those requests in the investigation, it should identify that information and should not be able to simply point to 8.8 million documents and say, "[t]hrough its five discovery productions, the government has met its disclosure obligations under *Brady v. Maryland* and its progeny," as was its response to each and every *Brady*-related request. (*See* Tab B, at ¶¶ 16-66.)

**C.      Requests 47-49 seek additional information about the exculpatory information the government disclosed in summary form—that at least two of its labs involved in the NECC investigations destroyed evidence and one lost <u>its accreditation.</u>**

One of the few specific *Brady* disclosures the government has made in this case was to share that two facilities that analyzed drugs seized from NECC in 2012 improperly destroyed samples it was supposed to maintain. (A copy of the portions of the government's February 12, 2015, discovery letter discussing the NRL is attached at Tab E.)  One of those labs, the FDA's Northeast Regional Laboratory's ("NRL"), which is one of the largest FDA labs, according to the material the government provided, ran so afoul of its own procedures that it lost its accreditation in September 2014 after a surprise inspection by the American Association for

Laboratory Accreditation. (*Id.*)  The limited discovery that the government has provided on this problem suggests that the unannounced inspection was sparked at least in part on an "allegation that people were being pressured into getting certain results."[14] The relevance to the present case cannot be overstated.

The government produced summary reports and limited documentation about the NRL's systemic problems. During the telephone call to conference the present motion, the government asserted that defendants had everything that the FDA had provided to it. The government also indicated that the only information that could be relevant would relate to the particular lab *within* the NRL facility that tested (or destroyed) the NECC samples. The government agreed to look into defendants' request for the interview memoranda of all interviews, including those conducted by the FDA's Office of Internal Affairs. That is not sufficient. There is no dispute that the FDA jointly investigated this case; accordingly, as a matter of law, all of the FDA's files are in the government's possession, custody, and control for discovery and *Brady* purposes. The fact that the FDA lab that analyzed NECC's samples lost its accreditation and incorrectly destroyed evidence relating to NECC is plainly relevant and plainly exculpatory. Defendants are entitled to more than the sanitized, summary documents that the FDA chose to provide to the government. And defendants should not be relegated to asking for what they need from those materials—it is exculpatory and must be affirmatively disclosed. The full file about the labs' problems in the FDA's possession must be produced, including but not limited to: all information concerning allegations that NLR employees were pressured to reach particular results; interview memoranda; the audio files of those interviews referenced in the discovery; the quality control

---

[14] This assertion is made in an interview summary of Brian L. Baker, the Center Director for the Food and Drug Administration Winchester Engineering and Analytical Center at page DOJ_NECC003704840. That page is not attached here, but can be provided at the Court's request.

issues-related documents; information about the CDC small pox incident which apparently

prompted the wrongful destruction of NECC samples; all documents concerning the NLR's 2012

accreditation; all documents relating to the 10-day audit of the NLR; all documents from the OIA

investigation; all information relating to the NLR having "gotten sloppy with the paperwork" as

discussed in the discovery materials; all documentation concerning forged documents at NLR;

and, all other reports concerning the decision to strip the NLR of its accreditation.


**III.    THE GOVERNMENT'S CORRESPONDENCE WITH STATE AND FEDERAL AGENTS IS MATERIAL TO DEFENDANTS' DEFENSE AND LIKELY CONTAINS EXCULPATORY INFORMATION, IN PARTICULAR ON THE SECOND-DEGREE MURDER RACKETEERING ACTS.**

The government has exerted an extraordinary degree of control over other state and

federal authorities in any matter relating to NECC, often behind the scenes. Based on that

control, defendants are seeking information about those communications in a limited number of

states, namely, those states under whose law two defendants here are accused of murder.

The government's efforts to quash several different governmental (state and federal)

depositions in the civil MDL case illustrate the government's unusual behind-the-scenes effort to

control other governmental bodies and highlight why those communications are material to the

case and likely contain exculpatory information. Parties in the civil case had noticed depositions

of certain agents of the Food and Drug Administration ("FDA"). The FDA successfully opposed

those efforts; the government did not intervene at that time. At a hearing last month in the MDL,

however, the government acknowledged that it controlled and directed the FDA's effort to quash

FDA civil deposition subpoenas. (Tab D, Hearing of October 14, 2015, at p. 12, line 2.)

