UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| Plaintiff, | ) ) | No. 14-CR-10363 (RGS) |
| v. | ) ) ) | |
| (1) BARRY J. CADDEN, <br> (2) GLENN A. CHIN, <br> (3) GENE SVIRSKIY, <br> (4) CHRISTOPHER M. LEARY, <br> (5) JOSEPH M. EVANOSKY, <br> (6) SCOTT M. CONNOLLY, <br> (7) SHARON P. CARTER, <br> (8) ALLA V. STEPANETS, <br> (9) GREGORY A. CONIGLIARO, <br> (10) ROBERT A. RONZIO, <br> (11) KATHY S. CHIN, <br> (12) MICHELLE L. THOMAS, <br> (13) CARLA R. CONIGLIARO, <br> (14) DOUGLAS A. CONIGLIARO | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**<u>JOINT MOTION FOR SEVERANCE</u>**

Defendants Gene Svirskiy, Christopher Leary, Joseph Evanosky, Scott Connolly, Sharon Carter, Alla Stepanets, Robert Ronzio, and Michelle Thomas (the "Defendants") submit this memorandum in support of their joint motion to sever their trial from the trial of co-defendants Barry Cadden and Glenn Chin, or, in the alternative, to sever the Count 1 second-degree murder racketeering acts from the trial of all remaining charges, pursuant to Federal Rule of Criminal Procedure 14(a) and this Court's inherent case management authority.

- 1 -

## I. INTRODUCTION

The government claims that the 2012 nationwide fungal meningitis outbreak that led to the deaths of sixty-four people was caused by contaminated vials of preservative-free methylprednisolone acetate ("MPA") compounded at the New England Compounding Center ("NECC"). In connection with the outbreak, the government obtained a sprawling seventy-three page, 131-count indictment against fourteen individuals associated with NECC. Notably, only two of the fourteen defendants – Barry Cadden, NECC's owner and head pharmacist, and Glenn Chin, NECC's supervisory pharmacist – are alleged to have produced or in any way been responsible for the contaminated MPA. These two defendants have been charged with, among other things, twenty-five acts of second-degree murder as predicate offenses to the indictment's substantive racketeering charge (Count 1). In this regard, it is alleged that Cadden and Chin acted "so recklessly and wantonly as to manifest a mind utterly without regard for human life" and "demonstrate[ed] a depraved mind without regard for human life." Indictment ¶¶ 61 and 62.

None of the remaining lower-level defendants are alleged to have had any responsibility whatsoever for any act or omission that caused harm to patients, much less any deaths. They have been charged with a variety of crimes, including, for example, offenses based on purported violations of the United States Pharmacopeia (the "USP"), a set of standards produced by a non-profit organization that pertain to the "identity, strength, quality and purity of medicines," and the Food, Drug, and Cosmetic Act ("FDCA"). Indictment ¶ 17. The allegations against them include claims that non-MPA lots of medications were shipped prior to sterility testing and that one pharmacy technician with no MPA involvement was not properly licensed. *Id.* ¶¶ 64, 70. They are not alleged to have had any involvement with the production of MPA, contaminated or

not. Indeed, several of the remaining defendants did not even work in an NECC clean room at all and thus had no responsibility for compounding sterile medications of any kind.

Nevertheless, because of the way the government charged this case, if it is tried in its current form, the Defendants inevitably will be subject to improper prejudicial spillover from the second-degree murder charges and evidence and, by extension, guilt by association. There can be no doubt that the Defendants would suffer overwhelming prejudice when at trial the government introduces evidence of twenty-five excruciating deaths through experts, treating physicians, and bereaved friends and family members. Additionally, a trial of this case in its current form – including twelve defendants, 109 counts[1], and seventy-eight racketeering acts, of which twenty-five allege second degree murder under the statutes of seven states – would be so large and complex that the jury would have a very difficult time reliably meeting its obligation to reach individualized determinations of guilt as to each defendant.

In order to avoid the undue prejudice the Defendants would suffer from the second-degree murder charges and evidence, this Court should sever the trial of Cadden and Chin from the trial of all remaining defendants or, in the alternative, sever the second-degree murder racketeering acts from the trial of all remaining charges. Severance is necessary because limiting instructions simply could not cure the significant spillover prejudice.

