UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No.:  14-cr-10363-RGS |
| | ) | |
| BARRY J. CADDEN, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT BARRY CADDEN'S MEMORANDUM IN SUPPORT OF MOTION FOR HEARING INTO POSSIBLE GOVERNMENT MISCONDUCT, AND FOR MODIFICATION OF BAIL[1]

### I. INTRODUCTION

> "In cases in which a … arrest warrant is to be executed, no advance information will be provided to the news media about actions to be taken by law enforcement personnel, nor shall media representatives be solicited or invited to be present."

United States Attorney's Manual, Assisting News Media, 1.7.600D.

> "#5 Investigates at homes of 3 NECC owners as they were arrested this morning …"

Tweet from Channel 5 reporter, on 12/17/14 at 7:06 a.m., concerning presence of Channel 5 reporters at early morning arrests of Barry Cadden and two (actually three) co-defendants at their homes.  Exhibit 1.

On December 17, 2014 at approximately 6:00 a.m., Barry Cadden and his co-defendants were arrested at their homes on the present indictment.  Mr. Cadden and three of his co-defendants were greeted not only by teams of law enforcement agents conducting the arrests, but by representatives and cameras from media outlets as well.  Live reports from their homes,

---

[1] The following defendants join in this motion, other than the request for relief that is specific to Mr. Cadden:  Glenn A. Chin, Christopher M. Leary, Alla V. Stepanets, Robert A. Ronzio, and Scott M. Connolly.

accompanied by graphic visual images of their arrests, handcuffed "perp walks," and aerial shots of their homes, dominated national and local air waves throughout the day.

This motion addresses whether government representatives improperly leaked information about the arrests and indictment to enable these media representatives to be present at the three homes of these four co-defendants, at a time when their arrest warrants and the indictment were under seal at the request of the U.S. Attorney.[2]  See § II, infra.  The presence of large numbers of media representatives at or before 6:00 a.m. to record "live" the arrests of Mr. Cadden at his residence -- and the three other co-defendants at theirs -- establishes ample *prima facie* evidence suggesting that the government leaked information about the indictment and impending arrests, in violation of Fed. R. Crim. P. 6(e)(4), the order sealing the case, and numerous other policies and regulations.  Accordingly, as detailed in § II, infra, Mr. Cadden is entitled to an evidentiary hearing concerning the circumstances of such leaks, to determine in fact whether they were improperly made.

This motion also addresses the fact that the government improperly asked for the indictment (and arrest warrant) of Mr. Cadden to be sealed.  See § III, infra.  The government had absolutely no basis for believing that Mr. Cadden posed any risk of flight.  He had been well aware for nearly two years that he was being investigated for serious federal and state (Michigan) offenses, including homicide-related offenses carrying the possibility of life imprisonment, and that it was a virtual certainty that as the head of NECC, he would be indicted for such offenses.

---

[2]  We do not intend to suggest or imply that members of the media engaged in any improper conduct by covering events about which they were informed.

Far from fleeing, or showing any signs of doing so, he had his attorneys practically beg the U.S. Attorney's Office to take possession of his and his wife's passport. When the U.S. Attorney who is now so concerned about his risk of flight rebuffed this offer, Mr. Cadden had the passports locked in a safe in his attorneys' office. See § IIIB, infra. And when he was advised by counsel[3] that his arrest would likely take place on a Wednesday in December 2014, his reaction was to stay at home, and awake early three consecutive Wednesdays to be dressed and ready to invite the agents in to arrest him. See § IVA, infra. It is no wonder then that when his arrest finally occurred on the third Wednesday of this cycle, one of the arresting officers aptly noted, "[h]e was at home, he was cooperative. I'm guessing that he probably expected that something was on the horizon."[4]

This evidence, detailed in §§ III and IV, infra, demonstrates that Mr. Cadden's intent throughout was to remain at home with his family awaiting his inevitable arrest. The government had no basis for seeking his detention, and used the detention hearing to further contaminate the jury pool with inflammatory and unfairly prejudicial information having nothing to do with the risk of flight. Mr. Cadden does not present a risk of flight, and thus should have his current bail condition of home incarceration with an electronic bracelet modified. See § IVA, infra.

---

[3]  Undersigned believed the indictment would come before the year ended and also knew that the grand jury met on Tuesdays.

[4]  Statement to Channel 7 News by an unidentified officer who was present at the arrest. See Kelli O'Hara, Co-founder of NECC arrested at his home in Wrentham, 7 News WHDH (Dec. 17, 2015), available at http://www.whdh.com/story/27652099/co-founder-of-necc-arrested-at-his-home-in-wrentham; see also WHDH (Channel 7) video interview of officer, Exhibit 9, clip 10.

## II.   A LEAK OF INFORMATION ABOUT THE SEALED ARREST WARRANT AND INDICTMENT SUBJECTED MR. CADDEN AND THREE OTHER DEFENDANTS TO AN UNCONSTITUTIONAL PERP WALK

### A.   The government is prohibited from leaking to the media news of a sealed indictment and an impending arrest

A government disclosure to the media of a sealed indictment and arrest warrant is explicitly prohibited by the Federal Rules of Criminal Procedure, Department of Justice regulations, the U.S. Attorney's Manual, and the ABA Standards for Criminal Justice.

Fed. R. Crim. P. 6(e)(4) states:

> The federal magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial. The clerk must then seal the indictment, *and no person may disclose the indictment's existence except as necessary to issue or execute a warrant or summons.*

> (emphasis added)

Likewise, Department of Justice regulations expressly provide that "[p]ersonnel of the Department of Justice should take no action to encourage or assist news media in photographing or televising a defendant or accused person being held or transported in Federal custody." 28 C.F.R. §50.2(b)(7). This prohibition applies to the release of information to the news media "from the time a person is the subject of a criminal investigation until any proceeding resulting from such an investigation has been terminated by trial or otherwise." Id. at §50.2(b)(1).

These prohibitions protecting a defendant's right to a fair trial are reinforced in the U.S. Attorney's Manual, which instructs prosecutors that:

> "[i]n cases in which a ... arrest warrant is to be executed, *no advance information will be provided to the news media about actions to be taken by law enforcement personnel, nor shall media representatives be solicited or invited to be present. This prohibition will also apply . . . to any multi-agency action in which Department personnel participate."*

U.S. Attorney's Manual, Assisting News Media, 1.7.600D
(emphasis added).[5]

Such leaks also violate of the American Bar Association Standards for Criminal Justice, Fair Trial and Free Press, Third Edition. ABA Standard 8-2.1(b) provides: "Law enforcement officers and agencies should not exercise their custodial authority over an accused individual in an manner that is likely to result in … (1) the deliberate exposure of a person in custody for the purpose of photographing or televising by representatives of news media…" See also Local Rule 83.2 (prohibiting the dissemination of information by means of public communication, in connection with a pending or imminent criminal case, where "there is a reasonable likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the due administration of justice").

