UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 14-cr-10363 (RGS) |
| | ) | |
| CARLA R. CONIGLIARO AND | ) | |
| DOUGLAS A. CONIGLIARO | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**CARLA CONIGLIARO'S AND DOUGLAS CONIGLIARO'S MEMORANDUM OF LAW
IN SUPPORT OF MOTION TO DISMISS STRUCTURING AND CONTEMPT CHARGES**

## INTRODUCTION

The 73-page indictment in this case (Docket No. 1) ("Indictment") charges fourteen individuals with a series of federal crimes in a total of 131 counts. The first twelve defendants are charged with various crimes, including murder, arising out of the alleged compounding and distribution of contaminated methylprednisolone acetate ("MPA"), an injectable steroid medication, at the New England Compounding Center ("NECC"). The Government alleges that the contaminated MPA that was compounded at NECC resulted in a nationwide fungal meningitis outbreak in 2012 that caused the deaths of at least 64 people and sickened close to 700 others.

The charges against the first twelve defendants arise out of their alleged conduct at NECC and include, *inter alia*, racketeering (predicated upon twenty-five counts of murder and fifty-three counts of mail fraud), conspiracy, and the introduction of adulterated and misbranded drugs into interstate commerce. Indictment ¶¶ 38-119. The Government alleges that certain of the defendants failed to follow proper pharmaceutical sanitary procedures at NECC, which allegedly led to the contamination of the MPA and the resulting deaths and illnesses. In significant contrast, the charges brought by the Government against the last two defendants, Carla Conigliaro and Douglas Conigliaro ("the Conigliaros"), whose trial has now been severed from that of the first twelve defendants, Docket No. 358, are of a wholly different nature -- in substance, in time frame, and otherwise.

The Government alleges that between 2010 (two years prior to the meningitis outbreak) and 2014, the Conigliaros "structured" certain bank withdrawals (primarily ATM cash withdrawals) at three different local banks totaling approximately $570,000 in order to avoid federal currency transaction reporting requirements. Indictment ¶¶ 122-137. The Government further alleges that in early 2013 the Conigliaros made certain "transfers" of significant sums of money between personal family bank accounts, allegedly in violation of orders issued by a United States Bankruptcy Judge. Indictment ¶¶ 120-121.

1

As set forth more fully below, however, the allegations contained in the Indictment are insufficient as a matter of law to set forth the crimes of structuring and contempt, and therefore the charges against the Conigliaros must be dismissed.

## I.   RELEVANT FACTS

### A.   Structuring Charges

In the Indictment, the Government alleges that the Conigliaros held joint checking accounts at Middlesex Savings Bank, SunTrust Bank, and TD Bank, and made hundreds of cash withdrawals (primarily ATM withdrawals) from those accounts for the purpose of causing the respective bank to fail to file Currency Transaction Reports ("CTRs").[1]   Indictment ¶¶ 131, 134 and 137.   The Government further alleges that the Conigliaros conspired to engage in such conduct.   Indictment ¶¶ 122-128.

Specifically, the Government alleges that, during the 851-day time period between September 27, 2010 and January 25, 2013, the Conigliaros made "504 structured cash withdrawals, totaling approximately $389,680.26" at Middlesex Savings Bank.   Indictment ¶ 131. The Government further alleges that, during the 303-day time period between February 4, 2013 and December 4, 2013, the Conigliaros made "148 structured cash withdrawals, totaling approximately $111,103.50" at SunTrust Bank.   Indictment ¶ 134.   The Government further alleges that, during the 393-day time period between February 13, 2013 and March 13, 2014, the Conigliaros made "124 structured cash withdrawals, totaling approximately $71,558.25" at TD Bank.   Indictment ¶ 137.   The Indictment alleges a separate count of structuring at each of the three banks, Indictment ¶¶ 129-131 (Count No. 129 - Middlesex Savings Bank), 132-134 (Count No. 130 - SunTrust Bank), and 135-137 (Count No. 131 - TD Bank), as well as a separate count of conspiracy to commit structuring.   Indictment ¶¶ 122-128 (Count No. 128).

---

[1]      Federal law requires banks and other financial institutions to file a CTR with the appropriate federal agency whenever $10,000 or more in cash is deposited into or withdrawn from the institution in a single day.   *See* 31 U.S.C. § 5313(a); 31 C.F.R. §§ 1010.306, 1010.311.

The "structured cash withdrawals" alleged in each of the three counts consist of every individual cash withdrawal made by the Conigliaros at that particular bank over the course of the time period encompassed by that count.   In other words, the Indictment alleges that every withdrawal at each of the three banks constituted an act of "structuring."   Similarly, in framing the three substantive structuring counts, the Government appears to have simply aggregated (or added up) every single cash withdrawal at each of the three banks.   Dividing the total amount of cash withdrawn by the number of withdrawals at each of the banks suggests that the alleged "structured withdrawals" averaged $773.18 (Middlesex), $750.70 (SunTrust), and $577.08 (TD Bank).[2]

### B.   Contempt Charges

In the Indictment, the Government alleges that the Conigliaros committed criminal contempt by "willfully and knowingly disobey[ing] and resist[ing]" two lawful court orders of the United States Bankruptcy Court (Boroff, J.), the first of which was issued on January 28, 2013. That order provided, in pertinent part, as follows:

> Defendants Barry Cadden, Lisa Conigliaro Cadden, Gregory Conigliaro, Carla Conigliaro (the "Shareholder Defendants") and their agents, employees, attorneys, assigns, and anyone who receives notice of this Order who is acting on behalf of or in concert with the Shareholder Defendants, are restrained from transferring, encumbering, assigning, pledging, mortgaging, or spending any assets of the Shareholder Defendants other than as necessary for ordinary living or legal-representation expenses, except by leave of this Court ….

