UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) ) ) ) ) | Court No.: 14-cr-10363-RGS |
| v. |  |  |
| BARRY J. CADDEN, et al., |  |  |
| Defendants. |  |  |

**GOVERNMENT'S OPPOSITION TO DEFENDANT BARRY J. CADDEN'S
MOTION FOR HEARING INTO POSSIBLE GOVERNMENT MISCONDUCT,
AND FOR MODIFICATION OF BAIL**

The United States of America hereby opposes Defendant Barry J. Cadden's Motion for Hearing into Possible Government Misconduct, and for Modification of Bail (the "Motion") (Doc. No. 406). In his Motion, defendant Barry J. Cadden ("Cadden") makes four primary complaints: (1) that the government may have violated Fed. R. Crim. P. 6(e) and the order sealing the case given the presence of news cameras outside Cadden's home the morning of his arrest; (2) that the government improperly sought an order sealing the case pending execution of the arrest warrants in the first place; (3) that the government improperly sought Cadden's detention pending trial, and that Chief Magistrate Judge Boal's order that Cadden instead be subject to home confinement with an ankle bracelet was "excessive, unnecessary, and inappropriate;" and (4) that the government issued press releases in conjunction with its forfeiture actions against Cadden as part of a supposed calculated effort to "contaminate the jury pool."[1] See Motion, at 2. Cadden's co-defendants Glenn Chin, Christopher Leary, Alla Stepanets, Robert Ronzio, and Scott Connolly all join the Motion, though it is silent as to any

---

[1] If Cadden felt his rights had been violated by the circumstances surrounding his arrest and arraignment, and that his court-ordered release conditions were somehow an unjust result of such violations, it is unclear why he waited eleven months to raise these issues.

harm whatsoever that these defendants allegedly suffered as a result of the circumstances surrounding Cadden's arrest and detention hearing, the sealing of the case pending execution of the arrest warrants, the forfeiture of Cadden's property, or Cadden's release conditions. Id. at n.1.

This Court should deny the Motion because Cadden has not made a *prima facie* showing of government misconduct or shown that he suffered any prejudice from: the presence of the media on his street during his arrest or outside the Wrentham police station two hours after it, the order sealing the case pending execution of the arrest warrants, the detention hearing, or the government's press releases announcing its forfeiture actions (on which no media outlet apparently reported). In fact, the only potential harm to Cadden's right to a fair trial that he has alleged in the Motion is a speculative one. Specifically, he suggests that a potential juror might ignore this Court's instructions and conduct an Internet search for Cadden's name and see a picture of him being arrested sixteen months prior, and, presumably, become improperly influenced as a result. Even if such a possibility posed a plausible harm, which it does not, the only media photograph capturing Cadden in custody was taken *two hours* after his initial arrest when he was being escorted from the Wrentham police station to the agents' car parked in the parking lot – a point during that morning when the case had been unsealed and news of the highly anticipated NECC arrests had been confirmed by the government and widely reported. Further, to the extent any such potential jurors have been improperly influenced by something they saw or read in the media, they will be identified and excused during voir dire.

Second, there was nothing improper about the government seeking to seal this case pending execution of the arrest warrants or in seeking Cadden's detention, and Cadden has not made any showing that there was. These were all appropriate steps that the government was

entitled to take in its prosecutorial discretion in this and all criminal cases. Further, Cadden's argument that the government should not have sought the sealing orders in the first place is directly at odds with his complaint about the media presence outside his home at the time of his arrest. The media presence would have been much greater not only at his arrest, but also at the arrests of the other defendants, had the government not sought the sealing order. In fact, had the government not sealed the case pending execution of the arrest warrants, there is little doubt Cadden's Motion would be arguing that the absence of a sealing order was government misconduct.

Third, Cadden's accusation that the government timed its forfeiture actions to generate prejudicial pretrial publicity is baseless. The government's steps to forfeit Cadden's property were entirely appropriate, and there was nothing improper about the government notifying the public, including the more than 750 victims, of them via press releases. It is noteworthy that Cadden does not assert in the Motion that any media outlet even reported on them.

