UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

UNITED STATES OF AMERICA )
)
v. )          Court No.:  14-cr-10363-RGS
)
BARRY J. CADDEN, et al., )
)
Defendants. )
_____)

**GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
COUNT 1 (RICO) AND COUNT 2 (RICO CONSPIRACY),
AND TO STRIKE MURDER RACKETEERING ACTS FROM COUNT 1**

The United States of America hereby opposes the Motion to Dismiss Count 1 (RICO) and Count 2 (RICO Conspiracy) and to Strike Murder Racketeering Acts from Count 1 (Doc. No. 404) [hereinafter, the "Motion"], filed by defendants Barry Cadden, Glenn Chin, Gene Svirskiy, Christopher Leary, Joseph Evanosky, Scott Connolly, Sharon Carter, Robert Ronzio, and Alla Stepanets (collectively, the "defendants").[1]  The Indictment was returned by a legally constituted and unbiased grand jury, and is valid on its face.  The Indictment charges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and enumerates 78 racketeering acts, spanning three-and-a-half years, including 25 acts of second-degree murder.  The charges and the racketeering acts are well pled, and inform the defendants as to the nature of the charges against them.  Accordingly, the Indictment is sufficient to call for trial on the merits of the defendants' case, and therefore, the Motion should be denied.

**LEGAL STANDARD**

It has long been held that "[a]n indictment returned by a legally constituted and unbiased grand jury…if valid on its face, is enough to call for a trial of the charge on the merits.  The Fifth

---

[1]  It is unclear why defendant Robert Ronzio joins in this Motion since he is not charged in either count, and therefore, lacks standing to contest them on behalf of his co-defendants.

Amendment requires nothing more." <u>Costello v. United States</u>, 350 U.S. 359, 409 (1956).  <u>See also</u>, <u>United States v. Reed</u>, 27 F. Cas. 727, 738 (N.D.N.Y. 1852) ("No case has been cited, nor have we been able to find any, furnishing an authority for looking into and revising the judgment of the grand jury upon the evidence…..").  "In order for a criminal indictment to be sufficient, all that is required is that the indictment '…shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.'"  <u>United States v. Mavroules</u>, 819 F. Supp. 1109, 1112 (D. Mass. 1993) (<u>quoting</u> Fed. R. Crim. 7(c)).  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." <u>Hamling v. United States</u>, 418 U.S. 87, 117 (1974).

The First Circuit has held that, "[b]ecause the public maintains an abiding interest in the administration of criminal justice, dismissing an indictment is an extraordinary step." <u>United States v. Li</u>, 206 F.3d 56, 62 (1st Cir. 2000).  "When a federal court uses its supervisory power to dismiss an indictment it directly encroaches upon the fundamental role of the grand jury.  That power is appropriately reserved, therefore, for extremely limited circumstances." <u>Whitehouse v. U.S. District Court</u>, 53 F.3d 1349, 1360 (1st Cir. 1995).  <u>See</u> <u>United States v. Morrison</u>, 449 U.S. 361, 365 (1981) (holding that dismissal of an indictment was unwarranted absent a constitutional violation that prejudiced a defendant's case).

When evaluating an indictment's sufficiency, a court must "look to see whether the document sketches out the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense." <u>United States v.  Geurrier</u>, 669 F.3d 1, 3 (1st Cir. 2011) <u>see</u> <u>also</u> <u>United States v.</u>

Stewart, 841 F. Supp. 2d 431, 434 (D. Me. 2012) ("Unlike civil actions, an indictment is not generally subject to dispositive motion practice.").  "A motion to dismiss an indictment is not a device for a summary trial of the evidence, but rather it is directed only to the question of the validity of the indictment on its face."  United States v. Vincenzi, 1998 WL 98634, at *3 (D. Mass. Feb. 16, 1998).  In evaluating the indictment, all allegations set forth within it are assumed to be true.  Geurrier, 669 F.3d at 3-4; Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 343 n.16 (1952).  "Consistent with that rule, courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations."  Geurrier, 669 F.3d at 4.

Similarly, a court cannot weigh factual issues that must be left for a jury's determination.  United States v. Young, 694 F. Supp. 2d 25, 27 (D. Me. 2010); see also United States v. Marbelt, 129 F. Supp. 2d 49, 56 (D. Mass. 2000) (holding that where "the questions raised in the motion to dismiss the indictment involve mixed questions of fact and law, properly decided at trial, a motion to dismiss must be denied"); Vincenzi, 1998 WL 98634, at *3 ("When the pretrial motion raises questions of fact which are intertwined with issues involving the merits, a determination of that matter must be deferred until trial.").

