UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                          )
UNITED STATES OF AMERICA,                 )
                                          )        Criminal No.:  14-cr-10363-RGS
            v.                            )
                                          )        ORAL ARGUMENT REQUESTED
BARRY J. CADDEN, et al.                   )
                                          )
            Defendants.                   )
_____)

## DEFENDANTS' APPEAL OF DENIAL OF DEFENDANTS' CONSOLIDATED MOTION TO COMPEL DISCOVERY[1]

Defendants respectfully move, pursuant to Federal Rule of Criminal Procedure 59(a) and Rule 2(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, for partial reconsideration of the Order on Defendants' Consolidated Motion to Compel Discovery dated December 4, 2015.  Defendants request that this Court exercise its inherent discretion and grant the requests below, all of which are material to defendants' case preparation or seek exculpatory information.

## ARGUMENT

### I.      THE GOVERNMENT SHOULD PRODUCE *BRADY* AND *GIGLIO* MATERIAL.

Government disclosure of exculpatory material and impeachment evidence is part of the constitutional guarantee to a fair trial. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The United States Attorney's Manual directs that

---

[1] The following defendants joined in this Motion: Barry Cadden; Glenn A. Chin, Gene Svirskiy, Christopher M. Leary, Joseph M. Evanosky, Scott M. Connolly, Sharon P. Carter, Alla V. Stepanets, Robert A. Ronzio, Kathy S. Chin, and Michelle L. Thomas.

"[e]xculpatory information must be disclosed reasonably promptly after it is discovered." (*See* United States Attorney's Manual, 9-5.001(D)1.)

The government's *Brady* disclosures here have been limited to a handful of disclosures in each defendant's Rule 16 automatic discovery letters. The government has disclosed no further exculpatory information or documents, and has instead directed defendants to search the 8.8 million documents provided thus far in discovery (with hundreds of thousands more to come) to find information that may show one or more defendants' innocence.

Commentators have noted the real risks in allowing the government to satisfy its *Brady* obligations by simply pointing to a massive discovery production, especially in the electronic age where those productions are staggeringly voluminous. *See, e.g., "The Brady Dump': Problems with 'Open File' Discovery*," New York Law Journal, Sept. 4, 2009. It should go without saying that, at a minimum, the government should be required to give defendants, or identify specifically, all exculpatory documents or other information of which *it is aware* in that 8.8 million documents, even if the government does not have a burden to comb through that information itself to locate exculpatory information for defendants. And the government should also share all *Brady* material it locates going forward in future discovery being provided to defendants. The defendants' October 16, 2015, letter puts the government on notice of the types of information defendants view as exculpatory.

Defendants seek the following relating to *Brady* and *Giglio*:

1. Exculpatory evidence about FDA labs that handled NECC evidence.

One of the few specific *Brady* disclosures the government has made in this case was to share that two facilities that analyzed drugs seized from NECC in 2012 improperly destroyed samples

it was supposed to maintain. (A copy of the portions of the government's February 12, 2015, discovery letter discussing the NRL is attached at Tab E to Defendants' Consolidated Motion to Compel Discovery.) One of those labs, the FDA's Northeast Regional Laboratory's ("NRL"), which is one of the largest FDA labs, according to the material the government provided, ran so afoul of its own procedures that it lost its accreditation in September 2014 after a surprise inspection by the American Association for Laboratory Accreditation. (*Id*.) Even more troubling, the limited discovery that the government has provided on this problem suggests that the unannounced inspection was sparked at least in part on an "allegation that people were being pressured into getting certain results."[2] The relevance to the present case cannot be overstated.

The government produced summary reports and limited documentation about the NRL's systemic problems. During the telephone call to conference the present motion, the government asserted that defendants had everything that the FDA had provided to it. The government also indicated that the only information that could be relevant would relate to the particular lab *within* the NRL facility that tested (or destroyed) the NECC samples. The government agreed to look into defendants' request for the interview memoranda of all interviews, including those conducted by the FDA's Office of Internal Affairs.