That effort might be explained by the FDA's role as part of the criminal investigation,

except that the government likewise sought to influence and control the Massachusetts Board of

Pharmacy ("BOP"), a state Board it claimed was *not* a formal part of the investigation. Specifically, the Massachusetts BOP also received deposition subpoenas in the civil case. Rather than intervene in the MDL case to oppose that request, the government apparently directed the BOP to oppose the clinics' efforts to depose agents of the BOP. (*Id.,* at p. 11, lines 3-23.) Only after the Massachusetts Attorney General lost the motion to oppose those BOP depositions—a motion made at the government's request—the government intervened in the MDL case to seek another bite at the apple. Judge Boal criticized the government for this approach during a recent hearing: "Clearly, you could have done that [opposed the BOP deposition request] up-front, right? But you choose [sic] to go the route of asking the Attorney General to make arguments on your behalf." (*Id.*, at p.11, lines 12-15.)

There is strong reason to believe that the government exerted similar influence over, and had material communications with, the Michigan Attorney General who had convened a grand jury relating to NECC. Defendants detailed previously the level of orchestration between the state of Michigan and the government concerning these overlapping investigations. (*See* Defendants' Objections to the July 13, 2015, Order of the Magistrate judge (Boal, M.J.) on Defendants' Preliminary Motion to Compel Discovery.[15]) As noted there, the Michigan Attorney General publicly described "[o]ngoing coordination between state and federal investigators." (*Id.*, at p. 12). He also said: "This agreement with the United States Attorney Ortiz will allow us to coordinate with federal officials and maximize the resources dedicated to this investigation." (*Id.*, at p. 13.) The fact of the influence itself is exculpatory—the Michigan grand jury may well have chosen to reject murder charges against Cadden and Chin. Regardless, those communications likely include information material to the defense and/or that is exculpatory. For these reasons, the government should be required to produce information responsive to

---

[15] The Court previously concluded that the Michigan Attorney General was not a formal part of the investigation.

paragraphs 11 and 15 of defendants October 16, 2015, discovery letter relating to the Michigan case.

In addition, the Court should order the government to share its correspondence with officials in the other states under whose law Cadden and Chin are charged with second-degree murder. (*See* Tab A, at ¶ 15.) That request seeks all correspondence "discussing or related to whether the activities at NECC and/or the actions (all or some) set forth in the indictment would constitute second-degree murder, manslaughter, or any other crime in those states." If state officials in those states provided information to the government indicating that the actions in the indictment might *not* constitute second-degree murder under state law, defendants are entitled to that information.

## IV. DISCOVERY OF THE GRAND JURY EVIDENCE AND LEGAL INSTRUCTIONS PERTAINING TO COUNT 3 IS NECESSARY TO RESOLVE WHETHER THE FACTUAL AND LEGAL MISSTATEMENTS IN THE INDICTMENT WARRANT DISMISSAL OR EXCISION.

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." Thus, an indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *accord, United States v. Serino,* 835 F.2d 924, 929 (1st Cir.1987). With respect to an indictment alleging a fraud conspiracy, the First Circuit has required that the "allegations, on their face, describe fraudulent conduct." *United States v. Yefsky,* 994 F.2d 885, 893 (1st Cir. 1993). In *Yefsky*, the First Circuit found the indictment was inadequate because it contained:

> "[C]onclusory language drawn from the mail fraud statute that Coogan
> had obtained this money from the GBPC members through false pretenses.
> It did not divulge the factual basis of this accusation. Accordingly, the
> count did not provide Yefsky with adequate notice of the charge against
> him."

*Id.* Here, the language of the Indictment is conclusory in that alleges the defendants defrauded

the United States from FDA oversight, but it also includes false information, insinuation and

omits crucial information that undermines the conclusory allegations. It also includes conduct

which was perfectly lawful and alleges that it was somehow unlawful and supported the overall

conspiracy.

The Defendants hereby move for disclosure of grand jury minutes pursuant to Rule

6(e)(3)(E) of the Federal Rules of Criminal Procedure. This Court is authorized to Order the

disclosure of grand jury minutes where the defendant sets forth a particularized need for the

disclosure by demonstrating that: (a) the material sought is needed to avoid a possible injustice;

(b) "the need for disclosure outweighs the need for continued secrecy"; and, (c) "the request is

structured to cover only what is needed." *United States v. George*, 839 F.Supp. 2d 430, 437

(D.Mass. 2012) (*quoting Douglas Oil Co. v. Petrol Stops Nw.,* 441 U.S. 211, 222 (1979)); *United

States v. Rodriguez-Torres*, 570 F.Supp.2d 237, 241 (D.P.R. 2008)(district has substantial

discretion in ordering the disclosure of grand jury minutes so that a defendant may pursue a

motion to dismiss). Here, the defendants are not only contemplating a motion to dismiss, but

must alert the Government to any defense of governmental authorization by November 26, 2015.