Either of Defendants' proposed approaches to severance would simplify the case and help ensure that Defendants are able to receive fair trials. Both approaches would result in increased efficiency. Large swaths of evidence regarding MPA and the twenty-five deaths could be

---

[1] On October 21, 2015, this Court entered an order granting the Assented-To Motion for Severance by Carla Conigliaro and Douglas Conigliaro (Dkt. 358). Counts 110-131 of the indictment charged Carla Conigliaro, the majority shareholder of NECC, and Douglas Conigliaro, an owner and director of Medical Sales Management, Inc., which provided sales and administrative services to NECC, with conspiracy to commit structuring and various structuring crimes in violation of 31 U.S.C. §5324. Carla and Douglas Conigliaro were not charged in any other counts of the indictment.

limited to one trial, and each trial would run more smoothly without the inevitable morass of limiting instructions. Finally, ten defendants, seven of whom have been appointed defense counsel paid for with Criminal Justice Act funds, would not be forced to sit through months of trial focused on extremely prejudicial evidence unrelated to their guilt or innocence.

## II. THE INDICTMENT

The 131-count indictment charges fourteen individuals with at least ten different crimes. At the forefront are Barry Cadden, who has been charged in ninety-seven counts and all seventy-eight racketeering acts, and Glenn Chin, who has been charged in seventy-four counts and sixty-eight racketeering acts. Cadden was NECC's owner and head pharmacist; Chin was NECC's supervisory pharmacist responsible for "all aspects of NECC's production and personnel in the two clean rooms." Indictment ¶¶ 3-4. Many of the other defendants were lower-level NECC employees with no supervisory authority who either worked in one of NECC's clean rooms (Svirskiy, Leary, Evanosky and Connolly) or in NECC's packing and shipping department (Carter, Stepanets, K. Chin, and Thomas). Indictment ¶¶ 3–14. One defendant, Michelle Thomas, worked in NECC's packing area for less than six months and is charged in only two counts. Indictment ¶ 14.

The indictment alleges that various combinations of the defendants committed the following crimes: racketeering in violation of 18 U.S.C. §1962(c) (Count 1), conspiracy to commit racketeering in violation of 18 U.S.C. 1962(d) (Count 2), conspiracy to defraud the government in violation of 18 U.S.C. §371 (Count 3), mail fraud in violation of 18 U.S.C. §1341 (Counts 4-56), and various violations of the Food, Drug, and Cosmetic Act (Counts 57-109), among other things.

Count 1 charges six defendants – Cadden, Glenn Chin, Svirskiy, Leary, Evanosky and Connolly – with racketeering and describes seventy-eight predicate racketeering acts. Overall, the number of racketeering acts each of these six defendants is alleged to have committed ranges from as many as seventy-eight for Cadden to four for Evanosky. Twenty-five of the seventy-eight racketeering acts (numbers 28-52) charge only Cadden and Chin with second degree murder in violation of the laws of Florida, Indiana, Maryland, Michigan, North Carolina, Tennessee and Virginia. The remaining fifty-three racketeering acts (numbers 1-27 and 53-78) allege mail fraud based mostly on regulatory violations of the USP. Only Cadden and Chin are charged with racketeering acts 1-27, which pertain to the compounding and shipment of MPA. Various combinations of the six Count 1 defendants (but always either Cadden and/or Chin) are charged with racketeering acts 53-78, which describe regulatory violations wholly unrelated to MPA.

The Count 1 mail fraud racketeering acts are realleged as non-RICO substantive mail fraud Counts 4-56, and many are also refashioned as violations of the FDCA in Counts 57-94. The substantive mail fraud and FDCA counts alleged as to Svirskiy, Evanosky, Leary, and Connolly are based on the same facts as the Count 1 mail fraud racketeering acts.

Count 2 charges eight defendants – all those charged in Count 1 plus Carter and Stepanets – with a RICO conspiracy in violation of 18 U.S.C. §1962(d). Notably, Count 2 alleges that the RICO conspiracy consisted of multiple acts of mail fraud only, *not second-degree murder*. Indictment ¶ 73.