**B.    Numerous media representatives had been tipped off to the arrests of Mr. Cadden and three of his co-defendants, and were at their homes to report on it live**

At or around 6:05 a.m. on December 17, 2014, fourteen agents and officers from the FBI, OPM-OIG, and Wrentham Police Department descended upon the Cadden's secluded residence in Wrentham, Massachusetts to arrest Mr. Cadden. See FBI SA Philip M. Sliney, Jr. 302 (Exhibit 2). Arrest warrants were also simultaneously executed at the residences of 11 other former employees and officers of NECC. See 1:14-cr-10363-RGS at 4 (arrest warrants for 12 of the 14 defendants).

---

[5] U.S. Attorney's Manual, Media Relations – Purpose (§1.7.001), provides as follows:

> The purpose of this policy statement is to establish specific guidelines consistent with the provisions of 28 CFR 50.2 governing the release of information relating to criminal and civil cases and matters by all components (FBI, DEA, INS, BOP, USMS, USAO, and DOJ divisions) and personnel of the Department of Justice. These guidelines are: 1) fully consistent with the underlying standards set forth in this statement and with 28 CFR 50.2; 2) in addition to any other general requirements relating to this issue; 3) intended for internal guidance only; and 4) do not create any rights enforceable in law or otherwise in any party.

Members of the news media, including reporters and crews from WCVB (Channel 5) and WBZ-TV CBS Boston (Channel 4), were present at Mr. Cadden's home at the time of his arrest. The first media report occurred at 6:16 a.m., when WCVB tweeted, "[a]rrests under way in deadly meningitis outbreak." Exhibit 3. Eight minutes later, at 6:24 a.m., WCVB reporter Karen Anderson tweeted "[o]wners of New England Compounding Center arrested just minutes ago – 2 years after meningitis outbreak." Exhibit 4. And three minutes after that (at 6:27 a.m.), Ms. Anderson confirmed that WCVB was present at the time of his arrest, tweeting: "We were at home of Barry Cadden – NECC President/Head Pharmacist – *as fed agents converged this morning.*" Exhibit 5 (emphasis added).

At 6:27 a.m., Peter Wilson, the then-managing editor at WBZ CBS Boston (Channel 4) tweeted, "BREAKING: From @Lauren WBZ. Agents making arrests at this hour tied to nationwide fungal meningitis outbreak linked to NECC in Framingham." Exhibit 6.[6] One minute later (at 6:28 a.m.), Peter Wilson tweeted: "WBZ crews have seen agents making arrests at the homes of NECC owners Barry Cadden in Wrentham and Greg Conigliaro in Southbrough [sic]." Exhibit 7.

By 6:34 a.m., WBZ-TV CBS Boston had tweeted pre-dawn video footage of law enforcement vehicles leaving the Caddens' residence with Mr. Cadden in custody. See Daniel Gadbois Tweet ("FIRST VIDEO in from outside Wrentham home of owner Barry Cadden), Exhibit 8. At 6:37 a.m., WBZ-TV reporter Lauren Leamanczyk reported on Channel 4 that her news crew had captured video of police presence at Mr. Cadden's home. A copy of the video is contained on the CD, which is included as Exhibit 9, clip 1. WBZ-TV then broadcast the video showing law enforcement personnel driving out of Mr. Cadden's driveway, and Leamanczyk reported that Mr. Cadden, "who was the prime operator" of NECC, was under arrest. Id.

---

[6] @LaurenWBZ is the Twitter handle for WBZ reporter Lauren Leamanczyk.

Leamanczyk added that viewers "will remember that he is the one who testified before Congress, refusing to give information before Congress . . . and pleading the 5th, his right not to self-incriminate." Id. CBS national reporter Paula Reid also confirmed at 6:48 a.m. that CBS crew members were present at the time of Mr. Cadden's arrest, tweeting: "JUST IN: CBS crew witness arrests at homes of NECC owners Barry Cadden & Greg Conigliaro. 64 died from 2012 fungal meningitis traced to NECC." Exhibit 10.

The U.S. Attorney's Office did not make its first public statement on the arrests until 6:40 a.m., via Twitter, stating: "Arrests made in New England Compounding investigation by federal authorities. More to follow." Exhibit 11. Four minutes later (at 6:44 a.m.), Karen Anderson tweeted that the U.S Attorney's Office had confirmed the arrests and stated that "#5Investigates was there [at Mr. Cadden's residence] and we are live now on #WCVB." Exhibit 12.

As early as 6:37 a.m., and continuing throughout the day, several news outlets, including WBZ (Channel 4), WCVB (Channel 5), and Fox 25 News, broadcast reports about the arrests of Mr. Cadden and other defendants, and carried video shots at the residences of Mr. Cadden and the three co-defendants, showing agents either arresting those defendants, or in Mr. Cadden's case (because his home is at the top of a steep driveway), leaving the premises with Mr. Cadden in custody. See e.g.:

-- 12/17/14 WBZ (Channel 4) video (showing law enforcement vehicles exiting the Caddens' driveway) (Exhibit 9, clip 1);

-- 12/17/14 WBZ (Channel 4) video (showing arrests of co-defendants at their homes and law enforcement vehicles leaving the Caddens' residence) (Exhibit 9, clip 2);

-- 12/17/14 WCVB (Channel 5) video (showing law enforcement vehicles exiting the turning circle at the top of the Caddens' driveway, Mr. Cadden's perp walk, and a co-defendant being arrested at his home in Southborough) (Exhibit 9, clip 3);

-- 12/17/14 WCVB (Channel 5) video (Karen Anderson: "federal agents have converged on the homes of owners of NECC all around the region this morning. 5 investigates was there. Now, we are at the home of Barry Cadden in Wrentham.") (Exhibit 9, clip 4);

-- 12/17/14 WCVB (Channel 5) video (showing the arrests of co-defendants at their homes in Dedham and Southborough, in addition to agents leaving the Caddens' residence) (Exhibit 9, clip 5);

-- 12/17/14 WCVB (Channel 5) (Exhibit 9, clip 9);

-- 12/17/14 WPRI (Channel 12 Rhode Island) (showing law enforcement vehicles exiting the Caddens' residence and a co-defendant being arrested at his home) (Exhibit 9, clip 8);

-- 12/17/15 ABC News (showing law enforcement vehicles leaving the Caddens' home, Mr. Cadden's perp walk, and the arrest of a co-defendant at his home) (Exhibit 9, clip 7); and,

-- 12/17/15 CBS Evening News (Exhibit 9, clip 11) (showing law enforcement leaving the Caddens' home and the arrest of a co-defendant at his home).

Law enforcement agents took Mr. Cadden to the Wrentham police station for processing. At or around 7:50 a.m., the agents walked a handcuffed Mr. Cadden out of the Wrentham police station and across the parking lot, in front of media members, to a law enforcement vehicle. Several news outlets including ABC National News, Channel 5, Fox 25, and the Boston Globe, broadcast video and published photographic images of Mr. Cadden's perp walk. See e.g.:

-- Bob Murdock (Fox 25) Tweet (7:54 a.m.), Karen Anderson Tweet (7:57 a.m.), Fox 25 News Boston Tweet (8:02 a.m.), and Karen Anderson Tweet (8:16 a.m.) (collectively, Exhibit 13);

-- Kay Lazar and Todd Wallack, 14 executives, staff charged in tainted drug case, BOSTON GLOBE, Dec. 18, 2014 (Exhibit 14);

-- 12/17/15 WCVB (Channel 5) video (Exhibit 9, clip 3);

-- 12/17/15 WCVB (Channel 5) video (Exhibit 9, clip 5);

-- 12/17/14 Fox 25 News video (Exhibit 9, clip 6); and,

-- 12/17/15 ABC News video (Exhibit 9, clip 7).