Order on Committee's Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief, *Moore v. Cadden et al.*, No. 13-1040 (Bankr. D. Mass. Jan. 28, 2013), ECF No. 22 (Meier Decl. Ex. 1).[3]

---

[2]   Notably, the Indictment is silent as to *why* the Conigliaros allegedly sought to avoid the currency transaction requirements in this (or any other) manner.   Likewise, the Indictment offers no suggestion as to why the Government framed the structuring allegations and counts in the manner that it did.

[3]   On February 12, 2013, the Bankruptcy Court issued a second order that superseded this order.   The language of the second order contained nearly the same provisions verbatim.   *See*

The Indictment alleges that the Conigliaros violated the orders -- and committed criminal contempt -- by "transferring" monies between certain personal family bank accounts (by means of checks or wire transfers) in certain transactions that occurred on several dates in February and March, 2013.  Indictment ¶ 121.  Four of the transactions involved substantial sums of money and totaled $19.8 million; fourteen subsequent transactions involved lesser sums of money that originated from within the same $19.8 million and totaled $13.5 million.  The Government alleges that each of the eighteen transactions constituted a "transfer" in violation of the bankruptcy court orders and charged *each* of the transactions as a separate act of contempt.  Indictment Count Nos. 110 – 127.

Significantly, in connection with that same bankruptcy proceeding, *Moore v. Cadden et. al.*, Carla Conigliaro made a full and complete disclosure to the trustee of all of the Conigliaros' assets.  Ironically, the disclosure included all of the same funds that the Government now alleges were contemptuously transferred.  *See* Disclosure Statement for the First Amended Joint Chapter 11 Plan at 11, *In re New England Compounding Pharmacy, Inc.*, No. 12-19882-HJB, (Bankr. D. Mass. Feb. 22, 2015), ECF No. 1155 (Meier Decl. Ex. 3) (statement of bankruptcy trustee that seizure warrants issued prior to commencement of the civil forfeiture case "identify no assets that the Shareholders did not previously identify in the financial disclosures which they provided to the Chapter 11 Trustee under the Shareholder Settlement Agreement.").

The trustee, NECC's creditors (including victims of the meningitis outbreak), NECC's shareholders (including Carla Conigliaro), and other interested parties ultimately negotiated a plan of reorganization in the *In re New England Compounding Pharmacy, Inc.* case.  Under this plan, a fund that was expected to yield between "$160 million to $190 million … for distribution to Tort Claimants" injured by the NECC-caused meningitis outbreak was created, and was funded

Stipulated Order on Committee's Emergency Motion for Temporary Restraining Order and Preliminary Injunctive Relief, *Moore v. Cadden et al.*, No. 13-1040 (Bankr. D. Mass. Jan. 28, 2013), ECF No. 51 (Meier Decl. Ex. 2).

in part by NECC's shareholders.   *See id.* at 3.   Carla Conigliaro contributed $24 million to that fund, which represents 113.2% of the amount that the Bankruptcy Trustee calculated he could recover if he were to succeed in litigation against Carla Conigliaro and if he recovered *all* of the assets owned by Carla Conigliaro that were subject to levy.   *See* Declaration of Chapter 11 Trustee in Support of Pending Settlement Motions at ¶¶ 12, 18, *In re New England Compounding Pharmacy, Inc.*, No. 12-19882-HJB (Bankr. D. Mass. July 9, 2014), ECF No. 905 (Meier Decl. Ex. 4).

The reorganization plan enjoyed broad support from all involved in negotiating it – indeed, when proposed to the meningitis outbreak victims themselves, more than 99% voted in favor of the plan.   *See* Plan Proponents' Pre-Confirmation Hearing Memorandum of Law at ¶¶ 49, 50, *In re New England Compounding Pharmacy, Inc.*, No. 12-19882-HJB (Bankr. D. Mass. Apr. 29, 2015), ECF No. 1240 (Meier Decl. Ex. 5).   At the confirmation hearing on the plan, Judge Henry Boroff – who had also issued the restraining orders at issue in this case – confirmed the plan and spoke highly of it, stating that:

> I think that this plan and its associated trust agreements are the best that could have been achieved for the hundreds of people for whom there could be no full compensation. And that this is, in my view, the highest and best use of the Bankruptcy Code, and evidence of the professionalism of the bar in this district and in the affected districts.

Transcript of Hearing at 40, *Moore v. Cadden et al.*, No. 13-1040 (Bankr. D. Mass. May 19, 2015), ECF No. 1240 (Meier Decl. Ex. 6).