Finally, even if Cadden's accusations about the government's conduct had merit, the proper remedies would not include conducting a hearing or amending his release conditions, as he requests. Generally, the remedy sought for prejudicial pretrial publicity is a change of venue, but Cadden does not make this request or even cite the law on prejudicial pretrial publicity because he cannot come close to meeting the standard. As discussed further below, Cadden's requests for relief, including his request for an evidentiary hearing, particularly in light of such speculative potential harm, should all be rejected. The Court should deny the Motion.

**ARGUMENT**

I.  **CADDEN HAS ALLEGED NO PREJUDICE FROM THE CIRCUMSTANCES OF HIS ARREST, AND HIS CONSTITUTIONAL RIGHTS WERE NOT VIOLATED.**

   A.  Cadden's Indictment and Arrest in December 2014 Were Widely Expected.

In late 2014, an indictment in the NECC investigation was widely anticipated. Significantly, there never were – nor are there now – any allegations of government leaks during the more than two-year criminal investigation in which the government interviewed more than 300 individuals. Nonetheless, it was apparently well-known that Cadden would be among those indicted for his conduct at New England Compounding Center ("NECC"),[2] and that the indictment would be returned on a Tuesday that December. Despite what Cadden claims was a "veil of ultra-secrecy with defense counsel," he knew with such certainty that he would be arrested on an early Wednesday morning in December 2014 that he dressed and waited at dawn for the agents three Wednesdays in a row that month.[3] See Mem. at 12. The 2012 fungal meningitis outbreak and resulting criminal investigation of NECC had generated intense public interest, and more than two years later in December 2014, there appeared to be a widespread expectation that the indictment was imminent.

Cadden was not the only one who was expecting his indictment and arrest that month. The former NECC owners may not have known it, but members of the media conducted surveillance in at least one of the owners' neighborhoods in the weeks leading up to the arrests. Law enforcement agents doing as much identified an unmarked media vehicle outside one of the NECC owners' homes as the media appeared to be waiting for something to happen. The

---

[2] Cadden acknowledges that it was "a virtual certainty" that he would be indicted. See Defendant Barry Cadden's Memorandum in Support of Motion for Hearing into Possible Government Misconduct, and for Modification or Bail, at 2 (the "Memorandum" or "Mem.") (Doc. No. 408).
[3] Cadden was not alone in this expectation; he was not the only defendant who was dressed and waiting to be arrested early that Wednesday morning, December 17, 2014.

morning of Cadden's arrest, however, the media was not in unmarked cars. They were overtly waiting at the bottom of Cadden's driveway, as well as those of the other NECC owners, before 6:00 a.m. The arrests all took place without incident. The only footage that was broadcast of Cadden's arrest at his home, which was accomplished in less than five minutes, was of the law enforcement cars leaving his property. See id. at 6, 9. Cadden does not claim that he suffered prejudice as a result of that media footage.

Following Cadden's arrest at his home, the agents brought him to the local Wrentham police station for booking. See id. at 8. Later that morning when the agents and Cadden left the police station at approximately 7:50 a.m., news of the highly anticipated NECC arrests had been widely reported, and media crews documented agents leading Cadden from the police station to the car in the police station parking lot for transport to the federal courthouse. See id. The government was not trying to orchestrate a media circus or "perp walk," as alleged by Cadden; the agents were simply trying to get Cadden to the car for transport to the courthouse. It did not matter by that point whether news of the arrests had been leaked or not. The case had been unsealed on execution of the first arrest, and the government had thereafter publicly announced the arrests at 6:40 a.m. that morning. See id. at 7. Thus, the only media footage of Cadden in custody, taken outside the Wrentham police station more than an hour after the case became public, would likely have been taken regardless of any leak of Cadden's arrest that morning.