## INDICTMENT ALLEGATIONS

The Indictment here alleges that New England Compounding Pharmacy, Inc., doing business as New England Compounding Center ("NECC"), was a compounding-only pharmacy licensed in the Commonwealth of Massachusetts.  Indictment, Doc. 1 at 2.  NECC sold drugs identified as sterile to medical facilities located throughout the country.  Id.  Medical Sales Management, Inc. ("MSM"), a Massachusetts corporation that shared ownership with NECC, provided sales and administrative services to NECC.  Id.

Defendant Cadden, was a licensed pharmacist, and was an owner and director of NECC. Id. Defendant Cadden served as NECC's president, head pharmacist, and Manager of Record. Id. Defendant Chin was also a licensed pharmacist, and served as a supervisory pharmacist at NECC overseeing all aspects of NECC's production and personnel in two clean rooms. Id. at 3. Defendants Svirskiy, Leary, and Evanosky were licensed pharmacists working in the clean rooms at NECC. Id. at 3-4. Defendant Connolly surrendered his pharmacy technician license in January 2009 in connection with a disciplinary action, but nonetheless worked as a pharmacy technician at NECC. Id. at 4. Defendant Carter was NECC's Director of Operations. Defendant Stepanets was a licensed pharmacist who worked at NECC. Id.

Count 1 of the Indictment, the substantive RICO count, alleges that NECC and MSM operated as an enterprise whose objective was to obtain money and property through materially false and fraudulent representations about its drug products and its compounding practices. Id. at 11. Specifically, Count 1 alleges that defendant Cadden instructed the MSM sales force to falsely represent to customers that NECC was providing the highest quality compounded drugs, and met the United States Pharmacopeia's ("USP") standards for sterile compounding. Id. 11-12. MSM's marketing materials also falsely claimed that NECC had a strictly enforced environmental monitoring program and a comprehensive end-product testing program for its drugs. Id. at 12.

Count 1 further alleges numerous unsafe and substandard production practices at NECC over a several-year period, including the use of expired and expiring ingredients, the use of expired and expiring stock solutions, improper sterilization of drugs, improper testing of drugs, improper mixing of lots, fraudulent labeling, and using an unlicensed pharmacy technician to fill drug orders. Id. at 12-15. Count 1 further alleges pervasive insanitary conditions within

NECC's clean rooms, including action-level sampling hits during thirty-seven out of thirty-eight weeks in 2012, and mold and/or bacteria detected on twenty-seven separate occasions during that time.  Id. at 16-17.

Count 1 alleges that as part of their employment at NECC, defendants Cadden, Chin, Svirskiy, Leary, Evanosky, and Connolly conducted the affairs of the enterprise, NECC and MSM, through a pattern of racketeering activity, and in particular, manufactured dangerous drugs, including non-sterile drugs, sub-potent drugs, untested drugs, expired drugs, and drugs produced by an unlicensed technician.  Id. at 12-15.  These dangerous drugs were shipped to unsuspecting NECC customers throughout the country for use on their patients.  Id. at 23-24, 29-35.  The Indictment further alleges that the use of the non-sterile methylprednisolone acetate ("MPA") caused the deaths of twenty-five patients in seven different states.  Id. at 25-29.  In total, Count 1 lists 78 individual racketeering acts of either mail fraud or second-degree murder spanning two-and-a-half years, with the earliest charged racketeering act occurring on March 25, 2010, and the last charged act occurring on September 27, 2012.  Id. at 19-29.

Count 2 of the Indictment charges defendants Cadden, Chin, Svirskiy, Leary, Evanosky, and Connolly, as well as defendants Carter and Stepanets, with conspiring to conduct the affairs of the enterprise, NECC and MSM, through a pattern of racketeering activity, and in particular, with conspiring in the production and shipment of dangerous drugs, including non-sterile drugs, sub-potent drugs, untested drugs, expired drugs, and drugs produced by an unlicensed technician.  Id. at 36-37.

On December 16, 2014, the Indictment was returned by a legally constituted and unbiased grand jury, and it is valid on its face.  Counts 1 and 2 are well pled, and inform the

defendants as to the nature of the charges against them.  Accordingly, the Indictment is sufficient to call for trial on the merits of the defendants' case.

## THE MOTION

In their Motion, the defendants do not challenge the validity of the grand jury, but instead make numerous erroneous legal and factual assertions.  Specifically, the defendants raise four unfounded arguments in their Motion: (i) the Indictment fails to charge a pattern of racketeering activity; (ii) the Indictment fails to charge the necessary element of causation as to the second-degree murder racketeering acts; (iii) Count 1 is void for vagueness; and (iv) the second-degree murder acts must be stricken for usurping the power of Congress.  The government respectfully submits that all of the defendants' arguments are wholly without merit, and therefore, the Motion should be denied.