That is not sufficient. There is no dispute that the FDA jointly investigated this case; accordingly, as a matter of law, all of the FDA's files are in the government's possession, custody, and control for discovery and *Brady* purposes. The fact that the FDA lab that analyzed NECC's samples lost its accreditation and incorrectly destroyed evidence relating to NECC is plainly relevant and plainly exculpatory. Defendants are entitled to more than the sanitized,

---

[2] This assertion is made in an interview summary of Brian L. Baker, the Center Director for the Food and Drug Administration Winchester Engineering and Analytical Center at page DOJ_NECC003704840. That page is not attached here, but can be provided at the Court's request.

summary documents that the FDA chose to provide to the prosecution team. And defendants should not be relegated to asking for what they need from those materials—it is exculpatory and must be affirmatively disclosed.

In addition, the full file about the labs' problems in the FDA's possession must be produced, including but not limited to: all information concerning allegations that NLR employees were pressured to reach particular results; interview memoranda; the audio files of those interviews referenced in the discovery; the quality control issues-related documents; information about the CDC small pox incident which apparently prompted the wrongful destruction of NECC samples; all documents concerning the NLR's 2012 accreditation; all documents relating to the 10-day audit of the NLR; all documents from the OIA investigation; all information relating to the NLR having "gotten sloppy with the paperwork" as discussed in the discovery materials; all documentation concerning forged documents at NLR; and, all other reports concerning the decision to strip the NLR of its accreditation.

2.  Brady Order.

Defendants seek a Court Order requiring the government to identify all documents and other information that it learns of that constitutes Brady and Giglio material.

3.  Exculpatory evidence concerning causation.

The government alleges second-degree murder racketeering acts against defendants Cadden and Chin based on three lots of methylprednisolone acetate ("MPA") injectibles. (Indictment, ¶¶56-62.) A critical element of those second-degree murder racketeering acts is that the government must prove that defendants' caused the twenty-five individuals' deaths—i.e., that

they caused the twenty-five particular MPA vials to become contaminated. *See, e.g., People v. Goecke*, 457 Mich. 442, 463 (1998); *State v. Ruane*, 912 S.W.2d 766, 774 (Tenn. Crim. App. 1995). Defendants do not believe the government can meet this heavy burden. Accordingly, defendants Chin and Cadden seek exculpatory evidence and information from the government that tends to demonstrate that the government will not be able to prove how the MPA became contaminated. Specifically, defendants requested: "All evidence that demonstrates specifically how the vials containing the MPA that were injected into individuals listed in Racketeering Acts 28-52 of Count One became contaminated with fungus." Likewise, defendants requested: "All information concerning any attempt to determine specifically how the three lots of MPA referenced in Racketeering Acts 28-32[3] of Count One, or certain vials from those lots, became contaminated."

The absence of evidence of how these three lots of MPA got contaminated would necessitate acquittals and, thus, is plainly exculpatory regarding the most serious charges in the indictment.The government should not have brought second-degree murder charges if it could not prove every element of those charges. If the government is aware of efforts to identify the specific source or cause of the contamination, it must provide defendants with the conclusions, or lack of conclusions, of those efforts.

---

[3] This request, as defendants are sure the government understood, should have referenced Racketeering Acts 28—52.

## II. ALL INTERVIEW MEMORANDA AND NOTES OF INTERVIEWS NOT PREVIOUSLY PROVIDED.[4]

Defendants request that the Court order the government to: (1) provide all interview memoranda[5] in its possession; and, (2) provide interview memoranda to defendants on a rolling basis within a reasonable time of each interview, but in no event later than two weeks after a given interview takes place. The government contends it has provided all interview memoranda in its possession and therefore, Judge Boal denied the request. Defendants ask the Court to ensure that this obligation is memorialized in a Court Order.

## III. THE GOVERNMENT'S CORRESPONDENCE WITH STATE AND FEDERAL AGENTS IS MATERIAL TO DEFENDANTS' DEFENSE AND LIKELY CONTAINS EXCULPATORY INFORMATION, IN PARTICULAR ON THE SECOND-DEGREE MURDER RACKETEERING ACTS.