Count 3 contains a troubling blend of false statements, lawful conduct presented as

unlawful, omissions, and disparaging insinuations set forth as both factual and legal assertions.

The insinuations begin in Paragraph 1 of the Indictment where it is alleged that NECC "held

itself out as a compounding-only pharmacy." This insinuation is repeated in Paragraph 78 where

the Government opines, that the defendants "purported to be operating NECC as a state-regulated pharmacy." Paragraph 78 also adds the false legal conclusion that NECC was operating as a pharmacy "rather than as a drug manufacturer." The Government's use of the words "held itself out" and "purported" are misleading because NECC was a licensed Massachusetts pharmacy as acknowledged by the Government in Paragraph 1 of the Indictment. More importantly, there is no mention of the fact that the FDA met with NECC and the Massachusetts Board of Pharmacy ("BOP") in February, 2003, after an inspection, and "current findings supported a compounding role." (*See* Excerpts from "FDA's Oversight of NECC and Ameridose: A History of Missed Opportunities?," Preliminary Majority Staff Report, Committee on Energy and Commerce, April 16, 2013, at p. 8, attached at Tab F.) Additionally, the FDA concluded that the BOP would provide primary oversight. (*Id.*) The phrase "rather than" connotes that NECC was under some legal obligation to call itself a manufacturer despite the fact that it was authorized by the FDA to treat itself as a pharmacy and license by the MBP to conduct itself as a pharmacy.

Paragraphs 79-80 of the Indictment repeat some of the false insinuations in Paragraph 78, and add the true statement that NECC customers are required to have prescriptions. The manner in which the prescriptions are described as being part of the conspiracy has the effect of alleging that this was criminal conduct when it was not. To allege this conduct to be part of the conspiracy when it was authorized and required by Massachusetts law is false and misleading warranting disclosure of Grand Jury testimony and instructions.

Paragraphs 89-91 of the Indictment perpetuate the false information by alleging that it was NECC that made false representations to the FDA in May 2003, October 2004, and January 2007 when, in fact, it was the FDA in February 2003 that told NECC that they would be treated

as a Massachusetts compounding pharmacy. (*See* Indictment, ¶ 89-91, and Tab F at p.8.) It was impossible for NECC to misinform the FDA that it was a pharmacy when it was the FDA that authorized NECC to hold itself out as a pharmacy. To allege this conduct to be part of the conspiracy when it was authorized and required by Massachusetts law is false and misleading warranting disclosure of Grand Jury testimony and instructions.

As a result of the way Count 3 of the Indictment is worded, the reader is left with the impression that NECC was falsely holding itself out to be something that it was not. On the contrary, NECC was approved by the FDA as early as 2003 to conduct its business in the exact manner the Government is alleging is was not entitled to do. (*See* Tab F, at p. 8.) Moreover, NECC was a licensed Massachusetts pharmacy as the Government notes in Paragraph 1 of the Indictment, but which the Government continues to completely ignore in its insinuations. Significantly, the Congressional Oversight Committee Report regarding NECC concluded that the "FDA is on Notice that NECC is Operating Outside the Scope of Traditional Compounding Pharmacy." (*Id.,* at p. 39.)

As a result, Count 3 of the Indictment seriously misrepresents the facts and law and omits other crucial facts as it relates to NECC's representations of itself and the FDA's knowledge of NECC's activities. These glaring deficiencies highlight the necessity for discovering exactly what the Government presented to the Grand Jury in terms of evidence and legal instructions. Based upon the foregoing, NECC has demonstrated a particularized need for disclosure of any testimony regarding NECC's representations of itself as a pharmacy. Moreover, any testimony as to what the FDA knew about NECC's activities should be disclosed because of the insinuation that NECC should have been calling itself a manufacturer. Lastly, any testimony regarding the

FDA's oversight history with NECC must be disclosed, because the clear intent of Count 3 is to allege that the FDA was kept in the dark. Nothing could be further from the truth.

**V.  DEFENDANTS SEEK THE MOST BASIC INFORMATION ABOUT THE SERIOUS CHARGES AGAINST THEM IN THE PREVIOUSLY FILED BILL OF PARTICULARS AND, IF THE GOVERNMENT CONTENDS THAT THOSE MATERIALS ARE "DISCOVERY," THEY SHOULD PRODUCE THEM AS SUCH.**

As the Court is aware, defendants requested that the government particularize the allegations in Counts 1 through 3 of the Indictment so that defendants can adequately prepare their defenses and avoid surprise at trial. The government refused, necessitating defendants' Consolidated Motion for Bill of Particulars which was filed on September 15, 2015.