Count 3 charges five defendants – Cadden, Carter, Stepanets, Greg Conigliaro, and Ronzio – with conspiracy to defraud the government by interfering with and obstructing FDA oversight by falsely claiming that NECC operated as a state-regulated pharmacy filling

individual patient-specific prescriptions. Indictment ¶ 78. No overlap exists between the overt acts charged in Count 3 and the racketeering acts charged in Count 1.[2]

**III.     THE TRIAL SHOULD BE SEVERED TO PREVENT UNDUE PREJUDICE FROM THE SECOND-DEGREE MURDER CHARGES AND EVIDENCE**

Rule 14(a) of the Federal Rules of Criminal Procedure permits a district court to grant severance "[i]f the joinder of offenses or defendants in an indictment … appears to prejudice a defendant or the government. . . ." Fed. R. Crim. P. 14(a). In addition, a district court has the power to order separate trials pursuant to its "inherent right and duty to manage its own calendar." *United States v. Leichter*, 160 F.3d 33, 35 (1st Cir. Mass. 1998) (noting that the court's case management authority is independent of its authority under Fed. R. Crim. P. 14.)

Severance should be granted when there is "a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 537-39 (1993). While courts generally prefer joint trials of people and crimes indicted together, primarily for reasons of efficiency and judicial economy, "Rule 14 directs the court to ask, in effect – at what price judicial economy? – particularly with respect to individual defendants." *United States v. Green*, 324 F. Supp. 2d 311, 319 (D. Mass. 2004). As a rule, district courts are given "wide latitude in determining whether a Rule 14 severance is appropriate." *United States v. Andrews*, 754 F. Supp. 1161, 1170 (N.D. Ill. Nov. 1990) ("*Andrews I*").

In determining whether the prejudice of a joint trial rises to a level that warrants severance, courts consider the following factors: "the number of defendants and the number of counts; the complexity of the indictment; the estimated length of the trial; disparities in the amount or type of proof offered against the defendants; disparities in the degree of involvement

---

[2] Fifteen of Count 3's overt acts (Acts C-Q) overlap with the FDCA charges alleged in Counts 95-109 (Misbranded Drugs – No Prescriptions).

by defendants in the overall scheme; possible conflict between various defense theories or trial strategies; and, especially, prejudice from evidence admitted only against co-defendants but which is inadmissible or excluded as to a particular defendant." *United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987); *see also United States v. Innamorati*, 996 F.2d 456, 469 (1st Cir. 1993) ("Prejudice from joinder can come in various forms, including jury confusion, the impact of evidence that is admissible against only some defendants, and 'spillover' effects where the crimes of some defendants are more horrific or better documented than the crimes of others."). Though none of these factors are themselves dispositive, taken together, courts must decide whether the jury would be "reasonably able to consider the evidence as to each defendant separately, independent of the evidence against his or her coconspirators." *Gallo*, 668 F. Supp. at 749. Here, several factors suggest that such compartmentalization by the jury would be impossible.

First, substantial evidence will be introduced of the excruciating deaths of twenty-five people in connection with the second-degree murder racketeering acts alleged only against Cadden and Chin. As a result, the risk of spillover prejudice and guilt by association will be so high that the jury will be faced with an incredibly difficult challenge in separating the evidence against each defendant and reaching a reliable verdict. *See United States v. Monteiro*, 2005 U.S. Dist. LEXIS 30829, at *3–4 (D. Mass. 2005) (Saris, J.), *citing United States v. Blankenship*, 382 F.3d 1110, 1125 (11th Cir. 2004) ("Severance is required under *Zafiro* where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants."); *Green*, 324 F. Supp. 2d at 319 ("There is no question that joint trials, involving defendants with different degrees of culpability, can raise a substantial risk of prejudice that evidence of a codefendants'

wrongdoing might erroneously lead the jury to convict the defendant. . ."). The risk of spillover is particularly unacceptable here because the second-degree murder evidence would clearly be inadmissible against any defendant other than Cadden and Chin. *See Zafiro*, 506 U.S. at 539 (noting that a serious risk of prejudice occurs "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant.").