**C.    A prima facie case has been established that the government improperly disclosed to media representatives that Mr. Cadden and other defendants had been indicted, and that they would be arrested early on the morning of December 17**

The evidence establishes that there was a leak to the media prior to the execution of the arrest warrant for Mr. Cadden and three of his co-defendants who also had media at their homes to report on their arrests.  This is the only conceivable way that reporters and crews, from multiple news outlets, could have arrived at Mr. Cadden's Wrentham home, and the other two homes, at or around the same time as government agents early on the morning of December 17, 2014.  Agents were only at Mr. Cadden's home for a few minutes.  FBI SA Philip M. Sliney, Jr. 302 (Exhibit 2).  Mr. Cadden was waiting by the door for them to arrive and was transported away within five minutes.  Id.; Excerpt of transcript of 12/17/14 hearing (Exhibit 15) at 3; Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 108.  By the time Mr. Cadden had been placed in a law enforcement vehicle outside of his home, a cameraman from one of the news outlets had already walked approximately 75-100 feet up the Caddens' private driveway and began filming the procession of law enforcement vehicles leaving from in front of the Caddens' home.  See Exhibit 9, clips 3 and 4.

WCVB (Channel 5) reporter Karen Anderson confirmed via twitter that she was at Mr. Cadden's Wrentham home "as fed[eral] agent's converged" to arrest Mr. Cadden (Exhibit 5). Likewise, CBS reporter Paula Reid confirmed that CBS crew members were present at the time of Mr. Cadden's arrest.  Exhibit 10.  Mr. Cadden had not seen any vehicles on his cul-de-sac

street in the early morning hours the prior two Wednesdays when he was awaiting his arrest.[7]

But on the morning of December 17, 2014, they arrived early and *en masse*.

In addition, the presence of media members at the home of one co-defendant in

Southborough, and two other co-defendants in Dedham, all well before the U.S. Attorney made

any official public comment, further confirms that the media was tipped off.  WBZ managing

editor Peter Wilson confirmed via a 6:28 a.m. Tweet that a WBZ crew saw agents making arrests

at the home of one co-defendant, as well as Mr. Cadden.  Exhibit 7.  In addition, cameramen shot

video of this same co-defendant, in handcuffs, being put in the back of a law enforcement vehicle

at his home.  Exhibit 9, clips 3, 5, 7, 8, and 11; Karen Anderson Tweet (7:49 a.m.), Daniel

Gadbois (WBZ) Tweet (8:02 a.m.), and Everonward Tweet (7:54 a.m.) (collectively, Exhibit 18).

Similarly, the media were at the Dedham home of the other two co-defendants, and broadcast

video of agents knocking on their front door and then taking them into custody.  Exhibit 9, clips

5 and 9.

Moreover, there is evidence strongly suggesting that the leak occurred on December 16,

2014, after the sealed indictment was returned and in advance of the arrests the following

morning.  Prior to December 16, 2014, Defendant Robert Ronzio's name had not been published

in any context or publically associated with NECC or the government's investigation.  Affidavit

of Robert Ronzio (Exhibit 19) at ¶6.  However, on December 16, 2014 – the day the sealed

indictment was returned, and the day before arrests were made – Kevin Rothstein, an

investigative producer at WCVB (Channel 5), reviewed Mr. Ronzio's on-line professional

webpage with LinkedIn.  Id. at ¶¶5, 8.  Mr. Rothstein is a member of WCVB News' 5

---

[7]  The federal grand jury investigating this case was a "Tuesday grand jury," meaning it met primarily on Tuesdays.
Mr. Cadden's lawyers had advised him it appeared an indictment was likely in December 2014, and that he would
thus likely be arrested in December early on a Wednesday morning, the day after the sealed indictment was
returned.  See Affidavit of Michelle R. Peirce, Esq. ("Peirce Affidavit") (Exhibit 17), ¶4.

Investigates Team, whose members also include investigative reporters Karen Anderson and Kathy Curran.

Another defendant whose name is not believed to have been publicly associated with NECC, or the government's investigation, was Christopher Leary, who also had a LinkedIn account. In his affidavit (Exhibit 43), ¶ 4, Mr. Leary states: "I specifically recall that my LinkedIn account was accessed by an investigative reporter from WCVB-TV within a day or so prior to my arrest. I am relatively certain that the person who accessed by account was named Kathy Curran." As noted above, Ms. Curran is a member of the same WCVB 5 Investigative Team as Mr. Rothstein.

The next morning, WCVB had cameras at the homes of NECC's co-owners in Wrentham, Southborough, and Dedham at the time of the arrests, and was the first to report on them at 6:16 a.m., with subsequent tweets from Karen Anderson continuing throughout the early morning. Exhibits 1, 3, 4 and 5. Mr. Rothstein, on at least 3 separate occasions, retweeted Ms. Anderson's and Ms. Curran's early morning tweets about the defendants' arrests. Exhibit 20.[8]

In analogous cases involving possible grand jury leaks in violation of Rule 6(e)(2), courts have held that a defendant is entitled to an evidentiary hearing upon a *prima facie* showing of a violation of these rules governing leaks to the media. United States v. Flemmi, 233 F.Supp.2d 113, 116-117 (D. Mass. 2000); see also Barry v. U.S., 865 F.2d 1317, 1321-22 (D.C. Cir. 1989); U.S. v. Eisenberg, 711 F.2d 959, 964 (11th Cir. 1983); Lance v. United States, 610 F.2d 202, 220-21 (5th Cir. 1980) (defendant made a sufficient prima facie showing of a violation of Rule 6(e) to warrant an evidentiary hearing). In Flemmi, the defendant asserted that the government leaked information to the media about the ongoing grand jury investigation. In evaluating the

---

[8] Again, Mr. Cadden is not suggesting that Mr. Rothstein, Ms. Anderson or any other member of the media engaged in any improper conduct by covering these arrests after the information was leaked.

defendant's claim, the court held that a news report "need only be susceptible to an interpretation that the information reported was furnished by an attorney or agent of the government; in fact [i]t is not necessary for [an] article to expressly implicate [the government] as the source of the disclosures if the nature of the information disclosed furnishes the connection." Flemmi, 233 F.Supp.2d at 117 (quoting In re Sealed Case No. 98-3077, 151 F.3d 1058, 1068 n. 7 (D.C. Cir. 1998)) (internal citations omitted).  If a defendant satisfies this "relatively light" burden, he is entitled to a show cause hearing. Id.  But if the defendant cannot show a definite source for the leak, the government might be able to cause the *prima facie* case to fail if it can make a responsive affidavit. Id.

Here, there is a *prima facie* basis for believing that the government was the source of the leak.  Unlike a leak in the grand jury context, where the source could be a grand jury witness or lawyer for the witness (or someone they told), the most plausible explanation given the circumstances here – where the government maintained a veil of ultra-secrecy with defense counsel – is that the source was a government attorney or agent.  They were the only individuals who were supposed to be aware that the arrest would occur on the morning of December 17, 2014, other than the court (and the grand jurors, who were also sworn to secrecy).  Thus, this case is distinguishable from Flemmi in that the *prima facie* evidence here points more directly to the government as the likely source.