Notwithstanding the above facts, not only did the Government charge the Conigliaros with the federal crime of contempt (in eighteen separate counts), but also sought forfeiture of additional personal funds belonging to the Conigliaros.   In that civil forfeiture action, the Government provided more information in a sworn affidavit concerning the eighteen alleged "transfers."   On May 22, 2015, the Government filed a Verified Complaint alleging that these same eighteen "transfers" also constituted bankruptcy fraud committed in violation of 18 U.S.C. §

152(7), and that as the proceeds of that offense, the Conigliaros' monies were subject to civil forfeiture under federal law.  *See* Verified Complaint for Forfeiture *In Rem*, *United States v. All Funds on Deposit in Lee Munder Wealth Planning Resource Account Number \*\*\*-\*\*\*1080 et al.*, No. 15-cv-11906 (D. Mass. May 22, 2015), ECF No. 1.  On June 12, 2015, the Government filed an Amended Verified Complaint for Forfeiture *In Rem*, which attached and incorporated by reference an Affidavit from Postal Inspector Brian J. Evans ("Evans Affidavit"); this Amended Complaint made substantially the same allegations as the initial complaint filed on May 22.  *See* Amended Verified Complaint for Forfeiture *In Rem*, *United States v. All Funds on Deposit in Lee Munder Wealth Planning Resource Account Number \*\*\*-\*\*\*1080 et al.*, No. 15-cv-11906 (D. Mass. June 12, 2015), ECF No. 9 (Meier Decl. Ex. 7).

The Evans Affidavit states the Government's position on the ownership and nature of the eighteen "transfers" alleged to constitute criminal contempt.  It makes clear that in each of these eighteen instances, both the account from which the Conigliaros allegedly removed money and the account into which they allegedly placed money *were owned by the Conigliaros as Tenants by the Entireties*.  Thus, the Government's own allegations show that these eighteen "transfers" did not work any change in the ownership of the funds in the accounts – all of the accounts alleged in counts 110-127 of the Indictment were owned by the Conigliaros as tenants by the entireties.

The chart below pairs the Indictment count with the relevant paragraph of the Evans Affidavit discussing the ownership of the accounts alleged in that count:

| Indictment Count | Summary of Alleged Contemptuous Transfer in Indictment | Paragraph(s) of Evans Affidavit Describing Accounts as owned by the Conigliaros as Tenants by the Entireties |
|---|---|---|
| 110 | Movement of $3.3 million by wire on February 1, 2013 from Merrill Lynch Account -872 to USAA Financial Advisors Account -5428 | Merrill Lynch Account -872 (¶ 41)[4]; USAA Financial Advisors Account -5428 (¶¶ 48-49) |
| 111 | Movement of $7 million by wire on February 4, 2013 from Merrill Lynch Account -872 to USAA Financial Advisors Account -5428 | Merrill Lynch Account -872 (¶ 41); USAA Financial Advisors Account -5428 (¶¶ 48-49) |
| 112 | Movement of $6.5 million by wire on February 4, 2013 from Merrill Lynch Account -872 to SunTrust Bank Account -2822 | Merrill Lynch Account -872 (¶ 41); SunTrust Bank Account -2822 (¶ 63) |
| 113 | Movement of $500,000 by check on February 5, 2013 from SunTrust Bank Account -2822 to Florida Bank of Commerce Account -6704 | SunTrust Bank Account -2822 (¶ 63); Florida Bank of Commerce Account -6704 (¶¶ 68-69) |
| 114 | Movement of $500,000 by check on February 5, 2013 from SunTrust Bank Account -2822 to BankFirst Account -0369 | SunTrust Bank Account -2822 (¶ 63); BankFirst Account -0369 (¶¶ 68-69) |
| 115 | Movement of $500,000 by check on February 5, 2013 from SunTrust Bank Account -2822 to PNC Bank Account -6896 | SunTrust Bank Account -2822 (¶ 63); PNC Bank Account -6896 (¶¶ 68-69) |
| 116 | Movement of $500,000 by check on February 5, 2013 from SunTrust Bank Account -2822 to CNL Bank Account -0113 | SunTrust Bank Account -2822 (¶ 63); CNL Bank Account -0113 (¶¶ 68-69) |
| 117 | Movement of $500,000 by check on February 5, 2013 from SunTrust Bank Account -2822 to Regions Bank Account -6303 | SunTrust Bank Account -2822 (¶ 63); Regions Bank Account -6303 (¶¶ 68-69) |
| 118 | Movement of $250,000 by check on February 21, 2013 from SunTrust Bank Account -2822 to Susquehanna Bank Account -9388 | SunTrust Bank Account -2822 (¶ 63); Susquehanna Bank Account -9388 (¶ 65 & Ex. 6) |
| 119 | Movement of $250,000 by check on February 21, 2013 from SunTrust Bank Account -2822 to Susquehanna Bank Account -9388 | SunTrust Bank Account -2822 (¶ 63); Susquehanna Bank Account -9388 (¶ 65 & Ex. 6) |
| 120 | Movement of $3.0 million by check on March | Merrill Lynch Account -872 (¶ 41); |