Cadden's request for an evidentiary hearing should be rejected because he has not made a *prima facie* showing that an agent of the government violated Federal Rule of Criminal Procedure 6(e) based on the news reports that morning, nor has he shown any prejudice that resulted from an alleged violation. As this Court has explained:

> [i]n determining whether a party alleging a violation of Rule 6(e) based on news media reports has established a *prima facie* case, a

Page 5

> court must consider several factors. First, there must be a clear indication that the media reports disclose information about 'matters occurring before the grand jury.' … Second, the article or articles must indicate the source of the information revealed to be one of those proscribed by Rule 6(e).

United States v. Flemmi, 233 F. Supp. 2d 113, 116-17 (2000) (citing In re Grand Jury Investigation, 610 F.2d 202, 216-17 (5th Cir. 1980) ("Lance")); see also United States v. Nichols, 2008 WL 5233199, at *9 (C.D. Cal. Dec. 15, 2008) (finding defendants had not established a *prima facie* case, nor shown any prejudice resulting from alleged media leaks). It is not necessary that the news article disclosing the grand jury information expressly implicate a government source "if the nature of the information disclosed furnishes the connection." Id. at 117 (citing In re Sealed Case No. 98-3077, 151 F.3d 1059, 1068 n.7 (D.C. Cir. 1998)). Here, Cadden has not made a *prima facie* showing of a violation of Rule 6(e) based on news reports because the media did not in fact report or disclose information about a matter occurring before the grand jury. The fact of an arrest is not a matter occurring before the grand jury. See e.g., In re Application of the United States for Material Witness Warrant, 214 F. Supp. 2d 356, 364 (S.D.N.Y. 2002) (holding that while matters occurring before the grand jury are secret, "no free society can long tolerate secret arrests"). Further, the media did not report on Cadden's arrest until *after* it had taken place. At that point, the case had been unsealed because the sealing order automatically lifted after the first arrest warrant had been executed.

Further, Cadden cannot cite to any harm or prejudicial disclosures resulting from the alleged violation in this case. The nature of the alleged violation of Rule 6(e) here is quite different from those alleged in the cases cited by Cadden in support of his request for a hearing, in which the defendants could show prejudice resulting from the alleged media leaks. For example, in Flemmi, the alleged government leak involved an allegation of a substantive

disclosure of grand jury testimony that the defendant had strangled his girlfriend – evidence that was deemed prejudicial and likely inadmissible in his trial.  See id. at 117-18.  The alleged leak led to a *Boston Globe* article headlined, "Flemmi allegedly strangled girlfriend."  See id. at 114.  In Lance, there were numerous alleged Rule 6(e) violations, including seven newspaper articles containing numerous disclosures of information about the grand jury proceedings, several of which identified either expressly or by inference the government attorneys as the source of the information.  See Lance, 610 F.2d at 207-08.  In addition, the court in Lance found that two grand jurors were publicly repeating the testimony of a grand jury witness, causing the court to order, among other things, that the government attorneys admonish the members of the grand jury.  See id. at 208.  In Barry v. United States, 865 F.2d 1317 (D.C. Cir. 1989), multiple alleged leaks were cited in several newspaper and television reports, including one that indicated that law enforcement officials had disclosed details about Mayor Barry's statements to the grand jury about his alleged cocaine use, among other things.  See id. at 1320.  The court in Barry found that the defendant had offered sufficient evidence to make a *prima facie* showing of a violation where one news article, among others that raised questions about possible government disclosures of Rule 6(e) protected information, both disclosed matters occurring before a grand jury and indicated that such information had been "provided by 'law enforcement officials familiar with [Mayor Barry's] testimony.'"  See id. at 1325.  Thus, in all of these cases, the media allegedly reported on substantive matters that had occurred before the grand jury, resulting in arguably prejudicial news reports about the defendants.