## ARGUMENT

### I.       The Indictment Clearly Alleges a Pattern of Racketeering Activity.

In order to allege a RICO violation under Section 1962(c), the indictment must allege that the defendants engaged "in the conduct of such enterprise's affairs through a pattern of racketeering activity…."  18 U.S.C. § 1962(c).  The term "pattern of racketeering activity" is defined in the statute as "at least two acts of racketeering activity…the last of which occurred within ten years…after the commission of a prior act of racketeering activity."  18 U.S.C. § 1961(5).  The Supreme Court has explained that the term "pattern" means that the indictment must allege that "the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity."  H.J. Inc. v. Northwestern Bell Tele. Co., 492 U.S. 229, 239 (1989) (emphasis in original).  "It is this factor of *continuity plus relationship* which combines to produce a pattern."  Id. (quoting S. Rep. No. 91-617, at 158) (emphasis in original).

"Whether the government can prove that a pattern existed by demonstrating the requisite relatedness and continuity of the predicate acts is a question properly reserved for trial." <u>United States v. Boidi</u>, 2006 WL 456004, at *2 (D. Mass. Feb. 24, 2006) (O'Toole, J.) (denying motion to dismiss on this ground). As Judge O'Toole explained:

> I do not read <u>H.J. Inc.</u> to require that relatedness and continuity be particularly alleged in the indictment. A common sense reading of <u>H.J. Inc.</u> instead suggests that the Court's explication was meant to provide guidance as to what types of evidence would satisfy RICO's "pattern" requirement. "Relatedness" and "continuity" are not elements of the offense, but rather means of proving a pattern of racketeering.

<u>Id.</u>; <u>see also</u> <u>United States v. Mavroules</u>, 819 F.Supp. 1109, 1117-18 (D. Mass. 1993) (Collings, M.J.) ("Accepting the allegations of the indictment as true, as must be done in determining sufficiency, the indictment is sufficient. It is true that at trial, the Government must offer evidence sufficient for the jury to find beyond a reasonable doubt that 'a pattern of racketeering activity' has been proved. But 'continuity' and 'relatedness' need not be alleged."), <u>affirmed by id.</u> at 1110 (Mazzone, J.) (affirming magistrate judge's denial of motion to dismiss RICO count); <u>United States v. Andriano</u>, 2005 WL 1267906, at *2 (M.D. Fla. May 27, 2005) (denying motion to dismiss on the ground that "neither continuity nor relationship need to be alleged in the indictment"); <u>United States v. Urso</u>, 369 F.Supp.2d 254, 261 (E.D.N.Y. 2005) (dismissing motion to dismiss on the ground that defendants' relatedness arguments were premature). Accordingly, as was held in <u>Boidi</u> and <u>Mavroules</u>, the Court should dismiss the Motion on this ground without reaching the merits.

Nevertheless, if the Court elects to address the merits of the defendants' arguments, the Indictment in this case clearly alleges 78 enumerated racketeering acts spanning two-and-a-half years that easily satisfy the continuity-plus-relationship test. Accordingly, the 78 enumerated

racketeering acts form a pattern of racketeering activity, and therefore, the argument should be rejected on its merits as well.

    A.  <u>The 78 Racketeering Acts Alleged in the Indictment Are Clearly Related.</u>

With respect to the first prong of the test, relatedness, the Supreme Court has explained that "Congress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways." <u>Id.</u> at 248-49. Therefore, the Court adopted an expansive definition for "relatedness" that encompasses "criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." <u>Id.</u> at 240 (<u>quoting</u> 18 U.S.C. § 3575(e)). The First Circuit has noted that racketeering acts cannot be viewed "in a piecemeal fashion" or "in isolation," but rather "[i]t is the relationship between the acts and the affairs of the enterprise that renders [the defendant's] conduct a pattern of racketeering activity under RICO." <u>United States v. Angiulo</u>, 897 F.2d 1169, 1180 (1st Cir. 1990). <u>See also</u> <u>United States v. Indelicato</u>, 865 F.2d 1370, 1383 (2d Cir. 1989) (holding that "two racketeering acts that are not directly related to each other may nevertheless be related indirectly because each is related to the RICO enterprise); <u>United States v. Qaoud</u>, 777 F.2d 1105, 1116 (6th Cir. 1985) (holding that racketeering acts need not be interrelated but instead "all that is necessary is that the acts are connected to the enterprise").