The government has exerted an extraordinary degree of control over other state and federal authorities in any matter relating to NECC, often behind the scenes. Based on that control, defendants are seeking information about those communications in a limited number of states, namely, those states under whose law two defendants here are accused of murder.

The government's efforts to quash several different governmental (state and federal) depositions in the civil MDL case illustrate the government's unusual behind-the-scenes effort to control other governmental bodies and highlight why those communications are material to the

---

[4] This request includes all witnesses who were questioned or interviewed by any federal or state agency in connection with the investigation of NECC and related individuals following the fungal meningitis outbreak. It includes as well a request for notes (including those of all government employees attending the interview) and draft memos not previously provided for interviews for which the government did previously provide some information.

[5] The government should also be required to provide the bates ranges, or copies, of all documents discussed or shown to the witness during the interview.

case and likely contain exculpatory information. Parties in the civil case had noticed depositions of certain agents of the Food and Drug Administration ("FDA"). The FDA successfully opposed those efforts; the government did not intervene at that time. At a hearing last month in the MDL, however, the government acknowledged that it controlled and directed the FDA's effort to quash FDA civil deposition subpoenas. (Attached at Tab D to Defendants' Motion to Compel, Hearing of October 14, 2015, at p. 12, line 2.)

That effort might be explained by the FDA's role as part of the criminal investigation, except that the government likewise sought to influence and control the Massachusetts Board of Pharmacy ("BOP"), a state Board it claimed was *not* a formal part of the investigation. Specifically, the Massachusetts BOP also received deposition subpoenas in the civil case. Rather than intervene in the MDL case to oppose that request, the government apparently directed the BOP to oppose the clinics' efforts to depose agents of the BOP. (*Id.,* at p. 11, lines 3-23.) Only after the Massachusetts Attorney General lost the motion to oppose those BOP depositions—a motion made at the government's request—the government intervened in the MDL case to seek another bite at the apple. Judge Boal criticized the government for this approach during a recent hearing: "Clearly, you could have done that [opposed the BOP deposition request] up-front, right? But you choose [sic] to go the route of asking the Attorney General to make arguments on your behalf." (*Id.*, at p.11, lines 12-15.)

There is strong reason to believe that the government exerted similar influence over, and had material communications with, the Michigan Attorney General who had convened a grand jury relating to NECC. Defendants detailed previously the level of orchestration between the state of Michigan and the government concerning these overlapping investigations. (*See* Defendants' Objections to the July 13, 2015, Order of the Magistrate judge (Boal, M.J.) on

Defendants' Preliminary Motion to Compel Discovery.[6]) As noted there, the Michigan Attorney General publicly described "[o]ngoing coordination between state and federal investigators." (*Id.*, at p. 12). He also said: "This agreement with the United States Attorney Ortiz will allow us to coordinate with federal officials and maximize the resources dedicated to this investigation." (*Id.*, at p. 13.)

The fact of the influence itself is exculpatory—the Michigan grand jury may well have chosen to reject murder charges against Cadden and Chin. Regardless, those communications likely include information material to the defense and/or that is exculpatory. For these reasons, the government should be required to produce information responsive to paragraphs 11 and 15 of defendants October 16, 2015, discovery letter relating to the Michigan case.

In addition, the Court should order the government to share its correspondence with officials in the other states under whose law Cadden and Chin are charged with second-degree murder. (*See* Tab A, at ¶ 15 to Defendants' Motion to Compel.) That request seeks all correspondence "discussing or related to whether the activities at NECC and/or the actions (all or some) set forth in the indictment would constitute second-degree murder, manslaughter, or any other crime in those states." If state officials in those states provided information to the government indicating that the actions in the indictment might *not* constitute second-degree murder under state law, defendants are entitled to that information.

The government claims there are no such communications. To ensure that the review has been thorough, and to ensure that future communications are provided to defendants, defendants seek a Court Order requiring that such communications be provided to defendants.

---

[6] The Court previously concluded that the Michigan Attorney General was not a formal part of the investigation.