Indicative of the government's unusually rigid approach in this high-profile case—and highlighting the need to order that this information be produced—the government opposed that motion contending, among other things, that defendants should have brought that motion within fourteen days of the indictment under the Local Rules. (*See* Government's Opposition to Defendants' Consolidated Motion for Bill of Particulars, Doc. No. 346, at p. 1.) The government's attempt to hide behind such a rigid rule in this type of case is unreasonable.

Worse, the government further opposed that Motion for Bill of Particulars on the grounds that the indictment  plus "extensive discovery provided by the government in this case more than adequately provides the defendants with the necessary details of the charges against them." (*Id*., at pp. 1, 15.) But that very discovery that the government claims (wrongly) would provide the particularization defendants sought began *after* the fourteen-day deadline and has still not been completed.

The government also took the position that the information sought in the Bill of Particulars was an effort to obtain discovery, not a bill of particulars. (*Id.,* at pp. 12-14.) Defendants disagree for all of the reasons spelled out in their Consolidated Motion[16]: the information sought is information that should have been included in the indictment, such as the nature and date of allegedly "false misrepresentations" on which the government relies; the dates when expired ingredients were purportedly used, and numerous allegations that must be included in an indictment as a matter of law, *see* Fed. R. Crim. P. 7(c), and of fairness. Regardless, for all of the reasons spelled out in Defendants' Consolidated Motion for Bill of Particulars, Defendants repeat their request that the Court order the government to produce this key information so they may defend themselves.[17]

## VI. DEFENDANTS REQUEST THAT THE COURT ESTABLISH A MECHANISM BY WHICH DEFENDANTS MAY ASSESS THE COMPREHENSIVENESS OF THE GOVERNMENT'S PRODUCTION OF ELECTRONIC MATERIALS AND, IF NECESSARY, OBTAIN ADDITIONAL ITEMS MATERIAL TO THEIR DEFENSE THAT ARE NOT INCLUDED IN THE DOCUMENTS PRODUCED BY THE GOVERNMENT TO DATE.

On September 30, 2015, the Court ordered the government to produce the search terms the government had used to select—from the full universe of electronic media seized from NECC—those documents it ultimately provided to defendants during discovery. As the Court held, "[t]he search terms are material in the sense that defendants have no other means by which

---

[16] Defendants incorporate that Motion here as if repeated fully.

[17] Defendants' discovery letter dated October 16, 2015, requested: "All information requested in the Defendants' Consolidated Motion for Bill of Particulars, and the letter requests submitted in advance of that motion." (Tab A, at ¶ 9.) The government responded: "Many of the 40 requests in the Defendants' Consolidated Motion for Bill of Particulars and the letter requests that preceded it, seek information regarding how the government will prove its case at trial, and therefore, are not proper discovery requests under Rule 16. Please identify which of the 40 requests you believe to be proper discovery requests and we will address them." (Tab B, at ¶ 9.) Defendants obviously believe all of them to be proper requests. Rather than dodge the requests, the government should instead simply respond to those it did believe were appropriate and explain why it believes others were not.

to test the inclusiveness of the government's selection of the material that it produced pursuant to its obligations under Fed. R. Crim. P. 16(a)(1)(E)."[18] (Order Dated September 30, 2015, No. 347, at p. 5.) The government produced that list on October 9, 2015. Defendants have been working with the government since the receipt of this list to obtain further information concerning the government's search methodology in order to: (a) determine whether any need exists to run additional searches against the electronic media seized from NECC; and, (b) if so, fashion the most reasonable, cost-effective mechanism for doing so. Pursuant to the government's request, defendants specified the additional information they are seeking in a series of written questions. (A copy of those questions, with accompanying cover letter, are attached at Tab G.) As the questions make clear, defendants are trying to better understand the manner in which the government's search terms were applied, and the resulting subset of e-mails culled and produced to defendants, to ensure that they have a complete understanding of what they do and do not have in the discovery provided to date.

Towards that end, defendants request that the Court order the government to provide the information requested in Tab G so as to explain to defendants: (1) how the search terms were searched; (2) whether the results of that search were further narrowed in any way; and, (3) whether the full response to those search terms was given to each of the defendants. If any of the defendants determine—due, for example, to gaps in the government's search terms and/or methodology—that additional searches need to be conducted against the electronic media seized from NECC, the government should be further ordered to provide a complete copy of the seized

---

[18] This issue was still being vetted with the government via email and telephone at the time this Motion was filed, but is included here out of an abundance of caution given the current November 3, 2015, deadline for filing discovery motions. There is a motion pending by defendants to extend that deadline.

electronic media, in the form of processed load files,[19] to permit defendants to run those searches in the most cost-effective manner possible.