Next, a trial of twelve defendants on 109 counts, including seventy-eight racketeering acts, twenty-five of which allege second-degree murder under seven state statutes, would be so complex that the jury could not possibly reach an individualized determination of guilt as to each defendant. *See e.g., Monteiro*, 2005 U.S. Dist. LEXIS 30829, *4; *Green*, 324 F. Supp. 2d at 319. This is particularly so with respect to Count 1 defendants Svirskiy, Leary, Evanosky and Connolly, who are charged with only a handful of regulatory or fraud offenses having nothing to do with MPA, let alone the charged murders, and the six defendants who never even worked in a NECC clean room at all.

Where a serious risk of prejudice exists, the district court ". . . may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). Here, justice requires either that the trial of Cadden and Chin be severed entirely or that the second-degree murder racketeering acts be severed from the trial of all other charges. *See e.g., United States v. DeCologero*, 364 F. 3d 12, 24 (1st Cir. 2004) (recognizing that severing racketeering acts, as opposed to counts or defendants, "may not be wholly beyond the district court's inherent [case management] authority…"); *United States v. Andrews*, 754 F. Supp. 1197, 1201 (N.D. Ill. Dec. 1990) ("*Andrews II")* (severing massive RICO case into five separate trials and dividing racketeering acts between trials pursuant to Fed. R. Crim. P. 14). Either option

would simplify the trials and ensure that Defendants are not prejudiced by the second-degree murder charges and evidence.[3]

### A. The Trial Should Be Severed to Prevent the Undue Prejudicial Spillover That Would Result from the Second-Degree Murder Charges and Evidence

The twenty-five second-degree murder racketeering acts alleged against Cadden and Chin are fundamentally different from the other allegations in the indictment. The remaining defendants are not alleged to have had any responsibility for any act or omission that caused harm to patients, much less any deaths, and are not alleged to have had any role in NECC's production of MPA. Given the gross disparity in the severity and amount of evidence that will be offered to prove the second-degree murder racketeering acts, prejudicial spillover is inevitable. This spillover would go far beyond the "garden variety" prejudice that typifies multi-defendant, multi-offense trials. *See United States v. Boylan,* 898 F.2d 230, 246 (1st Cir. 1990) *cert. denied*, 498 U.S. 849 (1990). Indeed, it would put all defendants at a high risk of being found guilty by association. *See Andrews I,* 754 F. Supp. at 1177 ("A gross disparity in the evidence presents a danger that some defendants will suffer spillover prejudice due to the accumulation of evidence against other defendants. When that occurs, a defendant may suffer a transference of guilt merely due to his association with an [allegedly] more culpable defendant.").

To prevail on a claim for severance based on spillover prejudice, a defendant "must muster a strong showing of evident prejudice." *United States v. Pierro*, 32 F.3d 611, 615 (1st Cir. 1994) (citations omitted). The First Circuit has noted that prejudice "means more than just a

---

[3] Defendants propose these two severance options because they present the most straightforward and, in the case of severing the second-degree murder racketeering acts, the most surgical way of accomplishing the goal of preventing the undue prejudice that would inevitably result from a trial that includes the second-degree murder charges and evidence. Other options exist, including the severance of all MPA-related racketeering acts (both mail fraud and second degree murder, numbers 1-52) which are alleged only against Cadden and Chin, or the bifurcation of the trial so that the evidence of second-degree murder is considered by the jury only after it has reached its decision on all other charges as to each defendant.

better chance of acquittal at a separate trial." *Id*. Here, because the disparity in the charges and evidence puts the Defendants at such an obviously high risk of being found guilty by association, this is a model case for severance.