Based on this *prima facie* evidence, Mr. Cadden respectfully requests that the court order an evidentiary hearing to pinpoint the source of the leak, any impropriety associated with it, and, if so, to determine the appropriate remedies for it.

**D.     The government's perp walk of Mr. Cadden violated his Fourth Amendment privacy rights and his Sixth Amendment right to a fair trial**

The government's actions resulted in widely disseminated and highly prejudicial video footage and photographic images from Mr. Cadden's residence at the time of his arrest, as well as images of Mr. Cadden being physically restrained by handcuffs and being walked out of the Wrentham Police Department. See e.g., Exhibit 13; Exhibit 14; Exhibit 9, clips 3, 5, 6, and 7. These images, which were widely broadcast, nationally and locally, violated Mr. Cadden's Fourth Amendment privacy interests and served to further taint the jury pool in violation of his Sixth Amendment rights.

"[T]he Fourth Amendment's proscription of unreasonable searches and seizures 'not only ... prevents[s] searches and seizures that would be unreasonable if conducted at all, but also ... ensure[s] reasonableness in the manner and scope of searches and seizures that are carried out.'" Caldaroloa v. Cnty. Of Westchester, 343 F.3d 570, 575 (2nd Cir. 2003), quoting Lauro, 219 F.3d at 209 (quoting Ayeni v. Mottola, 35 F.3d 680, 684 (2d Cir. 1994)).  A criminal defendant "possesses a privacy interest in not being 'displayed to the world, against his will, in handcuffs, and in a posture connoting guilt." Caldaroloa v. Cnty. Of Westchester, 343 F.3d 570, 575 (2nd Cir. 2003), quoting Lauro, 219 F.3d at 212 n. 7; see also Katz v. United States, 389 U.S. 347, 353 (1967) (Fourth Amendment extends to seizures of tangible and intangible items); Lauro v. Charles, 219 F.3d 202, 212 (2nd Cir. 2000) ("[T]he Fourth Amendment shields arrestees from police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure"); Brown v. Pepe, 42 F.Supp.3d 310, 315 (D. Mass. 2013) (even in a public setting, a person has a "minimal" expectation of privacy).

In <u>Brown v. Pepe</u>, 42 F.Supp.3d 310, 315 (D. Mass. 2013), this court considered as a matter of first impression the constitutionality of a perp walk.  Brown, a convicted felon and fugitive who was recaptured by police after an escape, was required to perform a perp walk in front of the news media and was photographed by a state trooper.  <u>Id.</u> at 312-13.  Brown later brought a civil rights action against the government agents responsible for this conduct, alleging a Fourth Amendment violation.  While the court concluded that the government's conduct "intruded on his legitimate concerns for privacy," it found that this seizure "was nonetheless reasonable when balanced against the government interests served by the publication by the news media of the visual verification of his extradition."  <u>Id.</u> at 316.

Unlike in <u>Brown</u>, there was no meaningful governmental interest served by Mr. Cadden's perp walk.  Mr. Cadden had repeatedly volunteered to surrender and to give the government his passport.  <u>See</u> § III, <u>infra</u>.  He was not a fugitive or considered a danger to the community, so there was no urgent need to inform the public through the publication of these images.  <u>Compare</u> <u>Brown</u> at 316-17.  He did not travel and the government knew where he was at all times.  Exhibit 16 at 106-07.  There also was no risk that a summons to Mr. Cadden would have led other defendants to flee.  Mr. Chin – the only other defendant for whom the government sought detention – was already under house arrest and subjected to electronic monitoring at the time of his re-arrest.  Moreover, the government accomplished the goal of informing the public about the its efforts to address the meningitis tragedy through a December 17, 2014 press release and a 49 minute televised press conference, conducted by U.S. Attorney Ortiz, other Justice Department officials, FDA Deputy Commissioner Howard Sklamberg, Michigan Attorney General Bill

Schuette, and others.  See 12/17/14 DOJ Press Release (Exhibit 21); Video excerpts from

12/17/14 DOJ Press Conference (Exhibit 9, clip 12).[9]

The only governmental interests served by the public arrest and perp walk were to

generate widespread favorable press for the U.S. Attorney and the Justice Department for their

aggressive efforts in a highly publicized case.  But in achieving these self-laudatory goals, they

humiliated Mr. Cadden and invaded his Fourth Amendment privacy interest.  And they inflamed

the public and impaired his Sixth Amendment right to a fair trial.

The harm that resulted from the government's actions was immense.  The images of Mr.

Cadden in handcuffs, "in a posture connoting guilt," appeared on local news stations WCVB

(Channel 5) and Fox 25.  See Exhibit 9, clips 3, 5, and 6; see also Exhibit 13.  These images were

also shown on national broadcasts, as well as on the front page of the Boston Globe's Metro

Section.  See e.g., Exhibit 9, clip 7; Exhibit 14.  Now every potential juror who does a Google

search for "Barry Cadden" – including selected jurors who may disregard the Court's

instructions – will see numerous images of him in handcuffs surrounded by federal agents and a

uniformed police officer.  The widespread publication of these images further tainted the jury

pool and increased the public condemnation for Mr. Cadden.

This prejudicial perp walk was entirely avoidable.  But the evidence suggests that

government chose to ignore Mr. Cadden's offers to surrender and turn over his passport so that

instead it could orchestrate the media circus.  These actions, and the harm that resulted, further

support the need for an evidentiary hearing into the media leaks that caused this harm.

---

[9] Counsel has not provided a complete copy of the press conference because of its length.  Instead, counsel has provided as Exhibit 9, clip 12, a short video compilation, created by the Boston Globe, of certain excerpts from the press conference.  If the Court would like a copy of the complete press conference, counsel will provide it.

III.   **THE GOVERNMENT HAD ABSOLUTELY NO VALID BASIS TO BELIEVE MR. CADDEN WAS A FLIGHT RISK, AND THUS WRONGFULLY ASKED TO SEAL THE INDICTMENT UNDER FED. R. CRIM. P. 6(e)(4)**

   A.   **Mr. Cadden has been aware since at least the fall of 2012 that he was the target of the government's investigation and that serious charges, with the possibility of life sentence, were a distinct possibility**

Rarely has a criminal defendant lived for a longer time with greater certainty that he would be indicted for very serious charges than Barry Cadden. As the horrible death toll mounted in the fungal meningitis outbreak associated with a drug compounded by NECC, a series of events swirled about Mr. Cadden that graphically demonstrated this sobering inevitability. Despite his strong belief in his innocence, the events made it clear to Mr. Cadden that there would unquestionably be an indictment; that as the head of the company, he would be named in it; and that the charges could well include homicide-related allegations carrying up to a life sentence if convicted.

The events that gave rise to this conclusion began on October 16, 2012, when federal agents, including agents from the FDA's office of Criminal Investigations, executed a search warrant at NECC in Framingham. See Toni Clarke, Suea Herbst-Bayliss, Feds raid Massachusetts lab tied to meningitis outbreak, REUTERS, Oct. 16, 2012 (Exhibit 22); Barry Chin and Liz Kowalczyk, FDA searches pharmacy amid outbreak investigation, BOSTON GLOBE, Oct. 16, 2012 (Exhibit 23). That same day, US Attorney Carmen M. Ortiz issued a statement acknowledging that her office and law enforcement partners were actively investigating allegations concerning NECC. See 10/16/12 Statement from U.S. Attorney Carmen M. Ortiz regarding the New England Compounding Center (Exhibit 24).