---

[4]     Even though the Merrill Lynch account statements say clearly that the Conigliaros held the Merrill Lynch Account -872 as tenants by the entireties, the Evans Affidavit states incorrectly that Merrill Lynch Account -872 was held by the Conigliaros as joint tenants.  The Government has since corrected this misstatement and alleged that Merrill Lynch Account -872 was held by the Conigliaros as tenants by the entireties.   *See* United States' Opposition to the Conigliaro Claimants' Motion to Dismiss the Complaint in Part at 2, *United States v. All Funds on Deposit in Lee Munder Wealth Planning Resource Account Number \*\*\*-\*\*\*1080 et al.*, No. 15-cv-11906 (D. Mass. Sept. 23, 2015), ECF No. 57 (Meier Decl. Ex. 8).

| Indictment Count | Summary of Alleged Contemptuous Transfer in Indictment | Paragraph(s) of Evans Affidavit Describing Accounts as owned by the Conigliaros as Tenants by the Entireties |
|---|---|---|
| | 18, 2013 from Merrill Lynch Account -872 to Seacoast National Bank Account -8506 | Seacoast National Bank Account -8506 (¶ 54) |
| 121 | Movement of $1 million by wire on March 18, 2013 from SunTrust Bank Account -2822 to Florida Bank of Commerce Account -6704 | SunTrust Bank Account -2822 (¶ 63); Florida Bank of Commerce Account -6704 (¶¶ 68-69, 79) |
| 122 | Movement of $1 million by wire on March 18, 2013 from SunTrust Bank Account -2822 to BankFirst Account -0369 | SunTrust Bank Account -2822 (¶ 63); BankFirst Account -0369 (¶¶ 68-69, 84) |
| 123 | Movement of $1 million by wire on March 18, 2013 from SunTrust Bank Account -2822 to PNC Bank Account -6896 | SunTrust Bank Account -2822 (¶ 63); PNC Bank Account -6896 (¶¶ 68-69, 74) |
| 124 | Movement of $1 million by wire on March 18, 2013 from SunTrust Bank Account -2822 to CNL Bank Account -0113 | SunTrust Bank Account -2822 (¶ 63); CNL Bank Account -0113 (¶¶ 68-69) |
| 125 | Movement of $1 million by wire on March 18, 2013 from SunTrust Bank Account -2822 to Regions Bank Account -6303 | SunTrust Bank Account -2822 (¶ 63); Regions Bank Account -6303 (¶¶ 68-69) |
| 126 | Movement of $500,000 by wire on March 18, 2013 from SunTrust Bank Account -2822 to Susquehanna Bank Account -9370 | SunTrust Bank Account -2822 (¶ 63); Susquehanna Bank Account -9370 (¶ 65 & Ex. 6) |
| 127 | Movement of $5 million by wire on March 19, 2013 from USAA Financial Advisors Account -5428 to SunTrust Bank Account -2822 | USAA Financial Advisors Account -5428 (¶¶ 48, 50); SunTrust Bank Account -2822 (¶¶ 50, 63) |

## II.    LEGAL STANDARD

It is well-settled that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c).  This Court may dismiss charges that fail to state an offense. Fed. R. Crim. P. 12(b)(3).  An indictment must "specif[y] the elements of the offense charged, fairly apprise[] the defendant of the charge against which he must defend, and allow[] him to contest it without fear of double jeopardy." *United States v. Eirby*, 262 F.3d 31, 37–38 (1st Cir. 2001).  In order to sufficiently meet these criteria, the indictment "must be accompanied with such a *statement of the facts and circumstances* as will inform the accused of the specific offence, coming under the general

description, with which he is charged."  *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010) (emphasis added); *see* Fed. R. Crim. P. 7(c)(1).

"To be sufficient, an indictment must fairly state all the essential elements of the offense." *United States v. Camp*, 541 F.2d 737, 739 (8th Cir. 1976).  "[E]very necessary allegation in an indictment must be directly and affirmatively alleged, and … charges by implication, intendment or conclusion are insufficient."  *United States v. Minnec*, 104 F.2d 575, 577 (7th Cir. 1939).  "The failure of an indictment to detail each element of the charged offense generally constitutes a fatal defect."  *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979); *see Camp*, 541 F.2d at 739-740 (noting that omission of an essential element "of substance" rather than "of form only" is a fatal defect).  When an indictment omits essential elements of the charged offense, it fails to inform the defendant of the specific crime that he is alleged to have committed, and the charges should be dismissed.  *See United States v. Tomasetta*, 429 F.2d 978, 979 (1st Cir. 1970) (dismissal for failure to identify victim); *see also United States v. Lang*, 732 F.3d 1246, 1249-1250 (11th Cir. 2013) (dismissal of 85-count structuring indictment for failure to state an offense in any count).  The words employed must "fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).  "The mere conclusion that the defendant[s] [have] violated the statute does not supply the necessary factual allegations." *United States v. Numrich*, 144 F. Supp. 812, 813 (D. Mass. 1956).