   All of these cases are inapposite.  Here, the alleged leak is not substantive and did not lead to any news reports disclosing grand jury information, since by the time the media reported

on the arrests, the case was unsealed.[4] The alleged leak involves nothing more than the timing of Cadden's arrest, which was highly anticipated in December 2014.[5] While the fact that the media apparently knew that arrests were happening that morning is certainly regrettable, it did not lead to the public disclosure of any Rule 6(e) protected information or even footage of Cadden in custody taken prior to the U.S. Attorney's Office's public announcement of the arrests. Rather, the information the press apparently had that arrests would take place that morning only enabled them to report on the arrests as soon as the case was unsealed, and, in Cadden's case, obtain footage of cars leaving his property. Thus, Cadden has failed to make a *prima facie* showing of a Rule 6(e) violation, and, regardless of any leak, has not shown that he suffered any prejudice from the media's presence either outside his property that morning or the police station two hours later, well after the arrests were public and the case was unsealed.

> B. Cadden's Walk to the Agents' Car Does Not Entitle Him to a Hearing, and Did Not Amount to a Violation of his Constitutional Rights.

>> 1. Cadden Is Not Entitled to a Hearing.

It is unclear from the Motion what relief Cadden seeks as a result of his claimed constitutional violations from his walk to the agents' car. He argues that the fact that the government chose to arrest Cadden supports his request for an evidentiary hearing. See Mem. at 15. As an initial matter, however, Cadden has not demonstrated a link between the alleged leak of his arrest and his walk to the car later that morning. As noted above, Cadden was not photographed in custody until he was being escorted from the Wrentham police station to the agents' car in the parking lot for transport to the courthouse at approximately 7:50 a.m. At that

---

[4] Also, as noted above, the fact of arrests taking place is not Rule 6(e) protected information. See e.g., In re Application of the United States for Material Witness Warrant, 214 F. Supp. 2d at 364.
[5] If the media knew that defendants Robert Ronzio and Christopher Leary (or any of the defendants other than Cadden and the Conigliaros) also had been indicted and were to be arrested on December 17, 2014, it is reasonable to assume that the media would have been outside their homes also that morning trying to capture footage of their arrests.

point, the highly anticipated NECC arrests had been public for approximately two hours. As such, Cadden's argument that the alleged leak of Cadden's 6:00 a.m. arrest at his home led to the press coverage of Cadden's 7:50 a.m. walk from the police station to the car for transport to the courthouse is simply untrue. See id. at 13. And it certainly did not amount to a violation of Cadden's Fourth Amendment privacy right or his Sixth Amendment right to a fair trial.

In addition, Cadden does not seek the only possible remedy available to him, a change of venue, and furthermore, he is not entitled to a hearing. The court in United States v. Edelin, 76 F. Supp. 2d 1 (D.D.C. 1999), addressed this very issue. In Edelin, the government arranged to have an already incarcerated defendant rebooked on a superseding indictment in the same place that it had scheduled a press conference relating to the case. See id. at 2-3. The government scheduled the press conference at "the precise time and location from which defendant Edelin would be brought out after booking," and the press was able to film his post-booking "perp walk." Id. at 3. Edelin argued that the government's only purpose for transporting him to the police station for rebooking, which he claimed was unnecessary, was to parade him before the media. See id. The court held that while it was disappointed with the government's conduct, Edelin "fails to articulate any particular injury or possible remedy available to him," and rejected his request for an evidentiary hearing on the matter. Id. The court noted that the only possible remedy that the defendant could seek in his criminal case is a change of venue under Fed. R. Crim. P. 21(a) based on alleged prejudicial pretrial publicity, but that such a remedy was not warranted in that case. The court held:

> Federal Rule 21(a) "is intended for cases in which prejudice in the community will make it difficult or impossible to select a fair and impartial jury." A "critical factor" in determining whether pretrial publicity is likely to affect an accused's right to a fair trial is the recency of the publicity in relation to the trial. In this case, the publicity surrounding the defendant's booking was in January of

> 1999. The trial is currently scheduled to begin in April of 2000. Therefore, given that more than a year will have elapsed between the media reports at issue and the selection of a jury, it is highly unlikely that these reports will render it impossible to select a fair and impartial jury. The burden is on the defendant to show a reasonable likelihood of prejudice. The defendant has failed to do so in this case. The publicity was not so recent, widespread or damaging to the defendant as to require a change of venue.