Applying these well-settled principles to the Indictment in this case, the 78 alleged racketeering acts clearly satisfy the relatedness test. All of the 78 racketeering acts involve NECC's manufacturing of dangerous drugs, including non-sterile drugs, sub-potent drugs, untested drugs, expired drugs, and drugs produced by an unlicensed technician. All of the 78

racketeering acts involve NECC's manufacturing of dangerous drugs by the defendants during the course of their employment at NECC, the enterprise.   Defendant Cadden, the head pharmacist at NECC, is charged in each of the 78 racketeering acts.   It is beyond question that the 78 racketeering acts are related to each other, and the affairs of the enterprise.

The defendants' only argument in their Motion on the relatedness point is that "[t]he murders…put an end to the business, and to the enterprise that was generating [the mail fraud] revenues."   Memorandum in Support of Motion (Doc. No. 405) ("Mem.") at 6.   At its core, this is a factual defense to the murder acts on behalf of defendants Cadden and Chin.   Whether the murders are related to the enterprise and part of a pattern of racketeering is a factual question that should be addressed by the jury, rather than this Court at this stage.   See Vincenzi, 1998 WL 98634, at *3 ("When the pretrial motion raises questions of fact which are intertwined with issues involving the merits, a determination of that matter must be deferred until trial.").   In addition, defendants Cadden and Chin are not charged with killing the twenty-five victims named in the Indictment (along with the thirty-nine others) with the specific intent to do so. Instead, they are charged with acting with extreme recklessness and a wanton and willful disregard for human life, in the course of trying to generate revenues for the enterprise.   The government submits that the trial of the case will reveal overwhelming evidence of these defendants' unconscionable indifference to the lives of NECC's patients in the pursuit of increasing profit.   Accordingly, the Motion should be denied.

B.   The 78 Racketeering Acts Over Two and a Half Years Clearly Satisfy the Continuity Requirement.

The Supreme Court has made clear that the continuity requirement may be proven in "a variety of ways, thus making it difficult to formulate in the abstract any general test for continuity."   H.J. Inc., 492 U.S. at 241; see also United States v. Connolly, 341 F.3d 16, 30 (1st

Cir. 2003) (internal citations omitted) ("We have previously indicated that it is difficult to formulate in the abstract any general test for the continuity required for a pattern.").  The Court explained that "[c]ontinuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  Id. at 241.  Closed-ended continuity is defined as "continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  Id. at 242.  By contrast, open-ended continuity is defined as a scenario "where the related predicates themselves involve a distinct threat of long-term racketeering activity."  Id.  "[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."  Id.  In this case, the 78 alleged racketeering acts satisfy both the closed- and open-ended continuity tests.

1. The 78 Racketeering Acts Over Two and a Half Years Sufficiently Satisfy the Closed-Ended Continuity Test.

To establish closed-ended continuity, the indictment must allege a series of racketeering acts that extend "over a substantial period of time."  Id. at 242.  What constitutes "a substantial period of time" has not been specifically defined by the courts.  Id.; see also Home Orthopedics Corp. v. Rodriguez, 781 F.3d 521, 529 (1st Cir. 2015) (noting that "the Supreme Court and this court have declined to spell out specifically how many predicate acts, or how long the racketeering has to endure, for a plaintiff to satisfactorily allege the pattern requirement").  While acts that span a few weeks or months have been held to be insufficient, "where the temporal duration of the alleged activity and the alleged number of predicate acts are so extensive that common sense compels a conclusion of continuity, closed-ended continuity should be found."  Giuliano v. Fulton, 399 F.3d 381, 387 (1st Cir. 2005) (internal citation omitted).  Accordingly, courts, including the First Circuit, have found closed-ended continuity where the criminal

activity spans a period of years.  See e.g., Fleet Credit Corp. v. Scion, 893 F.2d 441, 447 (1st Cir. 1990) (holding that 95 fraudulent mailings over four-and-a-half years satisfied continuity); United HealthCare Corp. v. Am. Trade Ins. Co., 88 F.3d 563, 572 (8th Cir. 1996) (finding multiple acts of mail and wire fraud over a two-year period to be sufficient for closed-ended continuity); Uniroyal Goodrich Tire Co. v. Mut. Trading Corp., 63 F.3d 516, 524 (7th Cir. 1995) (finding continuity with respect to multiple acts of wire and mail fraud involving single victim over a three-year period); Tabas v. Tabas, 47 F.3d 1280, 1294 (3d Cir. 1995) (en banc) (finding scheme that lasted three-and-a-half years to be sufficient for closed-ended continuity); Atlas Pile Driving Co. v. DiCon Financial Co., 886 F.2d 986, 994 (8th Cir. 1989) (finding that a period of three years "is not sporadic activity, nor is it the type of conduct occurring over a few weeks or months"); Fleischhauer v. Feltner, 879 F.2d 1290, 1298 (6th Cir. 1989) (finding 9 mail fraud and wire fraud acts defrauding 19 investors during a two-year period satisfied continuity).