**IV.    DISCOVERY OF THE GRAND JURY EVIDENCE AND LEGAL INSTRUCTIONS PERTAINING TO COUNT 3 IS NECESSARY (1) BECAUSE THE LAW IS AND WAS UNSETTLED AND IT IS CRITICAL TO KNOW WHAT LAW THE GRAND JURY WAS TOLD APPLIED, AND (2) TO RESOLVE WHETHER THE FACTUAL AND LEGAL MISSTATEMENTS IN THE INDICTMENT WARRANT DISMISSAL OR EXCISION.**

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires an indictment to provide "a plain, concise and definite written statement of the essential facts constituting the offense charged." Thus, an indictment is sufficient if it contains the elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and enables him to enter a plea without fear of double jeopardy. *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); *accord, United States v. Serino,* 835 F.2d 924, 929 (1st Cir.1987). With respect to an indictment alleging a fraud conspiracy, the First Circuit has required that the "allegations, on their face, describe fraudulent conduct." *United States v. Yefsky,* 994 F.2d 885, 893 (1st Cir. 1993). In *Yefsky*, the First Circuit found the indictment was inadequate because it contained:

> "[C]onclusory language drawn from the mail fraud statute that Coogan had obtained this money from the GBPC members through false pretenses. It did not divulge the factual basis of this accusation. Accordingly, the count did not provide Yefsky with adequate notice of the charge against him."

*Id.*

The Defendants are seeking disclosure of grand jury minutes pursuant to Rule 6(e)(3)(E) of the Federal Rules of Criminal Procedure. This Court is authorized to Order the disclosure of grand jury minutes where the defendant sets forth a particularized need for the disclosure by demonstrating that: (a) the material sought is needed to avoid a possible injustice; (b) "the need for disclosure outweighs the need for continued secrecy"; and, (c) "the request is structured to cover only what is needed." *United States v. George*, 839 F.Supp. 2d 430, 437 (D.Mass. 2012)

(*quoting Douglas Oil Co. v. Petrol Stops Nw.,* 441 U.S. 211, 222 (1979)); *United States v. Rodriguez-Torres*, 570 F.Supp.2d 237, 241 (D.P.R. 2008)(district has substantial discretion in ordering the disclosure of grand jury minutes so that a defendant may pursue a motion to dismiss).

Disclosure is required here first because the law that applied to NECC at the time of the outbreak was confusing and contradictory. The Massachusetts Board of Pharmacy claims that NECC was required to follow Massachusetts rules because it was located in Massachusetts. That "requirement" was reiterated only after the outbreak. Furthermore, while Massachusetts requires pharmacies to follow UPS797, other states in which NECC was licensed do not. The reality is that NECC was also licensed in virtually all other states and therefore, there is great confusion then and now as to what law applied. Again, some states did not require NECC to comply with USP797, the foundation of the government's case. The law is also unclear because it is not certain at all that the FDA had authority over NECC in the manner suggested in Count II. To illustrate, the head of the FDA testified in 2012 that the FDA did *not* have authority over NECC because it was a compounder. Defendants are entitled to see if the grand jury was incorrectly charged given the confusion in the law.

Disclosure of grand jury minutes is also required because Count 3 contains a troubling blend of false statements, lawful conduct presented as unlawful, omissions, and disparaging insinuations set forth as both factual and legal assertions. The insinuations begin in Paragraph 1 of the Indictment where it is alleged that NECC "held itself out as a compounding-only pharmacy." This insinuation is repeated in Paragraph 78 where the Government opines, that the defendants "purported to be operating NECC as a state-regulated pharmacy." Paragraph 78 also adds the false legal conclusion that NECC was operating as a pharmacy "rather than as a drug

manufacturer." The Government's use of the words "held itself out" and "purported" are misleading because NECC was a licensed Massachusetts pharmacy as acknowledged by the Government in Paragraph 1 of the Indictment. More importantly, there is no mention of the fact that the FDA met with NECC and the Massachusetts Board of Pharmacy ("BOP") in February, 2003, after an inspection, and "current findings supported a compounding role." (*See* Excerpts from "FDA's Oversight of NECC and Ameridose: A History of Missed Opportunities?," Preliminary Majority Staff Report, Committee on Energy and Commerce, April 16, 2013, at p. 8, attached at Tab F to Defendants' Motion to Compel.) Additionally, the FDA concluded that the BOP would provide primary oversight. (*Id.*) The phrase "rather than" connotes that NECC was under some legal obligation to call itself a manufacturer despite the fact that it was authorized by the FDA to treat itself as a pharmacy and license by the MBP to conduct itself as a pharmacy.