## CONCLUSION

The government should approach this case pragmatically instead of dogmatically. The government has accused fourteen citizens of serious crimes. The fight should be a fair one, and defendants ask the Court to ensure that is the case by granting the requests in this motion.

## LOCAL RULE 116(F) CONFERENCE

A good faith attempt was made to eliminate or narrow the issues raised in the motion through a conference with opposing counsel during a telephone call on November 3, 2015.

---

[19] To date, the government has proposed only to provide the electronic media in its "original version . . . prior to any processing by the government." Because the government necessarily must have processed and loaded the media to run its search terms in the first instance, and because it would cost defendants tens of thousands of dollars and many weeks of work to replicate that processing, defendants request that the government be directed to produce the data in the form of processed load files.

Dated:     November 3, 2015          Respectfully submitted,

BARRY J. CADDEN,
By his attorneys,


   /s/   Michelle R. Peirce
Bruce A. Singal (BBO# 464420)
Michelle R. Peirce (BBO# 557316)
Callan G. Stein (BBO# #670569)
DONOGHUE, BARRETT & SINGAL, PC
One Beacon Street – Suite 1320
Boston, MA 02108
Telephone:  (617) 720-5090
bsingal@dbslawfirm.com
mpeirce@dbslawfirm.com
cstein@dbslawfirm.com


SHARON CARTER,
By her attorneys,


   /s/   Michael Pineault
Michael Pineault
CLEMENTS & PINEAULT, LLP
23 Federal Street
Boston, MA 02108
Telephone:  (857) 445-0133

GLENN CHIN,
By his attorneys,


  /s/   *Stephen Weymouth*
Stephen Weymouth
LAW OFFICE OF STEPHEN WEYMOUTH
65a Atlantic Avenue, Suite 3
Boston, MA 02110
Telephone:  (617) 573-9598


KATHY CHIN,
By her attorneys,


  /s/   *Joan Griffin*
Joan Griffin
P.O. Box 133
Dublin, NH 03444
Telephone:  (617) 283-0954


SCOTT CONNOLLY,
By his attorneys,


  /s/   *Raymond Sayeg, Jr.*
Raymond Sayeg, Jr.
KRATTENMAKER O'CONNOR & INGBER P.C.
One McKinley Square
Fifth Floor
Boston, MA 02109
Telephone:  (617) 523-4010

JOSEPH EVANOSKY
By his attorneys,


  /s/   *Mark Pearlstein*
Mark Pearlstein
Dana McSherry
MCDERMOTT, WILL & EMERY
28 State Street
Boston, MA 02109
Telephone:  (617) 545-4000


CHRISTOPHER LEARY,
By his attorneys,


  /s/   *Paul Kelly*
Paul Kelly
Sarah Walsh
JACKSON LEWIS PC
75 Park Plaza, 4th Floor
Boston, MA 02116
Telephone:  (617) 367-0025


ROBERT RONZIO,
By his attorneys,


  /s/   *Peter Horstmann* .
Peter Horstmann
LAW OFFICES OF PETER CHARLES HORSTMANN
450 Lexington Street
Suite 101
Auburndale, MA 02466
Telephone:  (617) 723-1980

ALLA STEPANETS
By her attorneys,


  /s/   John Cunha, Jr.
John Cunha, Jr.
Helen Holcomb, BBO #547538
CUNHA & HOLCOMB, PC
One State Street
Suite 500
Boston, MA 02109
Telephone:  (617) 523-4350



GENE SVIRSKIY
By his attorneys,


  /s/   Jeremy Sternberg
Jeremy Sternberg
Chris Iaquinto
HOLLAND & KNIGHT
10 St. James Avenue, 11th Floor
Boston, MA 02116
Telephone:  (617) 854-1476



MICHELLE THOMAS
By her attorneys,


  /s/   Michael Bourbeau
Michael Bourbeau
BOURBEAU AND BONILLA, LLP
236 Commercial Street, Unit One
Boston, MA 02109
Telephone:  (617) 350-6565

## CERTIFICATE OF SERVICE

I, Michelle R. Peirce, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on November 3, 2015.

  */s/    Michelle R. Peirce*
Michelle R. Peirce