In order to prove the twenty-five second-degree murder racketeering acts against Cadden and Chin, the government will need to introduce evidence to satisfy the statutes of seven different states. This will include evidence of causation, death, and state of mind, among other things. This evidence is likely to be introduced through many different witnesses, including experts, doctors, and the bereaved friends and family members of each of the twenty-five victims. This emotionally charged and tragic evidence will consume substantial time at trial and will muddy the proof against every other defendant. The government easily could have drafted the Indictment to better segregate the charges and avoid such prejudice. Instead, it elected to charge this as a RICO case, lumping into Count 1 defendants with no responsibility for MPA, and thereby ensuring that the inevitable taint from the second-degree murder evidence would "dirty up" the cases against Svirskiy, Leary, Evanosky, and Connolly in particular, who are not alleged to have harmed even one person.[4]

Courts have granted severance in analogous situations. *See e.g.*, *United States v. Maisonet*, 1998 U.S. Dist. LEXIS 9696 (S.D.N.Y. June 30, 1998); *Gallo*, 668 F. Supp. at 750 (granting severance in part because of prejudicial spillover, which "is especially acute for those defendants whose alleged activities did not include the sort of violent or heinous offenses with

---

[4] Attorney General Eric Holder's statement in a DOJ press release from December 2014 is regrettable in its equally prejudicial conflation of the evidence and the charges: "With the indictment and these arrests, the Department of Justice is taking decisive action to hold these individuals accountable for their alleged participation in grievous wrongdoing. Actions like the ones alleged in this case display not only a reckless disregard for health and safety regulations, but also an extreme and appalling indifference to human life." Press Release, U.S. Department of Justice, 14 Indicted in Connection with New England Compounding Center and Nationwide Fungal Meningitis Outbreak (Dec. 17, 2014), *available at* http://www.justice.gov/opa/pr/14-indicted-connection-new-england-compounding-center-and-nationwide-fungal-meningitis

which some of their brethren are charged."). In *Maisonet*, 19 defendants were indicted in a thirty-two count racketeering and narcotics conspiracy case. 1998 U.S. Dist. LEXIS 9696 at *3–4. The indictment alleged a pattern of racketeering that included murder, narcotics trafficking, obstruction of justice, and witness tampering. *Id.* The court granted several severance motions, including one by a defendant named in the RICO count, but not alleged to have participated in the violent racketeering acts. *Id.* at *19. In granting severance, the court noted that the conduct for which the defendant was charged, obstruction of justice, "is markedly different from that for which his RICO co-defendants are charged." *Id.* at *18. The court granted severance because "[the defendant] is not charged with any act of violence, nor is he charged with participating in the possession, sale, or distribution of narcotics. Given the nature and extent of evidence that the Government will likely introduce against both groups of co-defendants, the potential for prejudice against [the defendant] arising from a joint trial with either group is substantial." *Id.* In addition, the court noted that "[i]t would not be fair to require [the defendant] (and his counsel) to sit through months of testimony having only minimal, if any, relevance to him." *Id.* at *19.

Here, as in *Maisonet*, because the second-degree murder allegations against Cadden and Chin stand in such contrast to all other allegations, the trial must be severed to prevent the inevitable undue spillover prejudice.

i. **The Second-Degree Murder Evidence Should Not Be Separately Admissible**

Courts are reluctant to grant severance based on claims of prejudicial spillover "[w]here evidence featuring one defendant is independently admissible against a codefendant . . . .," and have noted that in those situations "the latter cannot convincingly complain of an improper spillover effect." *United States v. O'Bryant*, 998 F. 2d 21, 26 (1st Cir. 1993) (collecting cases)

(affirming district court's refusal to sever two defendants charged in four-count indictment because allegedly prejudicial evidence was independently admissible against codefendant to prove conspiracy). Here, however, Defendants' claims of prejudicial spillover are particularly strong because the evidence of second-degree murder should not be admissible in separate trials.

First, the second-degree murder evidence should not be admissible as to the RICO conspiracy charge, Count 2, which alleges only conspiracy to commit mail fraud, or as to the non-RICO charges, Counts 3-109. Next, the second-degree murder evidence should not be admissible as to the substantive RICO charge, Count 1, because the deaths were at the very most unintended consequences of allegedly reckless regulatory violations, and not a pattern through which an enterprise was conducted. Next, even if the second degree murder evidence were admissible against Cadden and Chin, excluding it as to Svirskiy, Leary, Evanosky and Connolly (the four defendants other than Cadden and Chin charged in Count 1) would not change the number of racketeering acts alleged against those defendants and would not impact the government's ability to prove a RICO pattern as to those defendants.[5] *See United States v. Andrews*, 764 F. Supp. 1248, 1250 n.2 (N.D. Ill. 1991) ("*Andrews IV*") (observing that "it is not necessary to compound the number of predicate acts put before the jury. . . . Since a substantive RICO violation does not require proof of any more than two acts in establishing a 'pattern of racketeering activity,' the inclusion of additional racketeering acts become less important and less probative as the number of charged acts increase.") Finally, because the probative value of the second-degree murder evidence would be so outweighed by the enormous undue prejudice it