The focus on Mr. Cadden intensified in November of 2012, when he was subpoenaed to testify before the House of Representative's Energy and Commerce Committee as part of its

investigation of the fungal meningitis outbreak.  See U.S. House of Representative's Subpoena

(Exhibit 25).  Mr. Cadden declined to answer questions, exercising his Fifth Amendment

privilege against self-incrimination during this televised House hearing.  Widespread news

reports covered the exercise of his privilege.[10]  See e.g., Liz Kowalczyk and Kay Lazar, Co-

owner of pharmacy blamed for outbreak stays silent at hearing, BOSTON GLOBE, Nov. 15, 2012

(Exhibit 26); Sabrina Tavernise, F.D.A. Chief Seeks Expanded Authority to Improve Safety of

Drug Compounders, THE NEW YORK TIMES, Nov. 14, 2012 (Exhibit 27); Thomas M. Burton,

Lawmakers Criticize FDA Over Meningitis Cases, THE WALL STREET JOURNAL, Nov. 14, 2012

(Exhibit 28); Michael Martinez, Owner of firm linked to deadly meningitis outbreak takes Fifth

before Congress, CNN Online, Nov. 14, 2012 (Exhibit 29).

   The public outcry and widespread media attention increased as the investigation

progressed over the next several months.  In March 2013, the CBS News Program 60 Minutes

led its broadcast with a fifteen minute segment entitled, "Lethal Medicine Linked to Meningitis

Outbreak."[11]  The program included interviews of two former NECC employees as well as

numerous victims of this tragedy.  Id.

   Federal authorities were not the only ones investigating NECC and Mr. Cadden.  In

March of 2013, Bill Schuette, Michigan's Attorney General, announced that he had filed a

petition to the Michigan Court of Appeals to empanel a multi-county grand jury investigation

into NECC.  See Petition for Multi-County Grand Jury (Exhibit 30).  In a statement to the press,

AG Schuette stated:  "We will discover what went wrong, bring bad actors to justice, and then

work to implement new protections to ensure tragedies like this never happen again."  See

---

[10]  This attention pales in comparison to the graphic perp walk footage of Mr. Cadden being transported in
handcuffs by federal agents after his arrest that flooded the television and online media.

[11]  See http://www.cbsnews.com/news/lethal-medicine-linked-to-meningitis-outbreak-10-03-2013/.

3/26/13 Michigan Attorney General's Press Release (Exhibit 31).  In April 2013, the Michigan

Court of Appeals granted AG Schuette's request, and thereafter a state grand jury investigation

commenced.  See 12/17/14 Press Release by Michigan Attorney General (Exhibit 32).

Mr. Cadden was well aware of both the federal and state of Michigan grand jury

investigations, the likelihood that the Michigan grand jury was investigating alleged homicide

offenses under Michigan law, and the virtual certainty that he would be indicted on very serious

charges for his alleged role in the fungal meningitis outbreak.  See Peirce Affidavit (Exhibit 17),

at ¶ 3; Excerpt of transcript of 12/17/14 hearing (Exhibit 15) at 3; Excerpt of transcript of

12/18/14 hearing (Exhibit 16) at 105.[12]

**B.      The U.S. Attorney ignored Mr. Cadden's repeated pleas to surrender his and
          his wife's passports, and to be permitted to self-surrender**

In the spring and fall of 2013, counsel for Mr. Cadden made numerous requests to the

prosecution team and the U.S. Attorney that a summons issue so he would not be subjected to an

unnecessary and prejudicial perp walk.  In several conversations, emails, and letters, counsel

made clear that Mr. Cadden was not a flight risk and would willingly surrender his and his wife's

passports pre-indictment.

The first in-person discussion of these issues was on June 12, 2013.  See 9/24/13 letter

from Bruce A. Singal to K. Nathaniel Yeager (Exhibit 34).  During this meeting, AUSA Yeager

informed Mr. Cadden's counsel that if his office decided to charge Mr. Cadden and determined

that he represented a flight risk, he would not contact undersigned counsel before the arrest.  See

9/27/13 email from K. Nathaniel Yeager to Bruce A. Singal (Exhibit 34).  AUSA Yeager also

indicated that the government was not just considering an indictment for violations of the Food

---

[12] Mr. Cadden made this proffer through counsel at the initial appearance and detention hearing.  Mr. Cadden is not
waiving the attorney-client privilege.

Drug and Cosmetic Act, but instead was considering much more serious charges. Peirce Affidavit (Exhibit 17), at ¶2. Counsel advised their client of this alarming news. Id.

In a letter dated September 24, 2013, counsel again requested that if Mr. Cadden was indicted, he be allowed to self-surrender and have a summons, rather than an arrest warrant, issue. Exhibit 33. Counsel wrote that "[t]he Caddens have known for a year now that Barry, in particular, is in potentially grave legal peril," but "[t]hey [Mr. and Mrs. Cadden] are going nowhere!" Id. at 1. Counsel also made the government aware that the arrest of Mr. Cadden would raise significant constitutional concerns, which were magnified because of the widespread media attention to this tragedy. Id. at 2. Finally, to allay any possible concerns regarding flight, counsel offered to provide the Cadden's passports to prosecutors pending their decision regarding indictments. Id.

AUSA Yeager responded in an email dated September 27, 2013 (Exhibit 34), stating: "With regard to your client's passports, this office has not made any determination regarding charges in this matter. As a result, your offer is premature."

In an email dated October 1, 2013 (Exhibit 35), counsel asked that his email to AUSA Yeager constitute a continuing request that no arrest warrant issue in the event of any charges. Counsel wrote:

> You have declined, at least for now, our offer to turn over [the Caddens'] passports to you, so instead we will hold both their passports securely under lock and key in our office. If you want them, please let us know and we will promptly deliver them to you.

Having received no response, counsel sent another letter to AUSA Yeager on October 10, 2013 (Exhibit 36), enclosing photocopies of the signature pages of the Cadden's currently valid passports. Counsel informed AUSA Yeager that these passports had been locked up and secured

at counsel's law firm.  Id.  Counsel again offered to provide the passports to the government and reiterated the request for a summons because of the utter absence of any risk of flight.  Id.

In a letter to United States Attorney Carmen Ortiz, dated November 26, 2014 (Exhibit 37), undersigned counsel restated the request that a summons issue because Mr. Cadden posed no flight risk.  Counsel again offered to provide the Caddens' passports to the U.S. Attorney, and noted that under these circumstances, an arrest of Mr. Cadden would violate his constitutional rights.  Id.  U.S. Attorney Ortiz responded by email on December 1, 2014, and indicated that she had read the letter and would discuss this request with the AUSAs involved in the investigation. (Exhibit 38).

### C. The government violated Federal Rule of Criminal Procedure 6(e)(4) by improperly requesting to seal the indictment when it knew Mr. Cadden was not a flight risk.