In deciding a Rule 12(b)(3) motion to dismiss for failure to state an offense, the court is limited to deciding issues that "can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b).  While it is generally sufficient for the indictment to track the language of the statute and to provide the defendant with notice of which conduct is challenged, the court may decide motions to dismiss charges that raise questions of law where the facts are undisputed.  *See United States v. Nippon Paper Indus. Co.*, 109 F.3d 1 (1st Cir. 1997) (analyzing without any

9

comment on procedural propriety, district court decision dismissing indictment on grounds that no offense was stated as a matter of law); *United States v. McCormack*, 31 F. Supp. 2d 176, 180 (D. Mass. 1998) ("threshold issues, as to which the facts are uncontested, which comprise questions of law and not fact" may be decided on a motion to dismiss); *see also United States v. Stevens*, 778 F. Supp. 2d 683, 692 (W.D. La. 2011) ("'[A] question of law presented in a case involving undisputed facts can be determined without a trial of the general issue," and a district court is, thus, authorized to rule on such a motion to dismiss under Rule 12.") *quoting United States v. Flores*, 404 F.3d 320, 325 (5th Cir.2005).

In ruling on the motion to dismiss, the court may consider extrinsic evidence necessary to decide the questions of law presented by pre-trial motions.   *United States v. Washington*, --- F. Supp. 3d ---, 2015 WL 5522286, at *3 (E.D. Cal. Sept. 17, 2015); *see United States v. Levin*, 973 F.2d 463, 467 (6th Cir. 1992) ("district courts may make preliminary findings of fact necessary to decide questions of law presented by pretrial motions so long as the trial court's conclusions do not invade the province of the ultimate finder of fact."); *United States v. Salemme*, No. 94-10287-MLW, 1997 WL 810057, at *1 (D. Mass. Dec. 29, 1997) (same).

## III.   AS ALLEGED IN THE INDICTMENT, THE STRUCTURING CHARGES ARE INSUFFICIENT AS A MATTER OF LAW AND THEREFORE SHOULD BE DISMISSED

The Indictment fails to allege each element of the offense of structuring: it is devoid of any allegation or facts showing intent to evade the currency transaction reporting requirements – indeed, it omits *any* statement of facts related to the structuring charges against the Conigliaros. The Government instead mentions the Conigliaros in two preliminary paragraphs of the Indictment.   The structuring charges merely identify three bank accounts – Middlesex Savings Bank (Count 129), SunTrust Bank (Count 130), and TD Bank (Count 131).   In each of these three charges, the Government has merely added together *every single* cash withdrawal from the account at issue in the charge to arrive at the amount of money allegedly structured, and the

number of allegedly "structured" transactions.  The Indictment does not identify the withdrawals by date or amount, and sets forth no facts to provide the Conigliaros with notice of how or why the conduct alleged was undertaken with intent to evade the reporting requirement.  Thus, the structuring charges should be dismissed.

In order to convict a defendant of a structuring offense under 31 U.S.C. §5324, the government must prove beyond a reasonable doubt that: (1) the defendant, in fact, engaged in acts of structuring; (2) he did so with knowledge that the financial institutions involved were legally obligated to report currency transactions in excess of $10,000; and (3) he acted with the intent to evade this reporting requirement.  *See United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005).  Cases involving structuring of cash withdrawals involve an attempt by the defendant to conceal a large payment by collecting the money to make the payment through a series of smaller withdrawals, cashier's checks or money orders, each one for slightly less than $10,000.  *See, e.g., Ratzlaf v. United States*, 510 U.S. 135, 137 (1994) (defendant purchased multiple cashier's checks, each one for less than $10,000 and from a different bank, in order to pay a large casino debt without triggering the reporting obligations of the casino or the banks); *United States vs. Coney*, No. CR.A. 02-321, 2003 WL 2004437, *1 (E.D. La. Apr. 30, 2003) (defendant attorney cashed multiple checks, none for more than $10,000, in order to pay "runners" in cash for soliciting clients for his law firm); Indictment, *United States v. Hastert*, No. 15-cr-00315, (N.D. Ill. May 28, 2015), ECF No. 1 (defendant withdrew $952,000 through a series of at least 106 withdrawals from four different banks, each one in an amount slightly less than $10,000, in order to pay "hush money" to cover up allegations of prior sexual misconduct).

In other words, cases involving structured withdrawals contain an allegation of a connection between all the transactions to show that the transactions were undertaken with intent to evade the reporting requirement; the mere fact that the funds were derived from the same bank account does not show structuring.  The Government alleges no such connection

11

between the withdrawals by Carla Conigliaro or Douglas Conigliaro here, and it has not sufficiently pleaded facts to provide the Conigliaros with notice that the conduct alleged constitutes structuring.

The sum total of the Government's allegations about structuring is as follows:

In the first 119 paragraphs of the Indictment, the Government refers to the Conigliaros in only two paragraphs and even there does little more than identify their corporate positions and then leap to unsupported allegations.  *See* Indictment, at ¶¶ 15-16, 122-137.  Nowhere in the Indictment does the Government allege that the financial-related allegations against the Conigliaros were in any way related to the alleged conduct inside of NECC.    In fact, the Indictment does not allege that the Conigliaros even knew about the alleged criminal activity or wrongdoing at NECC.