Id. at 3-4 (internal citations omitted). Here, as in Edelin, Cadden is not entitled to a hearing based on his claim that he was subjected to a "perp walk." In addition, he cannot demonstrate (nor does he try to) that a change of venue is required due to the press coverage surrounding his arrest, which will have taken place sixteen months prior to the time his trial begins.

        2.        Cadden's Constitutional Rights Were Not Violated.

Not only does Cadden fail to seek a proper remedy for his walk to the agents' car, but his argument that the government's conduct surrounding his arrest was improper is baseless. Cadden's claim that the walk violated his constitutional rights seems to be grounded in his complaint that he should not have been arrested at all. See Mem. at 14-15. However, the decision to arrest following an indictment is one that is squarely a matter of prosecutorial discretion, so long as it is supported by probable cause, which is presumed and properly granted by the court following an indictment. See Fed. R. Crim. P. 9(a) ("The court must issue a warrant – or at the government's request, a summons – for each defendant named in an indictment…."). All that is required for the issuance of an arrest warrant is that it be supported by probable cause, which here was satisfied by the indictment. See Kalina v. Fletcher, 522 U.S. 118, 129 (1997) ([t]he Fourth Amendment requires that arrest warrants be based 'upon probable cause, supported by Oath or affirmation' – a requirement that may be satisfied by an indictment returned by a grand jury"). Further, Cadden is charged with ninety-seven felony counts, including RICO, RICO Conspiracy, Conspiracy, and Mail Fraud. He is charged with twenty-five racketeering

Page 10

acts of second-degree murder, and if convicted on all counts could face life imprisonment. Cadden's argument that it was improper for the government to seek a warrant for his arrest following the return of this indictment is unavailing, at best.[6]

Additionally, Cadden has not demonstrated any prejudice from the government's decision to arrest him. As noted above, Cadden's arrest was far from a "media circus." Mem. at 15. He was in custody at his home in less than five minutes, and the media was unable to film it. Cadden's only complaint of potential prejudice from his walk to the agents' car is that a juror might ignore the Court's instructions, conduct an Internet search for his name, see the picture of him being arrested, and thus become disposed against him during his murder trial. If a potential juror happens to be predisposed to ignore the Court's orders, and convict Cadden because of images he or she saw of him being arrested sixteen months prior, the voir dire process will surely identify such a problematic juror.

In arguing that Cadden's constitutional rights were violated, his attempt to distinguish the case of Brown v. Pepe, 42 F. Supp. 3d 310 (D. Mass. 2014) (Stearns, J.), is unavailing. In that case, this Court had occasion to decide as a matter of first impression in the First Circuit the constitutionality of a "perp walk." Id. at 315. In that case, this Court rejected the plaintiff's §§ 1983 and 1985 claims, finding that the walk had occurred at the main entrance of the jail, "the venue [being] one over which Brown had no dominion, nor, as an area open by right to the public, could he reasonably expect the exclusion of journalists and cameras from the vicinity simply because of his presence." Id. at 316. As such, the Court ruled that Brown "had only a

---

[6] Cadden's argument that his attorneys' multiple offers to the U.S. Attorney's Office to provide it with Cadden's passport during the investigation meant that any arrest of Cadden was unnecessary and improper is equally unpersuasive. As noted above, the government is within its right to seek an arrest warrant following indictment, and the court properly issued the warrant. Furthermore, the practice of surrendering a passport does not eliminate a target's potential risk of flight since international travel is not required to flee. See e.g., United States v. Bulger, 905 F. Supp. 2d 383, 384 (D. Mass. 2012) (Stearns, J.) ("Defendant James Bulger was a fugitive from justice for sixteen years.").