Applying these holdings to the Indictment in this case, the 78 alleged racketeering acts sufficiently satisfy the closed-ended continuity test.  As noted above, the acts span two-and-a-half years, with the earliest charged racketeering act occurring on March 25, 2010, and the last charged act occurring on September 27, 2012.  This is not sporadic criminal activity.  The 78 alleged racketeering acts involve numerous types of drugs manufactured at NECC and 74 different victims – both individual patients and NECC medical facility customers – located throughout the country.  The alleged racketeering acts are so extensive in both number and duration that "common sense compels a conclusion of continuity."  Giuliano, 399 F.3d at 387.

In their Motion, the defendants make multiple creative arguments to try to get around the clear continuity between the 78 racketeering acts as alleged in the Indictment.  First, they attempt to segregate the 25 murder racketeering acts from the remaining 53 acts, and argue that they

occurred too close in time to establish continuity.  See Mem. at 7-8.  The defendants' alternative

argument is that 25 murder racketeering acts should be grouped with some mail fraud acts, but

not others, thereby trying to justify a conclusion that all of the criminal activity occurred during

the summer of 2012.  See Mem. at 9-10.  But evaluating the continuity requirement based on just

a portion of the racketeering acts charged defies case precedent, and common-sense.  The

defendants cannot simply cherry-pick which of the 78 alleged racketeering acts they believe

should apply (and which should not).  The defendants cite no authority for this proposition.

Instead, the Court must evaluate the Indictment as a whole, including all 78 of the alleged

racketeering acts over a two-and-half year period.  See United States v. Barker Steel Co., 985

F.2d 1123, 1125 (1st Cir. 1993) ("We read an information as a whole and we construe the

allegations in a practical sense, with all necessary implications.").  The continuity test is easily

satisfied here.

2.   The 78 Racketeering Acts Also Satisfy the Open-Ended Continuity Test.

The Supreme Court's open-ended continuity test states that "the threat of continuity may

be established by showing that the predicate acts or offenses are part of an ongoing entity's

regular way of doing business."  H.J. Inc., 492 U.S. at 230.  In such circumstances, the alleged

racketeering acts themselves may be short-lived, but the enterprise itself is established, and there

exists a threat of future criminal activity.  See e.g., United States v. Hively, 437 F.3d 752, 762

(8th Cir. 2006) (concluding open-ended continuity existed where four predicate acts over a

period of a year); United States v. Khan, 53 F.3d 507, 515 (2d Cir. 1995) (finding that mail fraud

acts committed within nine weeks was sufficient for continuity where "the clinics regularly

engaged in defrauding Medicaid"); United States v. Maloney, 71 F.3d 645, 661 (7th Cir. 1995)

(finding that racketeering acts of bribery and concealment "were a regular way of conducting

defendant's ongoing legitimate business"); Ticor Title Ins. Co. v. Florida, 937 F.2d 447, 450 (9th Cir. 1991) (finding three acts within 13-month period sufficient for continuity where "this practice had become a regular way of conducting business at [the enterprise]").

Courts have noted that "the threat of continuity need not be established solely by reference to the predicate acts alone; facts external to the predicate acts may, and indeed should, be considered." United States v. Busacca, 936 F.2d 232, 238 (6th Cir. 1991). The threat of ongoing activity should be evaluated from the time of the offense prior to government intervention. See Hively, 437 F.2d at 762 (explaining the threat of ongoing activity at the time of the offense). As the Sixth Circuit has explained, "[a]ll racketeering activity must necessarily come to an end sometime. The lack of a threat of continuity of racketeering cannot be asserted merely by showing a fortuitous interruption of that activity such as by an arrest, indictment, or guilty verdict." Busacca, 936 F.2d at 238; see also United States v. Richardson, 167 F.3d 621, 626 (D.C. Cir. 1999) ("The fortuitous interruption of racketeering activity such as by an arrest does not grant defendants a free pass to evade RICO charges.").

In this case, the 78 racketeering acts alleged in the Indictment satisfy the open-ended continuity test as well. All of the 78 racketeering acts involve NECC's manufacturing of dangerous drugs, including non-sterile drugs, sub-potent drugs, untested drugs, expired drugs, and drugs produced by an unlicensed technician. All of the 78 racketeering acts involve NECC's manufacturing of dangerous drugs by the defendants during the course of their employment at NECC, the criminal enterprise. At the time the offenses occurred, all of the 78 racketeering acts were part of NECC's regular way of conducting business. This fact is further confirmed by the general manner and means allegations in the Indictment, which allege that NECC's unsafe and substandard production practices had been ongoing for several years prior to the enumerated

racketeering acts.  See Indictment, at 12-14 (noting the use of expired and expiring ingredients since at least 2008, the use of expired and expiring stock solutions since at least 2009, improper sterilization since at least 2009, mixing of drug lots since at least 2009, improper testing since at least 2006, shipments of untested lots since at least 2008, and use of an unlicensed technician since 2010).