Paragraphs 79-80 of the Indictment repeat some of the false insinuations in Paragraph 78, alleges that NECC customers are required to have prescriptions. The manner in which the prescriptions are described as being part of the conspiracy has the effect of alleging that this was criminal conduct when it was not. To allege this conduct to be part of the conspiracy when it was authorized and required by Massachusetts law is false and misleading warranting disclosure of Grand Jury testimony and instructions to see if the grand jury was also misled.

Paragraphs 89-91 of the Indictment perpetuate the false information by alleging that it was NECC that made false representations to the FDA in May 2003, October 2004, and January 2007 when, in fact, it was the FDA in February 2003 that told NECC that they would be treated as a Massachusetts compounding pharmacy. (*See* Indictment, ¶ 89-91, and Tab F at p.8 of Defendants' Motion to Compel.) It was impossible for NECC to misinform the FDA that it was a pharmacy when it was the FDA that authorized NECC to hold itself out as a pharmacy. To

allege this conduct to be part of the conspiracy when it was authorized and required by Massachusetts law is false and misleading warranting disclosure of Grand Jury testimony and instructions.

As a result of the way Count 3 of the Indictment is worded, the reader is left with the impression that NECC was falsely holding itself out to be something that it was not. On the contrary, NECC was approved by the FDA as early as 2003 to conduct its business in the exact manner the Government is alleging is was not entitled to do. (*See* Tab F, at p. 8 of the Motion to Compel.) Moreover, NECC was a licensed Massachusetts pharmacy as the Government notes in Paragraph 1 of the Indictment, but which the Government continues to completely ignore in its insinuations. Significantly, the Congressional Oversight Committee Report regarding NECC concluded that the "FDA is on Notice that NECC is Operating Outside the Scope of Traditional Compounding Pharmacy." (*Id.,* at p. 39.)

As a result, Count 3 of the Indictment seriously misrepresents the facts and law and omits other crucial facts as it relates to NECC's representations of itself and the FDA's knowledge of NECC's activities. These glaring deficiencies highlight the necessity for discovering exactly what the Government presented to the Grand Jury in terms of evidence and legal instructions. Based upon the foregoing, NECC has demonstrated a particularized need for disclosure of any testimony regarding NECC's representations of itself as a pharmacy. Moreover, any testimony as to what the FDA knew about NECC's activities should be disclosed because of the insinuation that NECC should have been calling itself a manufacturer. Lastly, any testimony regarding the FDA's oversight history with NECC must be disclosed, because the clear intent of Count 3 is to allege that the FDA was kept in the dark. Nothing could be further from the truth.

## V. DEFENDANTS SEEK THE MOST BASIC INFORMATION ABOUT THE SERIOUS CHARGES AGAINST THEM IN THE PREVIOUSLY FILED BILL OF PARTICULARS.

As the Court is aware, defendants requested that the government particularize the allegations in Counts 1 through 3 of the Indictment so that defendants can adequately prepare their defenses and avoid surprise at trial. The government refused, necessitating defendants' Consolidated Motion for Bill of Particulars which was filed on September 15, 2015.[7]

The government also took the position that the information sought in the Bill of Particulars was an effort to obtain discovery, not a bill of particulars. Defendants disagree for all of the reasons spelled out in their Consolidated Motion: the information sought is information that should have been included in the indictment, such as the nature and date of allegedly "false misrepresentations" on which the government relies; the dates when expired ingredients were purportedly used, and numerous allegations that must be included in an indictment as a matter of law, *see* Fed. R. Crim. P. 7(c), and of fairness. Regardless, for all of the reasons spelled out in Defendants' Consolidated Motion for Bill of Particulars, Defendants repeat their request that the Court order the government to produce this key information so they may defend themselves.