---

[5] Even as to Cadden and Chin, a surgical excision (through severance) of solely the second degree murder racketeering acts would not impede the government's ability to prove a pattern of racketeering activity against these two defendants because the same MPA shipments that underlie the murder allegations (acts 28-52) also underpin the non-murder MPA allegations (acts 1-27).

would cause, it should be excluded as to Svirskiy, Leary, Evanosky and Connolly under Rule 403. *See e.g., Andrews I*, 754 F. Supp. at 1178.

The *Andrews* case is instructive. In *Andrews*, a large and complicated RICO case, the government argued that severance of certain racketeering acts was not warranted based on the risk of prejudicial spillover because it "would be entitled to offer evidence of all of the charged racketeering activity at each separate trial to prove the entire pattern of racketeering activity and the full scope of the enterprise." *Andrews I*, 754 F. Supp. at 1178. The *Andrews* Court was not persuaded by this argument because all of the evidence would *not* have been admissible at the separate trials:

> "A great deal of evidence technically admissible under Evidence Rule 401 would certainly be excluded at each severed trial because of its lack of connection to the active criminal deeds of any of the defendants at those particular trials. This exclusion is dictated by Evidence Rule 403 which mandates the exclusion of evidence whose probative value is substantially outweighed by the "danger of unfair prejudice" and by "considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

*Id.* at 1178, *citing* Fed. R. Evid. 403; *see also United States v. Perry*, 37 F. Supp. 3d 546, 559 (D. Mass. 2014) (noting that the joinder of the extortion and racketeering charges to the other mail fraud and theft charges presented a risk of spillover prejudice because it would amount to propensity evidence barred by FRE 404(b)(1)). Here too, the second-degree murder evidence should certainly be excluded from Defendants' severed trial because of its lack of probative value and the enormous undue prejudice it would cause.

> B. **The Trial Should Be Severed Because the Second-Degree Murder Evidence Creates a Serious Potential for Jury Confusion**

A trial of twelve defendants on a 109-count indictment that includes seventy-eight separate racketeering acts, twenty-five of which allege second-degree murder against only two of the defendants, presents a serious potential for jury confusion. *See Monteiro*, 2005 U.S. Dist.

- 13 -

LEXIS 30829 at *3 (affirming order severing trials of thirteen defendants on thirty-one count indictment, which included a RICO charge that alleged twenty-one racketeering acts, in part because of "serious potential for jury confusion."). It is the highly prejudicial evidence of second-degree murder under seven different state statutes that would render a joint trial too complex for the jury to properly assess the guilt or innocence of each defendant independently. *See Blankenship*, 382 F.3d at 1124 (severance should be granted where "the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently.").

Courts recognize that "[a]s the number of counts and defendants in an indictment increase, 'it is obvious' that the resultant complex trial record makes it more difficult for a jury to keep straight the specific evidence and charges against each defendant." *Gallo*, 668 F. Supp. at 749 (citations omitted). In *Gallo*, sixteen defendants were charged in a twenty-two count indictment that included a RICO conspiracy charge alleging seventy-two predicate acts. *Id*. In granting severance in part based on the complexity of the indictment, the *Gallo* court noted: "A single jury would be required to make almost a gross of separate decisions of guilt or innocence after a long and arduous trial. Much of the relevant evidence would have been introduced and stored in the jury's collective mind for many months – and a good deal of it introduced only as to certain defendants or certain charges." *Id.* at 750; *see also Green*, 324 F. Supp. 2d at 327–28 (severing defendants in seventeen-count RICO indictment for reasons of "case management, juror comprehension, judicial economy, not to mention fairness," and recognizing that "there are potentially limits to the complexity that a jury can handle"); *United States v. Shea*, 750 F. Supp.