Under Fed. R. Crim. P. 6(e)(4), the government can request that the court seal the indictment until the defendant is in custody or has been released pending trial.  "[T]he government need not articulate its reasons for requesting that an indictment be sealed, so long as its request is based on a ground set forth in Rule 6(e)."  United States v. Balsam, 203 F.3d 72, 81 (1st Cir. 2000); see also United States v. Laliberte, 131 F.R.D. 20, 21 (D. Mass. 1990) (detailed factual basis required for sealing indictment for reason other than that contained in Rule 6(e)(4)); United States v. Richard, 943 F.2d 115, 116 (1st Cir. 1991) (court may grant the government's request to seal "for any legitimate prosecutorial objective or where the public interest otherwise requires it").

Upon return of the Indictment on December 16, 2014, the government filed a motion to seal the case until execution of the arrest warrants. See 1:14-cr-10363-RGS, document #2.[13] The government did not provide any rationale for its request to seal. Id. The presumption in a situation like this, when no justification is provided, is that the government's rationale is a risk of flight. United States v. Maroun, 699 F.Supp. 5, 7 (D. Mass. 1988). The court allowed the government's motion to seal, and approved the government's request for an arrest warrant for Mr. Cadden, which was also sealed. See 1:14-cr-10363-RGS, documents #3 and #4.

The government abused the sealing process because there was no reasonable basis to conclude that Mr. Cadden was a flight risk. This case thus closely resembles United States v. McBride, Crim. No. 13-10195-PBS, 2014 WL 2987014 (D. Mass. July 2014), where the defendant challenged the government's request to seal the indictment, arguing that there was no legitimate basis for the government's contention that he was a flight risk. Id. at *2. As in the present case, the government relied almost entirely on the seriousness of the crime charged to support its assertion that there was a risk of flight and a need to seal. Id. at *4.

Although the court considered this factor, it held that the evidence did not support a risk of flight because of McBride's extensive community and family ties. Id. at *2-5. Ultimately, the court denied McBride's request to dismiss the indictment, finding that although the sealing was unwarranted, it had not affected McBride's ability to defend against the indictment. Id. at *8; see also United States v. Gigante, 436 F. Supp. 2d 647, 657 (S.D.N.Y. 2006) (sealing of indictment was not justified where defendant's whereabouts were never unknown, defendant knew for several years he was under investigation, and defendant volunteered to surrender).

---

[13] The government further requested that the Court automatically unseal the case after the first arrest warrant was executed.

Here, the lack of any legitimate prosecutorial purpose for sealing the indictment and arrest warrant is even more profound. As U.S. Attorney Ortiz has acknowledged, "[t]he NECC criminal investigation . . . generated substantial coverage in both the national and local media for more than two years." Declaration of U.S. Attorney Carmen Ortiz, 1:13-md-02419-RWZ, document 1838-3, ¶¶5, 15. Mr. Cadden was keenly aware during that entire period that he was in "potentially grave legal peril," and would likely be charged with serious crimes, including crimes carrying the possibility of life sentences if convicted. See 9/24/13 letter from Bruce Singal to Nathanial Yeager; (Exhibit 33); Peirce Affidavit (Exhibit 17), at ¶3; Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 105-108.

Yet Mr. Cadden did nothing during the 2-year investigation to suggest in any way that he posed a flight risk. He did not travel anywhere outside of Massachusetts and Rhode Island, where he and his wife maintain homes, other than a few trips within New England and New York to visit colleges with his son and to take his daughter to interscholastic athletic tournaments. On the contrary, he stood ready, as reflected by counsel's numerous letters to the U.S. Attorney's Office, to surrender his and his wife's passports and to self-surrender upon indictment.

Finally, the U.S. Attorney's Office's longstanding justification that it cannot have a double standard for defendants in white collar cases does not justify its actions. No defendant – whether white collar or otherwise – who repeatedly offers to surrender and who does not pose a risk of flight or a danger to the community or himself, should be publically arrested and subjected to a perp walk. See McBride, supra at *4 ("While true [that white collar defendants should not be treated differently], this . . . does not defeat the basic principle that an indictment should not be sealed routinely without a legitimate prosecutorial objective").

## IV.    THE GOVERNMENT REQUESTED DETENTION EVEN THOUGH MR. CADDEN POSED NO RISK OF FLIGHT

### A.    There was no evidence of risk of flight

At Mr. Cadden's initial appearance on December 17, 2014, the government requested detention, and a detention hearing was held the following day.  At the hearing, the government presented no evidence that Mr. Cadden was not a stable and longstanding member of his community.  It presented no evidence showing any actions or statements on his part reflecting a desire to flee, or a risk that he would do so.  And it presented no evidence that he was a danger to himself or to others.

Rather, the government's central, if not exclusive, argument at the hearing was that Mr. Cadden became a flight risk when he was indicted on December 17 and became aware, for the first time, of the gravity of the charges.  During the hearing, AUSA Varghese stated (as to defendants Cadden and Chin):

> I don't believe that either defendant ever contemplated that
> they would be facing the number of counts, the severity of
> counts and the potential for life sentence.
>
> …
>
> [T]he calculus changes, Your Honor, when you're facing
> the enormity of offenses that these two men are now facing,
> and the sentences that will come when they are convicted. .
> . ." Exhibit 16 at 101-103.

This argument is not evidence of risk of flight.  That the government chose to overcharge Cadden and Chin with the most draconian offenses it could conjure up, even if not warranted, does not substitute for real evidence of risk of flight.  See U.S. v. Friedman, 837 F.2d 48, 50 (2d Cir. 1988) ("we have required more than evidence of the commission of a serious crime and the

fact of a potentially long sentence to support a finding of risk of flight"). Indeed, the circumstances should be given the least weight in the court's analysis of whether there are conditions that can reasonably assure the defendant's appearance. See U.S. v. Merrill, Crim. Action No. 14-0472, 2014 WL 2769148, *5 (D. Mass. June 17, 2014).

The government's argument that Mr. Cadden should be detained rested on the premise that he would be so stunned by the 25 second degree murder racketeering acts included in the RICO (Count 1) charge, carrying a potential life sentence, that this would convert him to a risk of flight. But the premise is a faulty and contrived one. For at least a year and a half prior to indictment, Mr. Cadden was well aware of the gravity of the potential federal charges, the ramification of the RICO statute, and the possibility of predicate acts such as second degree murder. Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 105; Peirce Affidavit (Exhibit 17) ¶3. Mr. Cadden was also aware that the U.S. Attorney's Office had advised his counsel that it was considering charges much more serious than violations of the Food Drug and Cosmetic Act. Peirce Affidavit at ¶2. Finally, Mr. Cadden was well aware that a Michigan grand jury had been empaneled and could be considering possible homicide charges. Id. at ¶3; Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 105.