Rather, the Government instead takes these few basic identifying facts and then leaps to the conclusions that the Conigliaros conspired to, and engaged in, acts of structuring in accounts at Middlesex Savings Bank, SunTrust Bank and TD Bank, without providing any notice of the alleged intent or motive.[5]   In illegal structuring cases, knowledge and intent are  established through circumstantial evidence in the following ways: (1) evidence that the subject withdrawals were used by the accused to amass a sum of money greater than $10,000 to make a large payment, or to move the money, without detection by the Government; (2) evidence that the subject withdrawals were all large but slightly under the $10,000 reporting threshold; and/or (3) evidence that the accused withdrew money in a manner that was so irrational or inefficient that it almost compels the conclusion of illegal structuring.  The Government does not allege any such facts here.

---

[5]     Moreover, the counts of structuring and conspiracy to commit structuring each incorporate only two paragraphs in the Indictment, which are the two introductory paragraphs relating to Carla (¶15) and Douglas (¶16).

Significantly, the Government does not allege that the Conigliaros withdrew a specified, large sum of money through a series of smaller transactions all under $10,000, even though such allegations are essential in structuring cases.  *See, e.g.,* Indictment at Count 2 ¶ 2, *United States v. Hastert*, No. 15-cr-00315, (N.D. Ill. May 28, 2015), ECF No. 1 (alleging that the defendant engaged in structuring by "withdrawing and causing the withdrawal of $952,000 in United States Currency in amounts under $10,000 in separate transactions on at least 106 occasions").  Instead, the Government alleges that the Conigliaros made "504 structured cash withdrawals" *totaling* $389,680.26 at Middlesex Savings Bank, "148 structured cash withdrawals" *totaling* $111,103.50 at SunTrust Bank, and "124 structured cash withdrawals" *totaling* $71,558.25 at TD Bank.  Indictment at ¶¶ 131, 134 & 137.  The Indictment does not contain facts that notify the Conigliaros of any reason why this sum of money was structured nor why these cash withdrawals constitute structuring.  Without such notice, the Conigliaros are unable to prepare a defense.  In fact, as the Government conspicuously omits from the Indictment, these transactions represent the sum total of *all* ATM and OTC withdrawals made by Carla or Douglas during the time periods identified in the Indictment.  In essence, the Government is alleging that the Conigliaros had a bank account, made ATM and teller withdrawals, and therefore acted with intent to evade the reporting requirement.  As a matter of law, this is insufficient

The Government does not allege that these withdrawals were each slightly less than $10,000, which Courts have previously acknowledged to be a hallmark sign of the defendant's knowledge of the $10,000 reporting threshold and intent to evade it.  *See United States v. Souza*, 749 F.3d 74, 79 (1st Cir.), *cert. denied* 135 S. Ct. 418 (2014) (defendant withdrew $54,000 in six separate installments of $9,000 at five different Sovereign Bank branches in one day); *United States v. Van Allen*, 524 F.3d 814, 820 (7th Cir. 2008) (noting that the transactions in most

13

structuring cases involve "massive sums of money, all under $10,000").[6]  The Government instead concedes by omission that the average amount of the 776 withdrawals was $737.55, more than $9,000 below the $10,000 reporting threshold, and the Government offers no facts about the Conigliaros' alleged knowledge of the reporting threshold or intent to evade it.

There is no allegation that the withdrawals were inefficient or irrational, which Courts have also recognized to be potential circumstantial evidence of knowledge and intent.  *See MacPherson*, 424 F.3d at 191 (defendant travelled to three different banks on nine separate days and made a deposit of $9,000 into each account on each day); *Van Allen*, 524 F.3d at 820 (defendant withdrew and deposited massive sums of money in transactions under $10,000 and had paid almost $100,000 in check cashing fees at one of the currency exchanges); *Souza*, 749 F.3d at 79 (defendant made six $9,000 withdrawals from five different branches of the same bank in an hour and a half on the same day).  No facts support a conclusion that the Conigliaros' banking habits were so unusual that a conclusion of structuring would be so clearly warranted.

The Indictment must notify the defendant of the unlawful conduct charged in the Indictment, *see MacPherson*, 424 F.3d at 189, yet the Government fails to identify who made the withdrawals (that is, whether it was Carla or Douglas).  The Government instead lumps Carla and Douglas together without providing any facts about which defendant did what when, and then offers the bare conclusion that the Conigliaros conspired to structure withdrawals in their accounts.  *See* Indictment at ¶¶122-128.  No facts support the conclusory allegation that there is a conspiracy here, and the Government does not explain how being married, having a joint bank account, and visiting the ATM or teller to withdraw money constitutes a conspiracy.

---

[6]     *See also United States v. Abair*, 746 F.3d 260, 261 (7th Cir. 2014) (defendant made eight deposits at a local bank in amounts ranging from $6400 to $9800); *United States v. Pipkin*, 114 F.3d 528, 533 (5th Cir. 1997) (defendant's employee cashed nine checks, each slightly under $10,000, in three separate instances); *United States v. Simon*, 85 F.3d 906 (2d Cir. 1996) (defendant made 14 deposits of almost $10,000 in eight different branches of a bank, located in three counties, over a seven-day period); *United States v. Nall*, 949 F.2d 301, 304 (10th Cir. 1991) (defendant divided a $26,000 deposit into three smaller deposits of $9,000, $9,000, and $6,000).