'minimal' expectation of privacy in the circumstances of his perp walk." Id. The Court weighed that minimal expectation of privacy against several government interests in favor of making public the plaintiff's arrest, which included, but was not limited to, the fact that he was a fugitive in a highly publicized case. Id. at 316-17. The Court also cited to the additional governmental interests, including enhancing the transparency of the criminal justice system, deterring others from attempting similar crimes, and informing and enabling members of the public who may come forward with additional information relevant to the law enforcement investigation. See id. at 316 (citing Caldarola v. County of Westchester, 343 F.3d 570 (2d Cir. 2003)). In both Brown and Caldarola, the courts found that the governmental interests outweighed any "minimal" intrusion on the defendants' rights. See id. at 316-17.

Here, unlike in Brown and Caldarola, the government did not encourage, much less distribute footage of, Cadden's walk to the agents' car. By the time Cadden was led to the car in the parking lot of the Wrentham police station, where Cadden had a minimal expectation of privacy, the news of his arrest had been public for nearly two hours. The law enforcement officers could not prevent the media from filming outside the police station, and the officers did nothing to encourage the filming; they merely escorted Cadden to the car in the parking lot. Given the media interest in the arrests in December 2014, the fact that it was able to obtain footage of Cadden in custody nearly two hours after the initial arrest is not particularly surprising, nor has Cadden demonstrated that it prejudiced him.

        3.        <u>Cadden's Right to a Fair Trial Was Not Violated.</u>

Cadden's argument that he suffered "immense" harm from the coverage of his arrest is unpersuasive. See Mem. at 15. As noted above, to the extent there are any potential jurors who are predisposed to Cadden's guilt as a result of the publicity surrounding his arrest (or any other

pretrial publicity), those individuals will be identified in the jury voir dire and excused. As the First Circuit has held, "impartial juries have been selected in many highly publicized criminal cases by the use of a rigorous and searching voir dire of the jury venire. And, of course, we expect the jury will be emphatically and clearly instructed to decide the case only on the evidence presented in court." Colon Berrios v. Hernandez Agosto, 716 F.2d 85, 92 (1st Cir. 1983). The First Circuit has also explained that "extensive publicity" in a criminal case, even as in the case of the Boston Marathon bombings, does not foreclose a defendant's ability to receive a fair trial. See United States v. Tsarnaev, 780 F.3d 14, 21 (1st Cir. 2015). The photograph taken of Cadden in custody by no means generated prejudicial pretrial publicity that threatens his right to a fair trial.

## II. THE GOVERNMENT'S MOTION TO SEAL THE CASE AND REQUEST FOR CADDEN'S DETENTION WERE APPROPRIATE.

### A. The Government's Motion to Seal the Case Was Proper.

Cadden's complaint that the government sought an order sealing the case pending execution of the arrest warrants should be swiftly rejected. The indictment charged fourteen defendants, and the government obtained arrest warrants for twelve of them.[7] As this Court and the parties know, this is a serious case involving serious charges, in which two of the defendants face possible life sentences if convicted. The government properly sought to have the indictment sealed in order to effect twelve of the defendants' arrests. See United States v. Balsam, 203 F.3d 72, 81 (1st Cir. 2000) ("Rule 6(e) rests on the premise that criminal defendants not yet in custody may elude arrest upon learning of their indictment."). Nothing more was required. See id. ("[T]he government need not articulate its reasons for requesting that an indictment be sealed, so

---

[7] The government sought arrest warrants for all fourteen defendants, but requested that the court hold the warrants for defendants Michelle Thomas and Kathy Chin in abeyance to allow them to self-surrender on the warrants (which they did).

long as its request is based on a ground set forth in Rule 6(e)."). A magistrate judge may grant the government's request to seal an indictment "for any legitimate prosecutorial objective or where the public interest otherwise requires it." See id.; United States v. Richard, 943 F.3d 115, 118 (1st Cir. 1991) (citing numerous decisions). Taking defendants into custody is a widely recognized basis for sealing an indictment under Rule 6(e). Id. ("Unlike the defendant, we do not read Rule 6(e)(4) so narrowly as to forbid the sealing of an indictment for any reason other than taking a defendant into custody.").