The defendants' only argument on this point is that NECC ceased its operations in October 2012, and therefore, could not be "ongoing."  Left unstated in the Motion, however, is that the cessation of NECC's operations was a direct result of the rapid response of federal and state regulators, including the CDC, the FDA, the Tennessee Department of Health, and the Massachusetts Board of Registration in Pharmacy, who correctly identified fungal meningitis in patients, and identified its source as NECC's MPA.  But for their coordinated response, NECC's operations (and the fungal meningitis outbreak) would have continued unabated.  See Rachel M. Smith et al., Estimated Deaths and Illnesses Averted During Fungal Meningitis Outbreak Associated with Contaminated Steroid Injections, United States, 2012-2013, 21 Emerging Infectious Disease 933, 937 (2015), available at http://wwwnc.cdc.gov/eid/article/21/6/14-1558_article (DOJ_NECC003720876-DOJ_NECC003720883) (estimating 153 infected patients and 124 deaths averted by the aggressive intervention of federal and state regulators).  This "fortuitous interruption" by the government was the sole reason NECC's criminal enterprise did not continue into the future.  The defendants should not be able to use that fact as "a free pass to evade RICO charges."  Richardson, 167 F.3d at 626.

Because the 78 racketeering acts alleged in the Indictment satisfy both the closed- and open-ended continuity tests, the Motion should be denied on this ground as well.

## II.     The Indictment Clearly Alleges that Defendants Cadden and Chin Committed Second-Degree Murder.

The defendants' second argument in their Motion is that the second-degree murder racketeering acts should be stricken because "the indictment makes no such link between any of these compounding practices and the second degree murder racketeering acts." Mem. at 13.  The defendants concede however, that the Indictment "cite[s] the state second degree murder statute which was allegedly violated," and "summarizes the state of mind imputed to Cadden and Chin in allegedly committing second degree murder, in terms that parrot the second degree murder statutes of the respective states." Mem. at 3.  That is all that the law requires. See Hamling, 418 U.S. at 117 ("It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.").

The defendants argue that they cannot tell from the Indictment, "[w]hat did Cadden and Chin do that caused the deaths of these 25 people?" Mem. at 15.   Once again, this is a sufficiency of the evidence challenge that will be answered by a jury at trial.  See Geurrier, 669 F.3d at 4 ("Consistent with that rule, courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations.").   The government submits that the trial in this case will reveal overwhelming evidence of the two defendants' extreme recklessness and wanton and willful disregard for human life that directly caused the deaths of the twenty-five individuals named in the Indictment.  It was not a "mere coincidence," Mem. at 14, as the defendants suggest, that these twenty-five people died after receiving injections of NECC's MPA.  Every one of these 25 deaths would not have occurred *but*

*for* the defendants' extreme recklessness.  This was not an unfortunate unexplainable tragedy; this was murder.

Because the 25 second-degree murder acts are properly alleged in the Indictment, the Motion should be denied on this ground as well.

## III.    RICO Is Not Void for Vagueness as Applied to the Defendants.

The defendants' third argument in their Motion is that the RICO statute is unconstitutionally vague as applied to them because "the defendants cannot be said to have been on notice that they were operating NECC through a pattern of racketeering activity…."  Mem. at 17.  In sum, defendants argue that they, as pharmacists or pharmacy technicians, were unware that they could be criminally prosecuted for widespread and pervasive fraud and conduct so extreme and reckless that it led to the outbreak and twenty-five deaths.  This argument is equally unavailing.

Though Justice Scalia, in his concurrence in H.J. Inc., invited vagueness challenges, see 492 U.S. at 255-56, all ten courts of appeals, including the First Circuit, that have addressed the issue since then, have rejected these challenges.  See e.g., United States v. Keltner, 147 F.3d 662, 667 (8th Cir. 1998) (upholding constitutionality of statute in case involving robbery and kidnapping); Columbia Natural Res. v. Tatum, 58 F.3d 1101, 1106-07 (6th Cir. 1995) (holding statute is not vague in fraud case involving oil well drillers); United States v. Freeman, 6 F.3d 586, 597 (9th Cir. 1993) (rejecting vagueness challenge in bribery case involving state legislature staff member); United States v. Ashman, 979 F.2d 469, 487 (7th Cir. 1992) (rejecting vagueness challenge brought by traders and brokers of soybean futures contracts at the Chicago Board of Trade); United States v. Borromeo, 954 F.2d 245, 248 (4th Cir. 1992) (finding statute not unconstitutionally vague as to medical doctor charged with illegally distributing narcotics); United States v. Aucoin, 964 F.2d 1492, 1497 (5th Cir. 1992) (rejecting vagueness challenge in