Contrary to Magistrate Boal's ruling, defendants are not requesting the government to disclose the minutiae of its case; defendants seek basic information that should have been in the indictment.[8]

---

[7] This Motion was denied. Defendants incorporate that Motion as if repeated here fully.

[8] Another issue raised in defendants' Motion to Compel was defendants' access to electronic media. The Court requested briefing on this issue and, therefore, it is not included here. Defendants' positions regarding that electronic media, as set forth in defendants' Motion, are expressly reserved.

Dated: December 18, 2015                Respectfully submitted,

BARRY J. CADDEN,
By his attorneys,


_/s/ Michelle R. Peirce_
Bruce A. Singal (BBO# 464420)
Michelle R. Peirce (BBO# 557316)
Callan G. Stein (BBO# #670569)
DONOGHUE, BARRETT & SINGAL, PC
One Beacon Street – Suite 1320
Boston, MA 02108
Telephone:  (617) 720-5090
bsingal@dbslawfirm.com
mpeirce@dbslawfirm.com
cstein@dbslawfirm.com



SHARON CARTER,
By her attorneys,



_/s/ Michael Pineault_
Michael Pineault
CLEMENTS & PINEAULT, LLP
23 Federal Street
Boston, MA 02108
Telephone:  (857) 445-0133

GLENN CHIN,
By his attorneys,


   _/s/   Stephen Weymouth_
Stephen Weymouth
LAW OFFICE OF STEPHEN WEYMOUTH
65a Atlantic Avenue, Suite 3
Boston, MA 02110
Telephone:  (617) 573-9598


KATHY CHIN,
By her attorneys,


   _/s/    Joan Griffin_
Joan Griffin
P.O. Box 133
Dublin, NH 03444
Telephone:  (617) 283-0954


SCOTT CONNOLLY,
By his attorneys,


   _/s/   Raymond Sayeg, Jr._
Raymond Sayeg, Jr.
KRATTENMAKER O'CONNOR & INGBER P.C.
One McKinley Square
Fifth Floor
Boston, MA 02109
Telephone:  (617) 523-4010

JOSEPH EVANOSKY
By his attorneys,


  */s/   Mark Pearlstein*
Mark Pearlstein
Dana McSherry
MCDERMOTT, WILL & EMERY
28 State Street
Boston, MA 02109
Telephone:  (617) 545-4000


CHRISTOPHER LEARY,
By his attorneys,


  */s/   Paul Kelly*
Paul Kelly
Sarah Walsh
JACKSON LEWIS PC
75 Park Plaza, 4th Floor
Boston, MA 02116
Telephone:  (617) 367-0025


ROBERT RONZIO,
By his attorneys,


  */s/   Peter Horstmann*  .
Peter Horstmann
LAW OFFICES OF PETER CHARLES HORSTMANN
450 Lexington Street
Suite 101
Auburndale, MA 02466
Telephone:  (617) 723-1980

ALLA STEPANETS
By her attorneys,


  /s/   John Cunha, Jr.
John Cunha, Jr.
Helen Holcomb, BBO #547538
CUNHA & HOLCOMB, PC
One State Street
Suite 500
Boston, MA 02109
Telephone:  (617) 523-4350



GENE SVIRSKIY
By his attorneys,


  /s/   Jeremy Sternberg
Jeremy Sternberg
Chris Iaquinto
HOLLAND & KNIGHT
10 St. James Avenue, 11th Floor
Boston, MA 02116
Telephone:  (617) 854-1476



MICHELLE THOMAS
By her attorneys,


  /s/   Michael Bourbeau
Michael Bourbeau
BOURBEAU AND BONILLA, LLP
236 Commercial Street, Unit One
Boston, MA 02109
Telephone:  (617) 350-6565

## CERTIFICATE OF SERVICE

I, Michelle R. Peirce, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on December 18, 2015.

_/s/   Michelle R. Peirce_
Michelle R. Peirce