46 (D. Mass. 1990) (severing charges against certain defendants considering the complexity and probable length of case).

Here, too, a trial of twelve defendants that includes the twenty-five second-degree murder racketeering acts would be so complex that the jury would not be able to keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict. Standing alone, this complexity is reason enough to sever the trial. In conjunction with the prejudicial spillover threatened by the second-degree murder charges and evidence, severance is a necessity. *See Monteiro*, 2005 U.S. Dist. LEXIS 30829 at *3; *Green*, 324 F. Supp. 2d at 327; *Gallo*, 668 F. Supp. at 750 ("The courts must be scrupulous to avoid the spectre of guilt by association – or, more likely, guilt by confusion.").

### C. The Prejudice Could Not Be Adequately Cured With Limiting Instructions

Although in certain cases a limiting instruction can be used to cure undue prejudice, here, limiting instructions would not be sufficient given the extreme nature and quantity of the anticipated evidence of second-degree murder. Indeed the sheer volume of the anticipated evidence regarding the second-degree murder racketeering acts would require frequent and complicated limiting instructions, making the case even more complex. One could imagine an instruction along the lines of: "This evidence should be considered only as to [Cadden/Chin] and only in connection with second-degree murder racketeering acts A-B, but not second-degree murder acts C-D. It should not be considered as to any other defendant but can be considered in connection with MPA-related mail fraud racketeering act X alleged against [Cadden/Chin], but not Y-Z." Add to that powerful evidence of the excruciatingly painful and tragic deaths of twenty-five people, and the effect of any limiting instruction would be quickly undermined. *See United States v. Cortinas*, 142 F. 3d 242, 248 (5th Cir. 1998) ("Limiting instructions given by the trial judge were inadequate to mitigate the prejudicial effect of the overwhelming testimony

regarding the violent, criminal activities of [co-defendants]"); *United States v. Perry*, 37 F. Supp. 3d 546, 559–60 (D. Mass. 2014) (allowing severance in part because "although the Court can and will instruct the jury about the government's separate burden of proof as to each count and can provide limiting instructions about the jury's consideration of certain evidence, given the complexity of the extortion and racketeering charges here, there remains a serious risk of prejudice of the joinder of these two sets of counts.").

### D. Severance Will Promote Judicial Economy

In support of the preference in the federal system for joint trials, courts often invoke principles of efficiency. *See e.g., Zafiro*, 506 U.S. at 537; *O'Bryant*, 998 F. 2d at 25 ("This practice helps both to prevent inconsistent verdicts and to conserve resources (judicial and prosecutorial)."); *Gallo,* 668 F. Supp. at 748 ("The general rule favoring joint trial is designed to conserve judicial resources, alleviate the burdens on citizens serving as jurors, and avoid the necessity of having witnesses reiterate testimony in a series of trials.") (internal citation and quotation marks omitted)[6]

> However, as Justice Stevens noted in his concurring opinion in *Zafiro*,
>
> "[t]here will … almost certainly be multidefendant cases in which a series of separate trials would be not only more reliable, but also more efficient and manageable than some of the mammoth conspiracy cases which the Government often elects to prosecute. And in all cases, the Court should be mindful of the serious risks of prejudice and overreaching that are characteristic of joint trials . . . . [T]here is much more at stake here than administrative convenience."

*Zafiro*, 506 U.S. at 545 (citations omitted); *see also Gallo*, 668 F. Supp. at 753 (questioning the "traditional assumption that denial of severance in cases . . . promotes efficiency."). This is such

---

[6] Defendants' request to sever the second-degree murder racketeering acts will have no impact on the government's ability to prove a RICO conspiracy (Count 2) because the RICO conspiracy is only focused on allegations of mail fraud. *See Gallo*, 668 F. Supp. at 754 (noting that courts are especially averse to granting severance "where defendants are all joined in a common conspiratorial scheme.").