What is most telling from a bail standpoint is not that Mr. Cadden was indicted on very serious charges, but that he knew for such a long time that this was inevitable (albeit unwarranted), and reacted to that news by staying at home awaiting arrest and trying to give his passport to the U.S. Attorney. See United States v. Simone, 317 F. Supp. 2d 38, 42, 49-50 (D. Mass 2004) (defendant's decision not to flee when he was aware of federal investigation,

together with his strong ties to the community and his children, is compelling evidence defendant would not flee if released in federal case).[14]

The government's contention that "everything changed" on December 17 also ignores that there was public commentary, more than two years before the indictment, indicating that charges involving possible life imprisonment were a possibility. A November 21, 2012 Boston Globe article entitled, "Pharmacy case may see call for jail time," noted that "federal guidelines allow for a life sentence in cases of health care fraud involving death." Kay Lazar, Pharmacy case may see call for jail time, BOSTON GLOBE, Nov. 21, 2012 (Exhibit 39).

The government also failed to point to any conduct or characteristics that suggest that Mr. Cadden was a flight risk. These factors support the opposite conclusion. Mr. Cadden and his wife of 22 years have lived for the past 15 years in the communities of Cumberland, Rhode Island and Wrentham, Massachusetts, which are approximately 5 miles apart. The Caddens have three children (ages 15, 18, and 19), one of whom still resides at home and attends high school in Rhode Island. The Caddens' older two children attend college.

As described earlier, see §IIIB, supra, Mr. Cadden's counsel repeatedly tried to persuade the U.S. Attorney to agree to a summons and self-surrender rather than an arrest warrant, and to take Mr. Cadden's passport. But these pleas continued to fall on deaf ears, and it became apparent to Mr. Cadden's counsel that the government was planning to indict sometime in December 2014.

---

[14] The evidence at the detention hearing suggested that the government itself did not consider Mr. Cadden a flight risk during the majority of its two year investigation. FBI Special Agent Clayton Phelps testified that although the government has the ability to place names on a watch list so it will be notified when a target of an investigation attempts to travel, the government did not place Mr. Cadden's name on this watch list at any point between mid-October 2012 and the summer of 2014. Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 96-97. Moreover, the fact that the government did not charge Mr. Cadden for over two plus years, when he was well aware that he was a target, further demonstrates that the government did not perceive him as a flight risk.

At this time, counsel informed Mr. Cadden that an arrest would likely occur on an early Wednesday morning because it was a Tuesday grand jury. Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 108. On several successive Tuesday nights in December 2015, when Mr. Cadden was informed an indictment was likely imminent, he arranged for his two children who then lived with him to stay at friends' houses so they would not be exposed to his arrest. Peirce Affidavit (Exhibit 17), at ¶4. Mr. Cadden then woke up at 4:00 a.m. on three successive Wednesdays, get dressed, and wait to welcome the agents into his home to arrest him. Excerpt of transcript of 12/7/14 hearing (Exhibit 15) at 3; Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 108. When the agents arrived at his home on December 17, 2014, Mr. Cadden opened the door for them before they knocked or rang the bell, and then left with them minutes later. See Exhibit 2. This was not a risk of flight; it was an invitation to arrest.

There is, in short, simply no evidence that Mr. Cadden is a flight risk. If he had wanted to flee in the face of very serious charges, he would have been long gone during the 1½-2 year period when he knew such charges were inevitable. There is no justification for the present bail condition of home incarceration via electronic monitoring, and Mr. Cadden respectfully requests that this condition be removed.

In the absence of any evidence of risk of flight – and in the face of compelling evidence to the contrary – a principled application of the bail statute would make personal recognizance, or at most, an unsecured appearance bond, the least restrictive condition necessary to reasonably assure his appearance at trial. 18 U.S.C. § 3142. But the reality is that there is already $500,000 in secured bond, by way of a residential mortgage on his residence, and Mr. Cadden does not

request its removal.[15]

### B.   The government attempted to use the detention hearing to improperly influence the jury pool

In the absence of any evidence of his risk of flight, the government used the opportunity of the detention hearing to continue its effort to introduce irrelevant and highly prejudicial testimony and exhibits for the benefit of the assembled media.   As ostensible evidence of Mr. Cadden's risk of flight, the government made arduous efforts to present autopsy photographs of the brains of individuals who were tragically killed.   Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 14, 70.   Like most of the other evidence presented, this was nothing more than a transparent attempt to further influence the attitude and opinions of potential jurors.   During sidebar (which was not recorded), Magistrate Judge Boal rebuffed the government's attempt to introduce these three exhibits.   Peirce Affidavit (Exhibit 17) at ¶5.   At least twice after the court denied this request, AUSA Varghese urged the court to reconsider.   Id.

Likewise, after the government began eliciting testimony about victims, counsel objected, and the court instructed, "[O]f course the victims have my sympathy but again, it's not relevant for the issues that are before me… we're not going patient by patient. … I think you've made your point, so I would suggest that you move on."   Excerpt of transcript of 12/18/14 hearing (Exhibit 16) at 71-73.

---

[15] Mr. Cadden has fully complied with all of the bail conditions imposed on him since December 2014. Since June, 2015, with the blessing of Pretrial Services, Mr. Cadden has traveled to Rhode Island to visit his parents' graves, and frequently to his lawyer's office in Boston, without incident.

Pretrial Services and the U.S. Attorney's Office were both notified that Mr. Cadden would be seeking to modify conditions of bail by removing the ankle bracelet and home confinement conditions.  Both offices stated they opposed the request.

In these ways, the government used the detention hearing, and its unjustified request for

detention, as a further vehicle to publicize inflammatory albeit irrelevant evidence to the jury

pool.

**V.    THE GOVERNMENT'S ABUSE OF THE COURT'S SEALING PROCESS AND
       PREJUDICIAL DISCLOSURES TO THE PRESS HAVE CONTINUED POST-
       INDICTMENT**

Since the indictment, the government has continued to abuse the Court's sealing process

and has engaged in piecemeal seizures of Mr. Cadden's assets so it could issue prejudicial press

releases to further taint the jury pool.   On January 5, 2015, nearly three weeks after the

indictment and after the assets at issue had been seized, the U.S. Attorney's Office moved to

unseal seizure warrants for assets held in various bank accounts allegedly belonging to Mr.

Cadden and other co-defendants.  See 1:14-mj-07211-JCB-1, Document 11; 1:14-mj-07212-

JCB-1, Document 11, 1:14-mj-07213-JCB-1, Document 11.  After the Court unsealed these

warrants the following day (see id., Document 12), the government immediately issued a press

release entitled, "$18 Million Seized from Owners of New England Compounding Center."

Exhibit 40.

Approximately six months later, on June 5, 2015, the government moved to seal the

seizure warrant applications related to the seizure of two assets allegedly belonging to Mr.

Cadden (a car and boat).  See 1:15-mj-07087-JCB-1, Document 2; 1:15-mj-07088-JCB-1,

Document 2.  In its motions to seal, the government stated that "public disclosure of the

information contained in said documents could lead to efforts by the owners or possessors of the

assets to transfer, place liens upon, deplete, or otherwise impair the forfeitability of the asset, or

interfere with an ongoing criminal investigation."  Id.

There was no legitimate basis for the government to request this sealing. The two assets that the government sought to seize were specifically identified as forfeitable property nearly six months earlier in both the racketeering and mail fraud forfeiture allegations in the December 16, 2014 indictment.  14-CR-10363 Document #1, ¶¶ 138, 140.

On June 8, 2015, after apparently recognizing that it had abused the sealing process, the government moved to unseal the seizure warrant application and related documents before the warrant had been executed.  See 1:15-mj-07087-JCB-1, Document 6; 1:15-mj-07088-JCB-1, Document 6.  In its motions, the government stated that it "intends to seek the cooperation of the owner of the above properties to execute the seizure warrants." Id.