The Government also fails to identify the subsection of the anti-structuring statute that the defendants are charged with violating.  *See Wright v. United States*, 243 F.2d 546, 547 (6th Cir. 1957) (noting that a general reference to a statute which contains a number of paragraphs describing different offenses is insufficient); *Colquette v. United States*, 216 F.2d 591, 594 (7th Cir. 1954) (same); Fed. R. Crim. P. 7(c)(1) ("For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.").   The structuring statute contains three subsections.  The first subsection of the statute makes it illegal for a person to cause the bank not to file a required CTR.[7]  *See United States v. Davenport*, 929 F.2d 1169, 1173 (7th Cir. 1991); 31 U.S.C. § 5324(a)(1).  The second subsection of the statute makes it illegal for a person to cause a bank to file a required CTR that contains a material omission or misstatement of fact.  *See* 31 U.S.C. § 5324(a)(2).  The third subsection of the statute makes it illegal to structure any transaction with one or more banks for the purpose of evading the reporting requirement.[8]  *See* 31 U.S.C. §5324(a)(3).  The Government must notify the Conigliaros of the theory under which it plans to prosecute them – the Indictment is entirely unclear which of these three provisions of the statute the Conigliaros are alleged to have violated.

All that the Government has done here is add up *all* of the Conigliaros ATM and OTC withdrawals from family bank accounts from September 2010 to December 2014 and then conclusorily allege that the Conigliaros engaged in structuring in three accounts without providing any facts to support the allegations, and without providing any notice of conduct that might

---

[7]     The first subsection states in part that no person shall "cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a) or 5325 or any regulation prescribed under any such section, to file a report or to maintain a record required by an order issued under section 5326, or to maintain a record required pursuant to any regulation prescribed under section 21 of the Federal Deposit Insurance Act or section 123 of Public Law 91-508[.]"  31 U.S.C. § 5324(a)(1).

[8]     The third subsection states in part that no person shall "structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions."  31 U.S.C. § 5324(a)(3).

constitute the crime of structuring.   The charges are insufficient and should be dismissed.   *See*

*Lang*, 732 F.3d at 1250.   *See United States v. Yefsky*, 994 F.2d 885, 893 (1st Cir. 1993) (when a

count does not divulge the factual basis of the accusation, it does not provide the defendant with

adequate notice of the charge against him and it should be dismissed).   Thus, all three

structuring counts, and the conspiracy to commit structuring count, should be dismissed.   *Id.*[9]

## IV.   AS ALLEGED IN THE INDICTMENT, THE CONTEMPT CHARGES ARE INSUFFICIENT AS A MATTER OF LAW AND THEREFORE SHOULD BE DISMISSED

In order to state an offense for criminal contempt under 18 U.S.C. § 402(3), the

Indictment must allege that "(1) there was a lawful court order of reasonable specificity, (2) the

[Conigliaros] violated it and (3) the violation was willful."   *United States v. Michaud*, 928 F.2d 13,

15 (1st Cir. 1991); *see Eirby*, 262 F.3d at 37–38 (indictment must "specif[y] the elements of the

offense charged").   Even when viewed in the light most favorable to the Government, the

evidence shows that the Conigliaros allegedly moved funds between bank accounts owned by

them as tenants by the entireties.[10]   As a matter of law, such movements of funds are not

"transfers" proscribed by the Bankruptcy Court orders, and no violation of the order occurred.[11]

---

[9]      In addition, case law makes clear that a defendant not alleged to have committed the crime of structuring cannot be alleged to have conspired to commit structuring.   *See United States v. Alston*, 77 F.3d 713, 715 (3d Cir. 1996).   Thus, if the three structuring counts are dismissed, the count of conspiracy to commit structuring also fails as a matter of law and must be dismissed.

[10]      It is worth noting that the order at issue prohibited "transfers" of only the assets of the Shareholder Defendants.   Although Carla Conigliaro was identified in that order as a Shareholder Defendant, Douglas Conigliaro was not.   Therefore, even an actual transfer of Douglas Conigliaro's assets cannot be the basis for a finding of contempt.

[11]      Moreover, the Indictment fundamentally alleges that all of the funds allegedly contemptuously "transferred" were held in the Merrill Lynch Account -872, whereupon the Conigliaros contemptuously "transferred" them into the other accounts.   Rather than charging one count of Contempt, as the alleged acts involve the same initial sum of money, the Indictment instead takes the multiplicious course of splitting the movement of one group of funds into eighteen separate charges.   *See Yates v. United States*, 355 U.S. 66 (1957) (dividing witness' failure to testify in single area of inquiry into separate contempt charge for each question was multiplicious); *United States v. Murphy*, 326 F.3d 501, 502 (4th Cir. 2003) (dividing each of

Therefore, the Indictment fails to state an offense as a matter of law and should be dismissed. *See McCormack*, 31 F. Supp. 2d at 181-82 (dismissing indictment where facts alleged by the Government did not state a violation of the relevant statute as a matter of law).