Cadden complains that the government "abused the sealing process" because it could not have viewed Cadden as a flight risk. Mem. at 21. This is not a legitimate complaint. If the government had not asked the court to seal the case prior to executing the warrants, it is likely that each defendant would have had media at their homes trying to film their arrests. Cadden's argument that sealing the case was improper flies directly in the face of his prior argument that having the media outside his home during his arrest and later outside the police station violated his rights. If the government had not sealed this case pending execution of the arrest warrants, it is easy to imagine the accusations Cadden and the other defendants would be making now.

If Cadden's complaint is that the government acted improperly in obtaining a warrant for his arrest because it did not view him to be a flight risk, that too is not a viable complaint. The government did view Cadden to be a flight risk, and for that reason sought his detention pending trial. But even if it did not, there is no requirement in Rule 9 that an arrest warrant may only issue if there is a risk of flight, and Cadden does not provide any support for such a position. See Fed. R. Crim. P. 9(a). It is undisputed in this case that there was a validly returned indictment, and probable cause therefore was established for issuance of the warrant. See Kalina, 522 U.S. at 129 ("The Fourth Amendment requires that arrest warrants be based 'upon probable cause,

supported by Oath or affirmation' – a requirement that may be satisfied by an indictment returned by a grand jury.") (citing Gerstein v. Pugh, 420 U.S. 103, 117 n.19 (1975) ("[A]n indictment, fair upon its face, and returned by a properly constituted grand jury conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry." (internal quotations omitted))).

The cases Cadden cites in support of his argument that the sealing of the indictment was improper are not persuasive. In United States v. McBride, the court found that the sealing of the indictment was harmless error where the court found that there was no basis for the order, including that the defendant posed a flight risk.[8] See 2014 WL 2987014, at *3 (D. Mass. Jul. 1, 2014) (Saris, C.J.). The court rejected the defendant's contention that the government's motion to seal violated Federal Rule of Criminal Procedure 9 and the Fourth Amendment. Id. at *4. The case of United States v. Gigante, 436 F. Supp. 2d 647, 649 (S.D.N.Y. 2006), where the government sealed an indictment and four superseding indictments against the defendant for twenty-one months, and the defendant was not apprised of the charges against him until more than six years after the last criminal act alleged in the operative indictment and after the statute of limitations had run, is even less on point. In this case, the government sealed the indictment for one night solely for the purpose of facilitating the arrests, and there is no allegation that this affected the defendants' ability to defend against the case.

In addition, Cadden cites no case law in support of his argument that the government's decision to seek arrest warrants and/or move to seal the case pending execution of the arrest warrants should give rise to an evidentiary hearing. First, probable cause clearly existed, and the court found no impropriety when it issued the arrest warrants and granted the motion to seal. See

---

[8] To the extent that this decision holds that the government's motion to seal the indictment pending execution of the arrest warrant or its seeking of an arrest warrant in that case was error, the government submits that it was wrongly decided.

Fed. R. Crim. P. 6(e)(4) ("The magistrate judge to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial."). Second, as noted previously, these decisions rested squarely within the government's prosecutorial discretion, and a hearing requiring government attorneys to explain why they made these decisions is not warranted. As such, Cadden's request that the Court conduct an evidentiary hearing into the government's motion to seal the case pending execution of the arrest warrants should be denied.

        B.      <u>The Government's Request that Cadden Be Detained Pending Trial Was Proper.</u>

The government was entitled to seek Cadden's and defendant Glenn Chin's detention pending trial in this case. See 18 U.S.C. §§ 3142(f)(1)(B) (authorizing request for detention in a case in which the maximum sentence is life imprisonment) and 3142(f)(2)(A) (authorizing request for detention where defendant poses a serious risk of flight). As was the decision to seek arrest warrants and move to seal the case pending their execution, the question of whether the government will seek detention in criminal cases rests within its discretion and does not form the basis for a remedy just because the defendant disagrees with it. As the government argued at the detention hearing, both defendants face RICO charges, including twenty-five acts of second degree murder, and the potential for life imprisonment if convicted on all counts. Furthermore, the government perceived Cadden and Chin to pose serious flight risks. Both were unemployed and unemployable as pharmacists, their trained profession, after the fungal meningitis outbreak. Cadden has substantial wealth, and Chin has foreign family contacts. The strength of the evidence against both defendants is strong. The government properly introduced evidence during the detention hearing demonstrating the strength of its case not to inflame the potential jury pool, but to demonstrate to the court that the strength of the evidence in the case supported