gambling case); <u>United States v. Coiro</u>, 922 F.2d 1008, 1017 (2d Cir. 1991) (holding statute not unconstitutionally vague with respect to bribery and money laundering charges); <u>United States v. Van Dorn</u>, 925 F.2d 1331, 1334 n.2 (11th Cir. 1991) (rejecting vagueness challenge in organized crime case); <u>United States v. Woods</u>, 915 F.2d 854, 864 (3d Cir. 1990) (holding statute not unconstitutionally vague as to corruption case); <u>Angiulo</u>, 897 F.2d at 1179 (noting defendants "have not even come close" to showing the statute is unconstitutionally vague with respect to organized crime defendants).  The test is whether a person of ordinary intelligence had fair notice that his contemplated conduct is forbidden by the statute.  <u>United States v. Marquardo</u>, 149 F.3d 36, 41 (1st Cir. 1998).

While originally passed to combat organized crime, the RICO statute has been used to prosecute criminal activity in diverse settings over the past forty-five years.  As the Supreme Court has explained, "[t]he fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates breadth."  <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473 U.S. 479, 500 (1985); <u>Angiulo</u>, 897 F.2d at 1179 ("The statute is not rendered unconstitutionally vague simply because potential uncertainty exists regarding the precise reach of the statute in marginal fact situations not currently before us.").  As the Seventh Circuit has explained:

> RICO is a remedial statute only.  It does not make criminal activity that is otherwise legal; it only increases the sanction for engaging in activity that is already forbidden.  Therefore, provided the statutes criminalizing the predicate acts are not unconstitutionally vague…the defendants are on notice that they are committing crimes, and the fact that they may not be aware of the extent of their criminality and consequent exposure to punishment is a detail.

<u>United States v. Korando</u>, 29 F.3d 1114, 1119 (7th Cir. 1994).

Applying these principles to the Indictment in this case, the government submits that a person of ordinary intelligence would have fair notice that widespread and pervasive fraud in the manufacturing of drugs would be criminal conduct. Mail fraud is a well-known criminal statute, and has long-survived constitutional vagueness challenges. See e.g., Bunchan v. United States, 2011 WL 3022537, at *3 (D. Mass.  Jul. 25, 2011) (Stearns, J.) (holding that "traditional *property rights based violations* of the mail-fraud statute under 18 U.S.C. § 1341" are not unconstitutionally vague) (emphasis in original); United States v. Whitty, 688 F. Supp. 48, 54-55 (D. Maine 1988) (rejecting vagueness challenge and holding that mail fraud statute has "well-established meaning and significance in our jurisprudence"). The RICO statute has been used on countless occasions, both criminally and civilly, to prosecute defendants for mail fraud schemes. See e.g., Sedima, S.P.R.L., 473 U.S. at 500 (allowing private civil action involving predicate acts of mail fraud); Fleet Credit Corp., 893 F.2d at 447 (upholding civil RICO action alleging 95 acts of mail fraud); Ashman, 979 F.2d at 487 (rejecting vagueness challenge brought by traders and brokers of soybean futures contracts at the Chicago Board of Trade charged with criminal RICO with predicate acts of mail fraud and wire fraud); United States v. O'Brien, 994 F. Supp. 2d 167, 191 (D. Mass. 2014) (Saylor, J.) (rejecting vagueness challenges to RICO and mail fraud statutes in the context of an alleged corrupt hiring scheme); United States v. Perry, 37 F. Supp.3d 546, 550 (D. Mass. 2014) (Casper, J.) (alleging criminal RICO violation of union executives based on mail fraud and other predicate acts); Boidi, 2006 WL 456004, at *1 (alleging criminal RICO violation against union executive based on mail fraud racketeering acts among others).