a case. In addition to ensuring a more reliable verdict as to each defendant, severing either Cadden and Chin entirely or only the second-degree murder racketeering acts would promote efficiency and conserve judicial resources. First, because the second-degree murder evidence is so prejudicial and is not likely to be admitted against defendants other than Cadden and Chin, there would be no duplication of that evidence between trials. Indeed, if Cadden and Chin are severed, the mountains of evidence related to the contaminated MPA could be limited to Cadden and Chin's trial. Next, a joint trial that includes the second-degree murder allegations would be exponentially longer than two separate trials in part because each piece of evidence relating to the second-degree murders would require a complicated limiting instruction. Finally, eight of the twelve defendants in this case are represented by court-appointed counsel. Seven of the court-appointed attorneys represent defendants not charged with the second-degree murder racketeering acts. If severance is not granted, counsel for ten defendants, seven of whom are court-appointed, will be forced to sit through months of testimony that is irrelevant to and/or inadmissible against their clients.

## IV. CONCLUSION

For the reasons discussed above, this Court should grant Defendants' motion to sever their trial from the trial of co-defendants Barry Cadden and Glenn Chin, or, in the alternative, to sever the Count 1 second-degree murder racketeering acts from the trial of all remaining charges,

pursuant to Federal Rule of Criminal Procedure 14(a) and this Court's inherent case management authority.

Dated: November 11, 2015

Respectfully submitted,

| | |
|---|---|
| JOSEPH M. EVANOSKY | CHRISTOPHER M. LEARY |
| By his attorneys, | By his attorney, |
| */s/ Dana M. McSherry* <br> Mark W. Pearlstein <br> BBO # 542064 <br> Dana M. McSherry <br> BBO # 664430 <br> McDermott Will & Emery <br> 28 State Street <br> Boston, MA 02109 <br> (617) 535-4000 <br> mpearlstein@mwe.com <br> dmcsherry@mwe.com | */s/ Paul V. Kelly* <br> Paul V. Kelly BBO #267010 <br> Jackson Lewis PC <br> 75 Park Plaza, 4th Floor <br> Boston, MA 02116 <br> (617) 367-0025 <br> paul.kelly@jacksonlewis.com |
| GENE SVIRSKIY | SCOTT M. CONNOLLY |
| By his attorneys, | By his attorney, |
| */s/ Jeremy M. Sternberg* <br> Jeremy M. Sternberg <br> BBO #556566 <br> Christopher M. Iaquinto <br> BBO #685718 <br> Holland & Knight <br> 10 Saint James Avenue, 11th Floor <br> Boston, MA 02116 <br> (617) 854-1476 <br> jeremy.sternberg@hklaw.com <br> christopher.iaquinto@hklaw.com | */s/ Raymond Sayeg, Jr.* <br> Raymond Sayeg, Jr. <br> BBO #555437 <br> Krattenmaker O'Connor & Ingber <br> One McKinley Square <br> Boston, MA 02109 <br> (617) 523-1010 <br> rsayeg@koilaw.com |

| | |
|---|---|
| SHARON P. CARTER | MICHELLE L. THOMAS |
| By her attorney, | By her attorney, |
| */s/ Michael J. Pineault* <br> Michael J. Pineault <br> BBO #555314 <br> Clements & Pineault LLP <br> 24 Federal Street <br> Boston, MA 02110 <br> (857) 445-0135 <br> mpineault@clementspineault.com | */s/ Michael C. Bourbeau* <br> Bourbeau and Bonilla, LLP <br> BBO #545908 <br> One Commercial Street <br> Unit One <br> Boston, MA 02109 <br> (617) 350-6565 <br> mike@lawgenie.com |

ROBERT A. RONZIO

By his attorney,

*/s/ Peter C. Horstmann*
Peter C. Horstmann
BBO #556377
Partridge, Ankner & Horstmann, LLP
450 Lexington Street, Suite 101
Newton, MA 02466
(617) 723-1980
pete@horstmannlaw.com

ALLA V. STEPANETS

By her attorney,

*/s/ John H. Cunha, Jr.*
John H. Cunha, Jr.
BBO #108580
Cunha & Holcomb, P.C.
1 State Street, Suite 500
Boston, MA 02109
(617) 523-4300
cunha@cunhaholcomb.com

**CERTIFICATE OF SERVICE PURSUANT TO L.R. 5.2(b)**

      I, Dana M. McSherry, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 11, 2015.

                    /s/ *Dana M. McSherry*
                    Dana M. McSherry