After the Court unsealed the seizure warrants, prosecutors provided copies to Mr. Cadden's counsel and asked if Mr. Cadden would be cooperative and put the vehicle out on the street in front of his home so that the marshals could seize it the following morning.  Peirce Affidavit at ¶6.  Mr. Cadden agreed and left the vehicle on the street outside his home with the keys in it.[16] Id.  Marshals seized the vehicle on the morning of June 9, 2015.  See 1:15-mj-07087-JCB-1, Document 9.

On the morning of June 10, 2015, the U.S. Attorney's Office issued a press release entitled "Luxury Car and Boat Seized From Former Head Pharmacist of New England Compounding Center."  See 6/10/15 U.S. Attorney Press Release (Exhibit 41).[17]  This press release rehashed the criminal allegations against Mr. Cadden, noting again that he is charged with "25 acts of second-degree murder in Florida, Indiana, Maryland, Michigan, North Carolina, Tennessee, and Virginia…" Id.  The press release also described the unrelated civil forfeiture

---

[16] Mr. and Mrs. Cadden reserved all rights to challenge this seizure and did not waive any of these rights by assenting to this process.
[17] Notably absent from this press release was any acknowledgement that Mr. Cadden had agreed to turn over this car and boat upon the government's request.  The "seizure" of the car consisted of picking it up with the keys in it by prearrangement with the owner.

complaint that was filed on May 22, 2015, against funds allegedly owned by Mr. Cadden and his wife. Id.

These continued efforts by the government to orchestrate highly prejudicial pretrial publicity about Mr. Cadden and his case clash with the government's professed concern about prejudicial publicity affecting the defendants' rights to a fair trial. However, the government's ostensible concern has been confined to its efforts to suppress evidence in the related MDL civil proceeding so that it is not available to the criminal defendants.

In May and June 2015, for example, the government tried to quash deposition subpoenas to FDA and Massachusetts Board of Pharmacy witnesses in the civil cases. In support of these motions, U.S. Attorney Carmen Ortiz submitted affidavits declaring:

> [C]onducting a deposition of one or more [FDA and Massachusetts Board of Pharmacy] witnesses now could generate substantial pretrial publicity that could affect the rights of the 14 criminal defendants to a fair trial. . . . In a high-profile matter such as this, it is likely that such widespread use of the deposition testimony will result in leaks and disclosures of the testimony, in whole or part, to the media, inadvertently or otherwise. Premature disclosure about the government's case, including potential witnesses' testimony or details regarding the nature of evidence seized through search warrants, could affect the ability to seat a fair and impartial jury in the criminal case."

See 1:13-md-02419-RWZ, Document 1838-3, ¶ 15 and Document 1976, ¶ 14.

Similarly, during a recent hearing in the civil litigation, AUSA Strachan argued that the defendants' right to a fair trial would be prejudiced if the government was forced to turn over discovery materials to the civil plaintiffs:

> 14 criminal defendants have a right to a fair trial. If these documents become public – there's a great national interest in this case, and if these documents become public, if testimony or witness interviews become public, there's no way to take that back, and there's no way to rectify the harm in some ways.

Excerpt of transcript of 9/9/15 motion hearing (Exhibit 42) at 34.[18]

But such sentiments by the government collide with its actions in this case.  The

government wanted no part of Mr. Cadden's proffered passport or self-surrender.  Instead,

without any evidence of risk of flight, the government improperly sealed the indictment and

obtained an arrest warrant to ensure there was a public perp walk.  *Prima facie* evidence suggests

that government officials may have violated the sealing orders that the government had obtained

to leak to the media the confidential information about the indictment and impending arrests in

order to orchestrate this massive media event.  The government used the unwarranted detention

hearing to further disseminate through the media inflammatory and highly irrelevant evidence

about the victims' medical conditions, and about inflated dollar figures allegedly received by Mr.

Cadden from NECC and the irrelevant Ameridose.  And since the indictment, the government

has continued to improperly seal, and then unseal with fanfare, further inflammatory information

serving to periodically remind the public of the tragic deaths at issue here, and the purported

wealth and luxury items possessed by Mr. Cadden.

In light of such conduct, the U.S. Attorney's sporadic and self-serving professions of

concern about the defendants' fair trial rights suffer from the aroma of hypocrisy.

## CONCLUSION

While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones."

Berger v. United States, 295 U.S. 78, 88 (1935).  It is the prosecutor's "duty to refrain from

---

[18] The government's preoccupation with preventing the defendants from gaining information under the guise of preventing pretrial publicity manifested itself again this week.  See 1:13-md-02419-RWZ, Document 2395.  On Monday, the government moved to stay the depositions of two potential government witnesses, contending that "allowing these depositions to proceed would risk not only making public, but generating substantial pretrial publicity – months before the criminal trial – the testimony of witnesses the government may call at trial." Id. at 3. The government also complained that the depositions "could potentially harm the criminal case given that those transcripts would be available for use by the criminal defendants in trying to impeach the witnesses during the criminal trial." Id. at 2.

improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." Id.

Ample *prima facie* evidence suggests that the government may well have trampled on that line through an abuse of the sealing process, an apparent leak to the media regarding Mr. Cadden's arrest, an orchestrated perp walk, and continued efforts to contaminate the jury pool with inflammatory information serving no legitimate governmental interest.  In light of this evidence, Mr. Cadden is entitled to, and respectfully requests, the following relief from this Court:

1.  An evidentiary hearing to determine how media representatives learned that Mr. Cadden and at least three of his co-defendants would be arrested early in the morning on December 17, 2014, and whether the government had adequate grounds for requesting a sealed indictment and arrest warrant;

2.  An Order that the government discontinue issuing inflammatory press releases related to this case; and

3.  Amendment of the conditions of Mr. Cadden's pretrial release under 18 U.S.C. § 3145(a)(2) to remove the requirement of 24-hour-per-day home incarceration with electronic monitoring.

If the evidentiary hearing proves that the government improperly requested to seal the indictment and arrest warrant, and/or then leaked information to the media about his and the three co-defendants' indictment and impending arrests, then Mr. Cadden would request from this Court appropriate relief and sanctions tailored to such evidence.

As a final note, Mr. Cadden's counsel wish to acknowledge their profound respect for the institutions of this United States Attorney's Office, and the Department of Justice of which it is a

part. But we are compelled to bring these matters to this Court's attention in order to advance the interests of justice and our client's right to a fair process.

Dated:  November 13, 2015                    Respectfully submitted,

                                             BARRY J. CADDEN,
                                             By his attorneys,


                                             /s/   Bruce A. Singal
                                             Bruce A. Singal (BBO# 464420)
                                             Michelle R. Peirce (BBO# 557316)
                                             DONOGHUE, BARRETT & SINGAL, PC
                                             One Beacon Street – Suite 1320
                                             Boston, MA 02108
                                             Telephone:  (617) 720-5090
                                             bsingal@dbslawfirm.com
                                             mpeirce@dbslawfirm.com


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on November 13, 2015.

                                             /s/   Bruce A. Singal
                                             Bruce A. Singal