The term "transfer" is defined in the United States Bankruptcy Code to mean "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, *of disposing of or parting with*- - (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54)(D) (emphasis added).

Clear case law from the Massachusetts Bankruptcy Court holds that an account owner's redepositing funds held in one account into another also owned by the same account owner is not a "transfer." *See In re Moise*, 463 B.R. 197, 200 (Bankr. D. Mass. 2012) (deposit of funds from co-debtors bank accounts into "Totten" trust account in which they had the same ownership rights, but which account would be paid to their child upon their death, was not a transfer); *Noonan v. Rauh (In re Rauh)*, 164 B.R. 419, 424 (Bankr. D. Mass. 1994) (wife's removal of funds from joint bank account was not a transfer because she always had the right to withdraw all of the funds in the account, thus, there was no change in her legal ownership of the funds) *amended on other grounds* 119 F.3d 46 (1st Cir. 1997). Where the owners of the deposited funds do not change, there is no "transfer" within the meaning of the Bankruptcy Code. *See Rosen v. Kore Holdings, Inc. (In re Rood)*, 459 B.R. 581, 606 (Bankr. D. Md. 2011) (finding that a deposit of funds into a bank account controlled by the debtor did not constitute a "transfer," because a "deposit of funds is not a sale or parting with property because the funds may be withdrawn at the will of the depositor.").[12] Put simply, by shifting money held in one account as

---

multiple profane statements to court during hearing into separate counts of contempt was multiplicious).

[12]    *See also Citizens' Nat. Bank of Gastonia v. Lineberger*, 45 F.2d 522, 527 (4th Cir. 1930) ("A deposit in a bank is not a sale or parting with property" within the meaning of the bankruptcy code); *Pioneer Liquidating Corp. v. San Diego Trust & Savings Bank (In re Consolidated Pioneer Mortg. Entities)*, 211 B.R. 704, 714-15 (Bankr. S.D. Cal. 1997) (debtor's deposit of funds into a checking account did not constitute a "transfer," because "the depositor has the right to withdraw the deposited funds, [and] the deposit does not deplete the depositor's estate … in

tenants by the entireties into another account held as tenants by the entireties, the Conigliaros effectively moved money "from one pocket to another," which is not a transfer under the Bankruptcy Code.  *In re Moise*, 463 B.R. at 200.

Simply stated, as a matter of law, the charge fails to sufficiently allege that an actual transfer occurred in violation of the bankruptcy court orders.  Accordingly, the charge fails to sufficiently allege the crime of contempt and this Court should dismiss Counts 110-127 of the Indictment.

To the extent that there is some doubt that a United States Bankruptcy Judge who uses a term that is expressly defined in the United States Bankruptcy Code would be applying the Bankruptcy Code-provided definition when he enters United States Bankruptcy Court orders, there is, at minimum, an ambiguity in the order that the Conigliaros are alleged to have violated that as a matter of law precludes any finding that the Bankruptcy Court's order provided sufficient "specificity" to support a finding of contempt.  "Transfer" in the Bankruptcy Court orders cannot plausibly have any meaning other than the clear, statutory definition in the Bankruptcy Code.

To be held in contempt, "the putative contemnor 'must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion.'"  *In re Grand Jury Investigation*, 545 F.3d 21, 25 (1st Cir. 2008) *quoting Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir. 2008).  To the extent that there is any question as to what the term "transfer" in the Bankruptcy Court's order means, that ambiguity must be construed in favor of the Conigliaros.  *See NBA Properties, Inc. v. Gold*, 895 F.2d 30, 32 (1st Cir. 1990) ("we must read any 'ambiguities' or 'omissions' in such a court order [that is the basis for a contempt charge] as 'redound [ing] to the benefit of the person charged with contempt.'") *quoting Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971)

---

effect, the assets available to the customer have not changed.") *reversed on other grounds* 166 F.3d 342 (9th Cir. 1999).

(per curiam).  It is indisputable as a matter of law that the Conigliaros did not undertake any "transfers" under the meaning ascribed to that term in the Bankruptcy Code.  If the order the Conigliaros are alleged to have violated referenced some other unidentified definition of "transfer," that order was ambiguous and, as a matter of law, the Conigliaros cannot be found to be in contempt of its terms.

## V.      CONCLUSION

For the reasons set forth above, Carla Conigliaro and Douglas Conigliaro respectfully submit that that their motion to dismiss the structuring and contempt charges should be allowed.

Respectfully Submitted,

CARLA R. CONIGLIARO and
DOUGLAS A. CONIGLIARO,

By their attorneys,

/s/ David E. Meier
David E. Meier, BBO # 341710
dmeier@toddweld.com
Melinda L. Thompson, BBO # 651265
mthompson@toddweld.com
Todd & Weld LLP
One Federal Street
Boston, MA  02110
(617) 720-2626

DATED: November 13, 2015

### CERTIFICATE OF SERVICE

I, David E. Meier, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 13, 2015.

/s/ David E. Meier