its argument that the defendants posed serious flight risks. While the government was not successful in convincing the court to detain these defendants pending trial, the court agreed that both defendants posed enough of a risk of flight that it ordered that they be released on the stringent conditions of home confinement with ankle bracelets, and also, in the case of Cadden, a secured bond. It cannot seriously be disputed that the government's detention requests for both defendants were proper.

Finally, amendment of Cadden's conditions of release is not a proper remedy for any of his complaints surrounding his arrest and detention hearing, and he cites no cases in support of this request. Cadden's release conditions must be tied to his risk of flight,[9] not to whether he has complaints about the circumstances of his arrest. His request that the Court amend his release conditions to make them less stringent should be rejected.

### III. THE GOVERNMENT'S PRESS RELEASES REGARDING FORFEITURE AND ITS MOTIONS TO SEAL WERE NOT IMPROPER, NOR HAS CADDEN DEMONSTRATED ANY RESULTING HARM.

Cadden's final argument is that the government coordinated its efforts to forfeit and seize Cadden's assets in order to allow it to issue prejudicial press releases to further taint the jury pool. See Mem. at 28. This is simply untrue. Attorneys from the government's Civil Division, including the Asset Forfeiture Unit, have taken steps, in coordination with the criminal prosecutors, to forfeit Cadden's property as set forth in the indictment. In the case of the seizure of Cadden's boat and car, the government sought an unsealing of the seizure warrant for the sole purpose of contacting Cadden's counsel to try to obtain Cadden's cooperation in seizing the car, which was located on his property, rather than seize it without warning. At no point did any government attorney "abuse[] the sealing process," and Cadden's baseless accusation that they did so is irresponsible. Mem. at 29.

---

[9] The government does not assert that Cadden currently poses a danger to the community.

Similarly, the government's press releases have not been used as a tactic to taint the jury pool, and there was nothing "inflammatory" about them, including their recitation of the charges against Cadden. The government has issued two press releases in connection with its forfeiture actions against Cadden's property, and Cadden does not indicate that either was picked up by the media. The U.S. Attorney's Office issued both releases as part of its efforts and obligation to keep the public, including the more than 750 victims, apprised of its actions to seek justice in this case. Cadden's request that the Court order the U.S. Attorney's Office to stop issuing "inflammatory" press releases is baseless, improper, and unnecessary, and the Court should reject it along with the Motion's other unsupported requests and hyperbolic accusations.

## CONCLUSION

For all of the above reasons, the United States respectfully requests that the Court deny the Motion.

        Respectfully submitted,

        CARMEN M. ORTIZ
        UNITED STATES ATTORNEY

By:   /s/ Amanda P.M. Strachan
      AMANDA P.M. STRACHAN
      BBO # 641108
      GEORGE P. VARGHESE
      Assistant United States Attorneys
      John J. Moakley United States Courthouse
      One Courthouse Way, Suite 9200
      Boston, Massachusetts 02210
      (617) 748-3100
      amanda.strachan@usdoj.gov
      george.varghese@usdoj.gov

Dated:  November 27, 2015

Certificate of Service

      I hereby certify that the foregoing documents filed through the ECF system will be sent electronically to counsel for the defendants, who are registered participants as identified on the Notice of Electronic Filing (NEF).

                                      By:   /s/ Amanda P.M. Strachan
                                                   AMANDA P.M. STRACHAN
                                                   Assistant United States Attorney

Dated:  November 27, 2015