Similarly, a person of ordinary intelligence would have fair notice that extreme reckless conduct resulting in the deaths of at least twenty-five individuals would be criminal conduct as well. Second-degree murder, also known as "depraved-heart" murder, is well-established at both

common-law and in case precedent.  See, United States v. Browner, 889 F.2d 549, 551-52 (5th Cir. 1989) ("Over the centuries, common-law 'malice' in the homicide context has come to encompass at least three distinct mental states, any one of which constitutes sufficient culpability for murder.  These mental states include…(3) the existence of a 'depraved heart,' another term of art that refers to a level of extreme recklessness and wanton disregard for human life."); see also United States v. Velazquez, 246 F.3d 204, 214 (2d Cir. 2001) (defining "malice required for second-degree murder…[as] reckless and wanton conduct on the part of the defendant which grossly deviated from a reasonable standard of care such that he was aware of the serious risk of death"); United States v. Wood, 207 F.3d 1222, 1229 (10th Cir. 2000) (noting that second-degree murder "involves reckless and wanton disregard for human life that is extreme in nature").  As with mail fraud, the RICO statute has been used to prosecute defendants for acts of second-degree murder.  See e.g., Maggiore v. United States, 302 Fed. Appx. 17, 20 (2d Cir. 2008) (affirming guilty plea of second-degree murder in aid of racketeering where defendant "acted under circumstances evincing a depraved indifference to human life"); United States v. Gotti, 2004 WL 32858, at *5 (S.D.N.Y.  Jan. 6, 2004) (denying motion to dismiss indictment that charged defendant with a racketeering act of second-degree murder).

Because a person of ordinary intelligence would have fair notice that widespread and pervasive mail fraud and extreme reckless conduct resulting in deaths of twenty-five individuals was criminal conduct, the Motion should be denied on this ground as well.

## IV.     The Murder Racketeering Acts Do Not Usurp Congressional Authority.

The defendants' final argument in their Motion is that the twenty-five murder racketeering acts represent an unlawful delegation of legislative authority from Congress to the USP, and is void for vagueness. Mem. at 21.  While the defendants have filed an entire separate motion on this point, the argument in this Motion is presented in a cursory fashion.  The

defendants simply claim that the Indictment is "the criminalization of a private industry code." Mem. at 21. This argument is specious.

In the Indictment, defendants Cadden and Chin are charged with twenty-five acts of second-degree murder. Nowhere in the Indictment are they charged with violating the USP. The Indictment does allege, however, that under Massachusetts law, defendants Cadden and Chin, as licensed pharmacists, were *required* to follow the standards set forth in the USP, and NECC, at defendant Cadden's direction, marketed itself as doing so. Indictment, at 6 (citing 247 C.M.R. § 9.01(3)). Accordingly, while the USP does not form the basis of the criminal charge, it is the standard by which the defendants' conduct as licensed pharmacists should be measured. Courts have routinely found that professional codes of conduct are admissible evidence by which to measure the conduct of a criminal defendant. See e.g., United States v. Williams, 445 F.3d 1302, 1308 (11th Cir. 2006) (holding that "evidence of noncompliance with civil standard of care" is admissible in prosecution of doctor for distributing drugs "outside the course of medical practice"); United States v. Feingold, 454 F.3d 1001, 1007 (9th Cir. 2006) (holding that "only after assessing the standards to which medical professionals generally hold themselves is it possible to evaluate whether a practitioner's conduct has deviated so far from the 'usual course of professional practice' that his actions become criminal"); United States v. Alerre, 430 F.3d 681, 691 (4th Cir. 2005) ("[E]vidence that a physician's performance has consistently departed from accepted professional standards supports the proposition that the physician was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice. As a result, such evidence may properly be relevant to establish that a physician contravened the criminal standard of liability.").

While the defendants' violations of the USP do not give rise to criminal charges *per se*, the Indictment alleges that the conduct of defendants Cadden and Chin deviated so greatly from the legally required USP professional standards, as required by Massachusetts law, such that they performed their duties at NECC with extreme recklessness, and acted in a wanton and willful disregard for human life.   The Indictment alleges that it was this extreme recklessness of the defendants that caused the deaths of the twenty-five named individuals.

Because the defendants' arguments with respect to the references of the USP in the Indictment are patently wrong, the Motion should be denied.

## CONCLUSION

For all the above reasons, the United States respectfully requests that the Court deny the

Motion.

Respectfully submitted,

CARMEN M. ORTIZ
UNITED STATES ATTORNEY


By:     /s/ George P. Varghese
        AMANDA P.M. STRACHAN
        BBO # 641108
        GEORGE P. VARGHESE
        Assistant United States Attorneys
        John J. Moakley United States Courthouse
        One Courthouse Way, Suite 9200
        Boston, Massachusetts 02210
        (617) 748-3100
        amanda.strachan@usdoj.gov
        george.varghese@usdoj.gov

Dated:  December 4, 2015


Certificate of Service

I hereby certify that the foregoing documents filed through the ECF system will be sent
electronically to counsel for the defendants, who are registered participants as identified on the
Notice of Electronic Filing (NEF).


By:     /s/ George P. Varghese
        GEORGE P. VARGHESE
        Assistant United States Attorney

Dated:  December 4, 2015